IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TRACY TIMMONS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | No. 4:18cv4368 |
| VS. | § | |
| | § | Jury Trial Demanded |
| SAN JACINTO COLLEGE, | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S MOTION FOR PARTIAL
## SUMMARY JUDGMENT AS TO LIABILITY

David C. Holmes, Attorney in Charge
State Bar No. 09907150
Southern District No. 5494
13201 Northwest Freeway, Suite 800
Houston, Texas 77040
Telephone: 713-586-8862
Fax: 713-586-8863
dholmes282@aol.com

ATTORNEY FOR PLAINTIFF

# **TABLE OF CONTENTS**

NATURE AND STAGE OF THE PROCEEDING . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES AND STANDARD OF REVIEW . . . . . . . . . . 12

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

I.  Direct Evidence Shows that Ms. Timmons' Termination
    Was Retaliatory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

II. San Jacinto College Cannot Meet Its Burden of Proving That
    It Was Justified in Firing Ms. Timmons . . . . . . . . . . . . . . . . . . . . . . . . 15

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## NATURE AND STAGE OF THE PROCEEDING

This is an employment case.  Ms. Timmons worked as a research librarian for San Jacinto College from 2011 to 2017.  Beginning in 2012, she complained repeatedly about racial harassment by her immediate supervisor (John Brower) and by his supervisor (Karen Blankenship).  This culminated in an angry face-to-face meeting in June 2017 during which Ms. Timmons accused Mr. Brower and Ms. Blankenship of racism.  San Jacinto College suspended and then terminated Ms. Timmons for insubordination based on her conduct at this meeting.

This is a direct evidence case, in that there is no dispute about the reasons for Ms. Timmons' termination.  The sole issue with respect to liability is whether San Jacinto College was justified in firing Ms. Timmons solely because two of its supervisors were upset with the manner in which Ms. Timmons opposed behavior that she perceived to be racist on their part.

Discovery is complete.  As shown below, the undisputed facts establish that San Jacinto College is liable for the retaliatory termination of Ms. Timmons.

## STATEMENT OF FACTS

Ms. Timmons is a research librarian.  She started with San Jacinto College on a part-time basis in 2011 and became a full-time employee in January 2012. Timmons Dep. at 20:14 to 21:19; Appendix 23 (hiring record).  Her duties included working the reference desk, handling interlibrary loans, and serving as liaison to the

1

health sciences department.  Timmons Dep. at 21:21 to 23:8; Appendix 24 (job description).  Her immediate supervisor was John Brower, and his supervisor was Karen Blankenship, who was director of the library.  Timmons Dep. at 25:11-14.

Ms. Timmons received positive job evaluations throughout her tenure at San Jacinto College.  For example, her 2016 evaluation (which turned out to be her last evaluation) was filled with positive comments such as:

Comments by John W Brower:
Tracy is very good about staying on top of Inter Library Loans and has filled in at the Service Desk when needed to. She is warm and welcoming to the students and wants to help them.

Comments by John W Brower:
Tracy continues to do a great job teaching classes.  She hasn't had as many health science classes to teach this year as before, but every class she taught has been highly rated by the faculty.

Appendix 26-27.  There is no issue in this case about Ms. Timmons' job performance.  San Jacinto College did not terminate her for poor performance.

Beginning in late 2012, Ms. Timmons encountered harassment from Mr. Brower.  For the most part, the harassment consisted of a long string of inappropriate comments and petty slights, some of which involved race and others of which involved sex or disability (Ms. Timmons has chronic issues with her legs).  This continued for several years and culminated in the incident that led to her termination.

In 2015, Ms. Timmons filed a charge of discrimination with the EEOC, alleging harassment based on race, sex, and disability.  Appendix 36.  She received a right to sue letter in 2016, but elected not to file a lawsuit.  Appendix 37.

While the events prior to 2016 are relevant because they form the background to the events of June 2017, Ms. Timmons is not suing over any of those incidents.

2

For that matter, Ms. Timmons is not seeking separate recovery for the hostile work environment.  Instead, this lawsuit is based on the termination in June 2017.

Mr. Brower never used the more extreme forms of racial abuse, such as the N-word, references to nooses, and the like.  His modus operandi was more subtle.  Ms. Timmons explained this:

> Q.   Is -- is John Brower a talkative kind of guy? Was he chatty?
>
> A.   I think John Brower is a bully. I think John Brower knows what's going to upset you and get up under your nerves, and I think he does that purposely to bother and humiliate me.  That's what I think.

Timmons Dep. at 183:4-9.  For example, one of his comments was that white people were still the "ruling class":

> [Mr. Brower] brought up this comment.  He was talking  about minorities.  And I said, you know what?  We are participating and voting more.  He said, you know what?  We're still the ruling class, Tracy.  I looked at him.

Timmons Dep. at 202:9-15.  Sometimes Mr. Brower attempted, and failed, to be subtle in his digs at Ms. Timmons:

> And he made this derogatory comment.  It was a student in the library.  He was dressed horribly bad.  And he said, Tracy, is that your brother?  And I looked at him like no.  My brother is a professional.  First of all, he don't even live in Houston.  Second of all, he works in the petrochemical.  He can't -- he couldn't even be dressed like that because you can't work and dress like that.  He just picked this random person, random black person who was dressed really horribly bad; and then he says, is that your brother?

Timmons Dep. at 185:10-24.  Mr. Brower "always said something derogatory about black people.  Always."  Timmons Dep. at 182:17-18.

Ms. Timmons told the college that this was happening.  For example, on February 1, 2017, Ms. Timmons sent an e-mail to the manager of the HR department describing some of the ongoing harassment by Mr. Brower:

Then Monday as I was leaving the desk and he was taking over, He mentioned Mary Tyler Moore and **illegal interview questions and there was one black person on the television show.  I specially mentioned in this type of behavior in the EEOC complaint, but it still happening.**

-

-

Tuesday, Karen scheduled a meeting in her office about before everybody else came to the meeting, thus the only people present where Karen, John and Tracy Timmons, is "we can't talk about those things because of you know who."

If they can't talk about of things then why are they constantly mentioning those things in front of me, when I specifically the exact things in EEOC complaint.  He is creating a hostile work environment and do everything in his power to make me uncomfortable.  Karen does not address the behavior.

IT HAPPENING ALL OVER AGAIN!

Appendix at 42-43.

Throughout all of this, San Jacinto College never took any effective measures to resolve the issues.  Instead, San Jacinto College simply allowed the situation to simmer until it finally boiled over.  This occurred in June 2017.

The ultimate triggering event involved a relatively minor administrative issue about employees being allowed to make up hours that they had missed due to time off for doctor visits and the like.  At this point, Ms. Timmons had been enduring digs

and jabs from Mr. Brower for years.  In that context, Ms. Timmons perceived that

Mr. Brower was discriminating against her because of her race:

> Q.     . . . On the making up time issue that -- the discussions you were having with -- in [June] of 2017 about what you were doing to make up time, did you feel that there was a racial component to that?
>
> . . . .
>
> A.     Yes, I do.
>
> Q.     Okay.  Explain to us what -- why you felt there was a racial component to that.
>
> A.     Because other people had come in late.  They didn't have to fill out times.  They didn't have to send out e-mails or anything. They came in late, and they went about their day as is.  I was the only person subjected to this.
>
> Q.     Okay.  What was the race of these other people?
>
> A.     White.

Timmons Dep. at 278:21 to 279:10.  Specifically, Ms. Timmons felt that Mr. Brower

was asking her to "beg" to make up her time.  This time, Ms. Timmons expressed

her opinion in writing, accusing Mr. Brower of expecting a "slave mentality":

> What I got from the meeting was being accurate about your time, what I interpret you got out of the meeting was begging to make up the time. **As an employee I should not have to beg it is a slave mentality that you try lord over me with your ruling class comment**.

Appendix 44.  Within two minutes, Mr. Brower forwarded this e-mail to Ms.

Blankenship and to Vicki Del Bello in HR.  Appendix 44.

Ms. Blankenship was well aware that Ms. Timmons had made complaints about both Mr. Brower and her on the basis of racism.  Blankenship Dep. at 7:15 to 8:7, 12:19 to 13:2.  Incredibly, Ms. Blankenship felt that it was appropriate for <u>her</u> to confront Ms. Timmons about the "slave mentality" comment.  Even more incredibly, Ms. Del Bello in HR apparently had no problem with this:

> Q.    What responsibility did you feel you had with respect to that comment?
>
> A.    I felt that it was an uncourteous, rude, and insubordinate statement, that it was unprofessional and that that was just inappropriate for the workplace.
>
> Q.    Okay.  But you did, that day, have a meeting with Ms. Timmons and Mr. Brower.  Correct?
>
> A.    Yes.
>
> Q.    Prior to that meeting, did you talk to Ms. Del Bello?
>
> A.    Yes.
>
> Q.    What did you discuss with Ms. Del Bello?
>
> A.    I discussed with Ms. Del Bello that I was going to be meeting with Tracy again to clarify that Tracy had to check in with her supervisor and get his permission before taking time off or making up time.  And I also brought a copy -- brought a copy of the procedure that clarifies, so that Tracy would have a written record of the procedure that requires an employee to seek permission from her supervisor.
>
> Q.    Did you discuss the slave-mentality comment with Ms. Del Bello?
>
> A.    Yes.

6

Q.      Okay.  What do you recall about that discussion?

A.      I don't remember.  Honestly, I don't remember.

Q.      Well, do you remember -- did Ms. Del Bello give you any instructions for talking to Ms. Timmons?

A.      I don't remember.  Usually Vickie just reminds us to follow college policies when -- P.R. procedures when -- you know, and to show the employee how they can make the correction.

Q.      Okay.  Was there some policy or procedure that you had in mind with respect to the slave-mentality comment?

A.      Not to my knowledge, no.

Blankership Dep. at 16:4 to 17:14.  **As a result, the two San Jacinto College employees who went to see Ms. Timmons about her "slave mentality" comment were the same employees who Ms. Timmons had accused of racism.**  Not surprisingly, this turned out to be a bad decision.

The meeting took place in Ms. Timmons' office, behind closed doors. Blankership Dep. at 24:1-5.  The meeting quickly became heated, which led Ms. Blankership to excuse Mr. Brower:

Q.      As best you can remember -- and I know it's been a long time, but what do you remember that she said, as best you can recall?

A.      It was -- she was difficult to understand because she was very agitated at this point and she was quite loud.  I couldn't actually track everything she was saying.  It was -- it was -- like I said here, it was like word salad.  It was very disjointed.

I excused John from the room, and I rose to conclude the meeting.

7

Q.      Okay.  Let's talk about that.  Why did you excuse John?

A.      Because she was saying things to him -- I'm trying -- I don't remember exactly what she was saying, but I just felt that we need to bring this meeting to a close.  And, so, I excused John.

Blankenship Dep. at 22:14 to 23:10.  According to Ms. Blankenship, Ms. Timmons then began to scream at her.  Blankenship Dep. at 25:6-13.  Ms. Blankenship acknowledges that Ms. Timmons was angry about perceived racism on the part of Mr. Brower:

Q.      All right.  [S]he said:  'I'm not a N-word.  I'm not an expletive N-word, and he is not going to treat me that way.'

You understood that "he" was referring to Ms. -- Mr. Brower?

A.      Yes.

. . . .

Q.      Did you make any comments about -- you know, about you treating her that way?

A.      She did -- I think she called me a racist at some -- at some point during this; but, honestly, she was -- she was so -- I don't know the right word.  She was so agitated that it was hard to track what she was saying.  I remember this because it was quite shocking.  These words were quite shocking.

Q.      All right.  The -- just to be clear, I guess, when he talks about -- when she talked about Mr. Brower treating her like an N-word, did you understand that she felt that that -- that he was doing that with – in connection with the time issues?

A.      Did I understand that?

8

Q.      Yeah, at the time.

A.      I -- I guess she was talking about the time issues.  I don't think this is accurate, if that's what she thought.

Blankenship Dep. at 28:1-22.  Ms. Blankenship claimed to be frightened, but admits that Ms. Timmons did not actually do anything threatening and did not even begin to get out of her seat:

Q.      Okay.  And she began screaming at you, according to this.  When you say screaming at you, what do you mean?  I mean –

A.      I mean, she was -- she was -- she was screaming very loud, and she was rocketing kind of back and forth in her chair.  She was slamming stuff around on her  desk, and then she started beating on her desk with her fist.

                . . . .

Q.      The -- I mean, did she -- did she start to get up?

A.      I was afraid she was going to get up, but I left as quickly as I could -- I was already standing up because I'd rose to leave and I was standing at the side of her desk.  And she was hitting her fist on her desk.

                And at first I couldn't move, and I was afraid -- I was afraid that she would hit me, and then managed to leave -- leave -- leave and go to my office.

Q.      Okay.  Did -- well, just be clear:  Did she actually make any motions directed at you?  Did she start to get up?  Did she, you know, start to take a swing at you, anything like that?

A.      Well, no.  She was rocketing around in her chair.  So, I wouldn't have been able to tell if she was about to get up or not because

9

she wasn't sitting still. I mean, I was afraid that she was going to get up and hit me.

        . . . .

    Q.    . . . So, did she actually, to your – from what -- from your perception, start to get up?

    A.    I'm not sure. I know she was -- as I mentioned, she was moving around in her chair and beating on her -- her desk. And I was afraid that -- that -- I was afraid that she was going to hit me. I mean, I wasn't that far from her.

    Q.    Well, did she make any motion...

    A.    I left.

    Q.    Before you left, did she make any motion, you know, towards hitting you? I mean, did she draw back her arm and...?

    A.    She was -- as I said, she was moving around in her chair. She was pounding on her desk. And when -- then -- and she was also, like, slamming stuff around on her desk.

        So, I just left. I wasn't going to – I didn't want to stay there. I wanted to get out.

Blankenship Dep. at 25:6-13, 25:18 to 26:10, 27:2-19.

Ms. Timmons' version of the meeting is similar in some respects, but she does

not agree that she was "screaming" at Ms. Blankenship:

    Q.    So you deny raising your voice at all?

    A.    I won't say I deny, but I didn't scream at her. I didn't try to intimidate her like she said I did. I never hit her. I never made an attempt to hit her. I never hit anybody.

Q.     Well, and I didn't ask if you hit her or tried to hit her or whether you screamed.  I was asking whether you raised your voice at Karen Blankenship?

A.     I was -- our meeting started off as I was speaking today at this meeting. So my voice has modulated up and down depending on -- so then that's when she excused John from the room.  And then I said, Karen, I'm not a nigger.  I said, that's what you treat me like.  You treat me like I'm a nigger.  I said, I'm not a nigger.  She said, Tracy, I would never think of you like that.  I said, yes, you do.  You treat me like I'm a nigger. And then I started giving her examples.  She said, no, Tracy. That's not me.  I think you're professional.  I said, okay, but I'm not a nigger.  And I said, I am not a nigger.  She said, Tracy.  Then she said -- she said something about I had to tell -- this is a fireable offense.  I said, you have to do what you have to do, but I'm not a nigger.

So I don't know how many times I said it. I probably did let -- more today than I did at the meeting, because she didn't stay that long.  After I said that, she got very offended.

Timmons Dep. at 215:18 to 216:20.

Mr. Brower apparently saw an opportunity in this turn of events.  Incredibly, he told another library employee to call the police. Appendix 48.  When the incident ended a few moments later, he told the employee to cancel the call.  This employee (Carolyn Riddle) claimed that she heard "very loud shouting and noises."  Appendix 48.   Another witness (Rudy Silva) said that he heard an "audible but undistinguishable disturbance."  Appendix 47.

In sum, Ms. Timmons complained about racism by Mr. Brower, and San Jacinto College made the incredible decision to send Mr. Brower and Ms.

11

Blankenship to counsel her about it.  Naturally, San Jacinto College claims to be

shocked that this turned out badly, but it should have surprised no one.

In any event, the Provost of San Jacinto College terminated Ms. Timmons on

June 27, 2017:

> The purpose of this correspondence is to inform you that your employment with the College will be terminated effective today, June 27, 2017.
>
> I have completed my investigation and it has been determined that you demonstrated inappropriate behavior when Ms. Karen Blankenship was speaking with you about properly recording your leave time, and the need to request permission to flex your schedule. On Thursday, June 15, 2017, you became very aggressive and began yelling and banging your fist on the desk when Ms. Blankenship was reviewing the procedure. This behavior was extremely inappropriate and does not demonstrate the College values.
>
> Based on this recent event, the Administration has made the decision to terminate your employment effective June 27, 2017.

Appendix 49.  Thus, there is no dispute that San Jacinto College terminated Ms.

Timmons solely based on her conduct at the meeting with Ms. Blankenship.

## STATEMENT OF THE ISSUES AND STANDARD OF REVIEW

1.      Whether Ms. Timmons has established a prima facie case of retaliation

by direct evidence, thus shifting the burden of proof to San Jacinto College.

2.      Whether San Jacinto College can meet its burden of proving that Ms.

Timmons' termination was lawful even though the basis for the termination was Ms.

Timmons' opposition to racial discrimination.

The standard of review is provided by Rule 56 of the Federal Rules of Civil

Procedure: whether there is no genuine issue of material fact so that Ms. Timmons

is entitled to judgment as a matter of law.

# **ARGUMENT**

I.   <u>Direct Evidence Shows that Ms. Timmons' Termination Was Retaliatory</u>.

The typical employment case alleging discrimination or retaliation is based on circumstantial evidence.  These cases are governed by the shifting burden analysis known as the *McDonnell Douglas* test.  However, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *TWA v. Thurston*, 469 U.S. 111, 121 (1985); *Herster v. Bd. of Supervisors*, 887 F.3d 177, 185 (5th Cir. 2018).

The typical direct evidence case involves a statement made in the workplace. The issue is whether the statement is direct evidence or a mere "stray remark."  The Fifth Circuit applies a four-part test for direct evidence: whether the statement is "(a) related to the protected class of persons of which the plaintiff is a member, (b) proximate in time to the employment decision at issue, (c) made by an individual with authority over the employment decision at issue, and (d) related to the employment decision at issue."  *Haire v. Bd. of Supervisors*, 719 F.3d 356, 366 (5th Cir. 2013).

The present case is less complex than the workplace comment cases.  There is no dispute that Ms. Timmons was complaining about racial discrimination in her meeting with Mr. Brower and Ms. Blankenship, there is no dispute that the meeting became heated, and there is no dispute that San Jacinto College fired Ms. Timmons

13

for insubordination based on her actions at the meeting. However, if the Court wishes to use the workplace comment test, then (a) the termination letter expressly relates to Ms. Timmons' actions at the meeting, when she confronted Ms. Blankenship about racial discrimination; (b) the letter was proximate in time to the employment decision, in that it actually <u>was</u> the employment decision; (c) the letter was written by the Provost, who had authority over the employment decision; and (d) the termination letter obviously related to the employment decision. Accordingly, Ms. Timmons has presented direct evidence of retaliation.

In a circumstantial evidence case governed by the *McDonnell Douglas* test, the plaintiff bears the burden of proving that the employer's stated reason for terminating the plaintiff was pretextual. "If, however, the plaintiff presents direct evidence of discrimination, 'the burden of proof shifts to the employer to establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor.'" *Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*, 778 F.3d 473, 475 (5th Cir. 2015).

Because Ms. Timmons has presented direct evidence of retaliation, San Jacinto College bears the burden of proving that it was justified in firing Ms. Timmons even though she was opposing race discrimination.

14

II.    San Jacinto College Cannot Meet Its Burden of Proving That It Was Justified in Firing Ms. Timmons.

This case squarely presents the issue of when and whether protected oppositional activity can justify a termination. This is an issue that is easy to resolve in extreme cases at either end of the spectrum. For example:

(1)    If an employee files a complaint about discrimination, surely the employer cannot fire the employee for insubordination simply because the employer is offended that the employee has complained.

(2)    If an employee opposes discrimination by bringing a firearm to the office and shooting at other employees, surely the employer can fire the employee.

While those cases are simple, they are not helpful in this case. Unfortunately, the case law does not provide any assistance in drawing the line between permissible opposition and impermissible opposition. There are a few cases involving unusual facts. *E.g., Coutu v. Martin Cty. Bd. of Cty. Comm'rs*, 47 F.3d 1068 (11th Cir. 1995) ("While Oldland felt that Coutu was too aggressive in her role as an employee advocate, he criticized her in this regard *not* because she was attempting to "stop discrimination," but because she failed to complete necessary management tasks, such as the revision of the personnel manual."). The EEOC offers this vague guidance: "The activity also will not be considered reasonable if it involves an unlawful act, such as committing or threatening violence to life or property. These examples are not exhaustive; whether the manner of opposition is unreasonable is a

15

context- and fact-specific inquiry." *EEOC Enforcement Guidance on Retaliation and Related Issues* II(A)(2)(b) (https://www.eeoc.gov/laws/guidance/retaliation-guidance.cfm).

There was nothing "unlawful" about Ms. Timmons' actions. To the extent that this is a "context- and fact-specific inquiry," both the facts and the context support the conclusion that San Jacinto College was not justified in terminating Ms. Timmons:

(1)     San Jacinto College has no specific policy or rule that applies to Ms. Timmons' conduct. Obviously, it is problematic when the employer seeks to prescribe a standard of conduct for employee complaints and then apply that standard retroactively to someone who is complaining about racism.

(2)     The subjective opinions of the persons who are accused of racism (Mr. Brower and Ms. Blankenship) are of limited relevance. People who are accused of improper behavior, in this case racism, are likely to be offended by the accusation, but this cannot override the prohibition on retaliation.

(3)     On June 15, 2017, everyone knew that Ms. Timmons was protesting racism when she made the "slave mentality" comment.

(4)     San Jacinto College (through its HR rep, Ms. Del Bello) made the decision to counsel Ms. Timmons for that comment by sending two employees to talk to Ms. Timmons even though she had complained about racism by those two

employees and even though the "slave mentality" comment was directed to one of the employees.

(5)    In effect, San Jacinto College created the circumstances for an acrimonious meeting, rather than having someone else (such as Ms. Del Bello herself) handle the situation.

(6)    The meeting took place behind closed doors.

(7)    It is disputed whether Ms. Timmons "screamed" at Ms. Blankenship, but it is undisputed that Ms. Timmons did not actually do anything violent or threatening, no matter what Ms. Blankenship claims to have feared.

(8)    The whole incident was over within a minute or so.  Even though Mr. Brower opportunistically tried to call the police, he had to cancel the call.

(9)    Ms. Timmons did not commit any unlawful or criminal act.

In assessing these facts and circumstances, it is helpful to consider how similar situations have been handled in other areas of the law.  This precise issue arises commonly in the context of labor-management disputes decided by the NLRB.  To resolve these issues, the NLRB applies the *Atlantic Steel* test to determine whether the employee's conduct was "opprobrious":

> [T]he Board and the courts have recognized . . . that even an employee who is engaged in concerted protected activity can, by opprobrious conduct, lose the protection of the Act.
>
> The decision as to whether the employee has crossed that line depends on several factors: (1) the place of the discussion; (2) the subject matter

17

> of the discussion: (3) the nature of the employee's outburst; and (4) whether the outburst was, in any way, provoked by an employer's unfair labor practice.

Appendix at 50 (copy of *Atlantic Steel,* 245 NLRB 814 (1979)); Appendix at 58 (copy of *Plaza Auto Center*, 355 NLRB 493 (2010)).   As the Seventh Circuit explained:

> As other cases have made clear, flagrant conduct of an employee, even though occurring in the course of section 7 activity, may justify disciplinary action by the employer. On the other hand, not every impropriety committed during such activity places the employee beyond the protective shield of the act. The employee's right to engage in concerted activity may permit some leeway for impulsive behavior, which must be balanced against the employer's right to maintain order and respect.

*NLRB v. Thor Power Tool Co.*, 351 F.2d 584, 587 (7th Cir. 1965); *see Boaz Spinning Co. v. NLRB*, 395 F.2d 512, 514 (5th Cir. 1968) (quoting *Thor Power Tool* and stating "Unquestionably, Alexander was insubordinate; however, it seems equally clear that his short speech, although intemperate, was of a pro-union character. Thus, as a union activist making a pro-union speech, he can avail himself of the protective shield of section 7 so long as his insubordination was not so flagrant as to take him beyond the pale."); *Mobil Exploration & Producing U.S., Inc. v. NLRB*, 200 F.3d 230, 242-43 (5th Cir. 1999).   While these cases did not arise under Title VII, the *Atlantic Steel* framework is a logical way to analyze employee behavior under those statutes.

18

Applying this framework, each of the four factors from *Atlantic Steel* weighs in favor of continued protection for Ms. Timmons' conduct:

(1)    The place of the conduct was behind closed doors in Ms. Timmons' office, not out in the workplace where library employees and students could become embroiled.   In fact, Ms. Blankenship selected the location, not Ms. Timmons.   *Plaza Auto Center*, 355 NLRB at 494 ("With respect to the first factor, the place of the discussion, the meeting took place in Felix's office, in the presence of only management officials.").

(2)    The subject matter was Ms. Timmons' belief that Mr. Brower and Ms. Blankenship were discriminating against her based on race.  *Id.* ("As to the second factor, the subject matter of the discussion, the discussion involved Aguirre's protected concerted activity of raising questions about terms and conditions of employment, particularly the Respondent's policies pertaining to breaks and compensation."),

(3)    The nature of the conduct may have been "loud" or "rude" (though Ms. Timmons denies this), but there is no claim that Ms. Timmons was profane, violent, or threatening.  *Id*. at 495 ("The Board has found that communications in the course of protected activity are also protected unless they are 'so violent or of such serious character as to render the

19

employee unfit for further service.'"). In *Plaza Auto Center*, the NLRB upheld protection for an employee who dropped the "F bomb" on his supervisor ("Aguirre became upset and told Plaza that he was an "F'ing mother F'ing," an "F'ing crook," and "an asshole," and that he was stupid, nobody liked him, and everyone talked about him behind his back. At one point, Aguirre stood up in the small office, pushed his chair aside, and said that, if he was fired, Plaza would regret it."). Ms. Timmons' conduct – even as described by Ms. Blankenship – does not come close to that that level. At most, Ms. Blankenship may have <u>thought</u> that Ms. Timmons <u>might</u> do something threatening, but Ms. Timmons never did so. This is not opprobrious and does not override the public policy of Title VII.

(4)    San Jacinto College provoked the conduct by sending Mr. Brower and Ms. Blankenship to counsel Ms. Timmons about the "slave mentality" comment, even though everyone involved knew that Ms. Timmons considered them to be racists and even though the "slave mentality" comment was directed to Mr. Brower. This was provocative conduct on the part of San Jacinto College.

Accordingly, under the *Atlantic Steel* analysis, Ms. Timmons' conduct was not "opprobrious" and remained protected even if she was "loud" and "rude."

20

Regardless of whether the Court chooses to adopt the *Atlantic Steel* test for purposes of Title VII, the test provides a useful framework for analyzing these issues. An employee who perceives racist behavior is not required to be meek and submissive, much less polite and forgiving. On the contrary, the law expects that the employer will appropriately address the complaint of race discrimination. In this case, San Jacinto College made the stunning decision to send the perpetrators to counsel Ms. Timmons about her complaint. San Jacinto College is not entitled to use its own mishandling of the situation to justify terminating Ms. Timmons.

Because this is a direct evidence case, San Jacinto College bears the burden of proof on this issue. No reasonable jury could find that San Jacinto College was justified in firing Ms. Timmons under these circumstances. Given that there is no genuine issue of material fact, the Court should grant summary judgment as to liability.

## **CONCLUSION**

For the foregoing reasons, the Court should grant summary judgment as to liability in favor of Ms. Timmons and against San Jacinto College.

Respectfully submitted,

/s/ David C. Holmes
David C. Holmes, Attorney in Charge
State Bar No. 09907150
Southern District No. 5494
13201 Northwest Freeway, Suite 800
Houston, Texas 77040
Telephone: 713-586-8862
Fax: 713-586-8863
dholmes282@aol.com

ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this pleading was sent electronically to all counsel of record on December 3, 2019.

/s/ David C. Holmes
David C. Holmes

## CERTIFICATE OF WORD COUNT

I certify that Word shows that this document contains 4,925 words, excluding the parts identified in the Court's procedures.

/s/ David C. Holmes
David C. Holmes