IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TRACY TIMMONS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | No. 4:18cv4368 |
| VS. | § | |
| | § | Jury Trial Demanded |
| SAN JACINTO COLLEGE, | § | |
| | § | |
| Defendant. | § | |

**APPENDIX**

**TO**

**PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT AS TO LIABILITY**

David C. Holmes, Attorney in Charge
State Bar No. 09907150
Southern District No. 5494
13201 Northwest Freeway, Suite 800
Houston, Texas 77040
Telephone: 713-586-8862
Fax: 713-586-8863
dholmes282@aol.com

ATTORNEY FOR PLAINTIFF

# **TABLE OF CONTENTS**

1       Excerpts from the Deposition of Tracy Timmons

12      Deposition of Karen Blankenship

23      Personnel Action Request (January 4, 2012)

24      Job Description

26      2016 Annual Performance Evaluation for Tracy Timmons

36      2015 EEOC Charge of Discrimination

37      2016 EEOC Right to Sue Letter

41      February 1, 2017 E-Mail from Tracy Timmons to Gretchen Rapp (contained within later e-mail chain)

44      June 15, 2017 E-mail Chain

47      Statement by Rudy Silva

48      Statement by Carolyn Riddle

49      Termination Letter

50      Copy of *Atlantic Steel* Decision by NLRB

58      Copy of *Plaza Auto Center* Decision by NLRB

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
 2                       HOUSTON DIVISION
 3    TRACY TIMMONS,              )
                                  )
 4         Plaintiff,             )
                                  )
 5    VS.                         ) Civil Action
                                  ) No.4:18-cv-4368
 6    SAN JACINTO COLLEGE,        )
                                  )
 7         Defendant.             )
 8
 9
10    *******************************************************
11           ORAL AND VIDEOTAPED DEPOSITION OF
12                  TRACY RENEE TIMMONS
13                  OCTOBER 14, 2019
14                     Volume 1
15    *******************************************************
16
17        ORAL AND VIDEOTAPED DEPOSITION of TRACY RENEE TIMMONS,
18    produced as a witness at the instance of the Defendant, and duly
19    sworn, taken in the above-styled and numbered cause on
20    October 14, 2019, from 9:48 a.m. to 6:40 p.m., before Brandy R.
21    Garney, CSR in and for the State of Texas, reported
22    stenographically, at the Law Office of David C. Holmes, 13201
23    Northwest Freeway, Suite 800, Houston, Texas, pursuant to the
24    Federal Rules of Civil Procedure and the provisions stated on the
25    record or attached hereto.
```

Page 3

```
 1                     I N D E X
 2                                    PAGE
 3    Stipulations                     1
 4    Appearances                      2
 5
 6    WITNESS:  TRACY RENEE TIMMONS
 7      Examination By Ms. Brown           7
 8      Examination By Mr. Holmes        278
 9      Further Examination By Ms. Brown   280
10
11    Signature and Changes              282
12    Reporter's Certificate             284
13
14               EXHIBITS INDEX
15
16    EXHIBIT 1
        Curriculum Vitae                 15
17
      EXHIBIT 2
18      San Jacinto College Librarian Job
        Description                      21
19
      EXHIBIT 3
20      Policy Manual acknowledgement      24
21    EXHIBIT 4
        Procedure 4-17: Exempt and Non-exempt   30
22
      EXHIBIT 5
23      Art Institute offer letter         40
24    EXHIBIT 6
        2012 Annual Performance Evaluation   46
25
```

Page 2

```
 1          A P P E A R A N C E S
 2  FOR THE PLAINTIFF:
 3      MR. DAVID C. HOLMES
        LAW OFFICES OF DAVID C. HOLMES
 4      13201 Northwest Freeway, Suite 800
        Houston, Texas 77040
 5      Phone:  713.586.8862
        dholmes282@aol.com
 6
 7  FOR THE DEFENDANT SAN JACINTO COLLEGE:
 8      MS. LISA A. BROWN
        MS. ANNA M. ROBSHAW
 9      THOMPSON & HORTON, LLP
        3200 Southwest Freeway, Suite 2000
10      Houston, Texas 77027
        Phone:  713.554.6741
11      Fax:  713.583.7698
        lbrown@thompsonhorton.com
12
13  VIDEOGRAPHER:
14      MR. ROBERT PIERCE
15
16  ALSO PRESENT:
17      MS. VICKIE DEL BELLO
18
19
20
21
22
23
24
25
```

Page 4

```
 1  EXHIBIT 7
      E-mail chain dated July 13, 2015, to
 2    July 14, 2015                      51
 3  EXHIBIT 8
      Memorandum dated November 5, 2012    55
 4
    EXHIBIT 9
 5    Photograph                         62
 6  EXHIBIT 10
      Baylor College of Medicine letter dated
 7    November 15, 2012                  67
 8  EXHIBIT 11
      Charge of Discrimination dated June 18, 2015  99
 9
    EXHIBIT 12
10    Dismissal and Notice of Rights     110
11  EXHIBIT 13
      Addendum to the November 5, 2012 Letter of
12    Corrective Action                  111
13  EXHIBIT 14
      2014 Annual Performance Evaluation   126
14
    EXHIBIT 15
15    E-mail chain dated June 2, 2015    128
16  EXHIBIT 16
      FMLA Certification of Healthcare Provider  134
17
    EXHIBIT 17
18    Letter dated June 24, 2015         134
19  EXHIBIT 18
      Photographs                        139
20
    EXHIBIT 19
21    Letter dated June 29, 2015         140
22  EXHIBIT 20
      FMLA Certification of Healthcare Provider  140
23
    EXHIBIT 21
24    Request for Information from Employee's
      Medical Provider                   142
25
```

Page 17

1  updated resume.  Now, this is a resume I applied to get the job

2  at San Jacinto College.  So the only thing you do not see on this

3  resume is San Jacinto College.

4      Q.   Well, you've applied for jobs since leaving San Jacinto

5  College, correct?  You just said you have?

6      A.   Yes.

7      Q.   And at no time since leaving San Jac have you needed to

8  have a professional resume to submit to a prospective employer?

9      A.   Yes, I have.

10     Q.   So you do have a copy of an updated resume?

11     A.   Yes, I do.  Not with me.

12          MS. BROWN:  David, that is one of the things we

13  requested.  We would like a copy.  And ideally at some point

14  today, if -- if on a break, we could obtain that.

15     A.   I wouldn't be able to obtain it on a break because I

16  would have to go back home and get on my computer.  So I --

17     Q.   (BY MS. BROWN)  All right.

18     A.   -- can get it to you tomorrow, if that's fine with you.

19     Q.   That's fine with me.

20     A.   Okay.

21     Q.   Thank you.  So you began -- well, let me -- before

22  we -- we go on.  Are you presently employed?

23     A.   I presently work part-time at Houston Community

24  College.

25     Q.   And when did you start working part-time at Houston

Page 18

1  Community College?

2      A.   2005.

3      Q.   And what is your job part time at Houston Community

4  College?

5      A.   I'm a public service librarian.

6      Q.   And do you work at a particular campus?

7      A.   Since 2005, I've rotated through many campuses.  I

8  started off as staffer.  I went out to Alief.  I've gone to

9  Northline.  I've gone to Caldwell.  I go where they need me to

10  go.

11     Q.   And how many hours a week are you working there now?

12     A.   I only work -- when I started there, I only worked

13  Saturdays.  And so I only work on Saturdays.  And I don't work

14  every Saturday.  I rotate.  And it's as an as-need basis or as my

15  schedule allows me to work.  So if she puts me on the schedule

16  and I'm not willing to work or can't work, I would just e-mail

17  her and say I cannot work.

18     Q.   Who's your supervisor at Houston Community College?

19     A.   Gwen Richard.

20     Q.   How do you spell her last name?

21     A.   R-i-c-h-a-r-d.

22     Q.   And when you were working at San Jacinto College, did

23  you work also at HCC part-time?

24     A.   Yes.

25     Q.   So consistently since 2005, you've worked at -- at HCC?

Page 19

1      A.   No.

2      Q.   Okay.

3      A.   I took a couple years off.  I didn't always work there.

4      Q.   Well --

5      A.   You can have -- you can be a part-time person; but

6  since I only work on Saturdays, if you're not needed and there's

7  a rotation of other 15 librarians, you're not guaranteed to work.

8  So -- or if you don't want to work, if something comes up, you

9  don't have to work.  It's as needed, as they need you from the

10  college.

11     Q.   You stopped working at San Jacinto College in June of

12  2017.  Is that correct?

13     A.   That is correct.

14     Q.   Since June of 2017, have you applied for full-time

15  employment at Houston Community College?

16     A.   I think so.  I think I applied for a full-time position

17  there.

18     Q.   You think you did or you know you did?

19     A.   I think I did.

20     Q.   And when would that have been?

21     A.   I would have to log on to my account to see that.  I

22  don't know the exact date.

23     Q.   But you have that information?

24     A.   I would have to get on a computer or go down to human

25  resources.  But I've applied for jobs there, and I haven't gotten

Page 20

1  them; but no, I don't know the exact date that I applied for a

2  job there.

3      Q.   But sitting here today under oath --

4      A.   I have applied for jobs, full-time positions at Houston

5  Community College, and I have not received a full-time position

6  at Houston Community College.

7      Q.   Have you been offered a job that offers more than just

8  occasional Saturdays?

9      A.   Yes.

10     Q.   What did Houston Community College --

11     A.   Houston Community College didn't offer me that.

12     Q.   And we'll talk later about other job searches.

13     A.   Okay.

14     Q.   So you started as a part-time reference librarian at

15  San Jacinto College in 2011?

16     A.   That is correct.

17     Q.   And was that at Central campus?

18     A.   That is correct.

19     Q.   And after you joined San Jac -- San Jac/San Jacinto

20  College, a full-time reference librarian position came open at

21  Central.  Is that correct?

22     A.   Karen brought me into her office.  She told me, Tracy,

23  we have an opening for a full-time position, and I would like for

24  you to apply for it.  That's how I found out.

25     Q.   And that is Karen Blankenship?



Page 21

**A.** That is correct.

**Q.** And she's the -- the director of the -- the library services?

**A.** That is correct.

**Q.** And she invited you to apply for the full-time job?

**A.** That is correct.

**Q.** And you, in fact, did apply?

**A.** That is correct.

**Q.** And who was on the interview committee, if you recall?

**A. Greg Schneider, Karen Blankenship, John Brower.**

**Q.** And they recommended that you receive the full-time job?

**A. I guess Karen did. I don't know who make -- I'm assuming Karen makes the final decision, since she's the director of the library. I don't know how the search committee worked. I haven't served on the search committee.**

**Q.** Well, suffice it to say you interviewed for the full-time reference librarian job, and then you got the job?

**A.** That is correct.

(Exhibit No. 2 was marked.)

**Q.** (BY MS. BROWN) What were your main job responsibilities as a full-time reference librarian at the central campus?

**A. Working the reference desk, answering questions for students, either in person, via chat, or via the telephone.**

Page 22

**Q.** And what other responsibilities?

**A. I also did interlibrary loan for the college. I also served as a liaison to the health sciences department, since that's what my specialty was, medical librarianship.**

**Q.** If you wouldn't mind taking a look at Exhibit 2. Do you recognize Exhibit 2?

**A. Yes, I do.**

**Q.** This is your -- well, this is the job description at San Jacinto College for a reference librarian, correct?

**A.** That is correct.

**Q.** And this, in fact, is the job description that applied to you when you were at San Jacinto College?

**A.** That is correct.

**Q.** And on the first page, it discusses some of the things you just referenced. Provide reference services, bibliographic instruction?

**A. Yes.**

**Q.** Is that teaching classes?

**A. Yes. Library instruction.**

**Q.** And would that be a class where you stand up and actually teach a class?

**A. It would be a room twice the size as this with a monitor, computer, projector. You would probably have a minimum of 25 computers. I believe our lab or section was larger. So it would be a library instruction classroom.**

Page 23

**Q.** And then collection development and liaison with campus departments to determine what they needed to support their curricula. That would be your health sciences support?

**A. That's correct.**

**Q.** And then on the -- the next page, it talks about basic computer skills, knowledge of reference work. Do you see those at the top?

**A. That's correct. I do.**

**Q.** And it also lists as a required minimum qualification, the ability to work in collaboration with others. Do you agree -- do you see that?

**A. Yes, I do.**

**Q.** And you agree that was part of your job?

**A. Yes.**

**Q.** And then at the very bottom, a couple of the other items here. It lists office environment and computer strain would be daily, the D being daily. That was a part of -- of working in the library. Would you agree?

**A. That's correct.**

**Q.** And then the bottom, it says, physical activity, that on a daily basis you might have to lift up to 50 pounds of force.

**A. Since I'm a reference librarian, we don't lift 50 pounds daily.**

**Q.** Well, but this job description that was part of your job description, there was a potential to need to lift, say,

Page 24

books?

**A. Yes. But I'm just saying as a reference librarian, my job was to sit behind a desk or table similar to this. People would walk up to me, ask me questions; and then I would help them. Yes, we may have to lift books, but I don't lift 50 pounds daily. And as a librarian, I usually lift one book at a time or we get a book truck, and I place them on a book truck.**

**Q.** Well, but would you agree that your job description stated that there was the potential to lift up to 50 pounds, as a requirement?

**A. Yes.**

MR. HOLMES: Do this for us. The ones that have the yellow -- the orange stickers on them, make sure you've got those set aside. Because those go with the court reporter. So don't get those -- don't get those mixed up with anything else.

THE WITNESS: Okay. Thank you.

(Exhibit No. 3 was marked.)

**Q.** (BY MS. BROWN) And as an employee of San Jacinto College, you understood that the college operates under a series of policies and procedures?

**A. That is correct.**

**Q.** And did you ever have the opportunity to read any of those policies or procedures when you were employed?

**A. Yes. Some of them. Not all of them.**

**Q.** Well, sure. I understand. And as a full-time

Page 25

1 employee, you were asked to acknowledge the existence of those

2 policies.  Do you recall signing Exhibit 3?

3 **A.  Yes.  This would be on the day of orientation.**

4 Q.  And that's your signature?

5 **A.  That is correct.**

6 Q.  And in this document, you're acknowledging that the

7 college maintains a website.  And it tells the reader of this

8 document how to get to the website, and that's where the policies

9 are?

10 **A.  That is correct.**

11 Q.  As a full-time librarian at Central, what was your

12 chain of command?

13 **A.  John Brower was my immediate supervisor.  The next**

14 **person would be Karen Blankenship, the director of the library.**

15 Q.  Do you know who Karen's supervisor was?

16 **A.  The department heads have changed since then.  When we**

17 **first started, it was in a president system.  So I don't know,**

18 **but it was a lady.  She was president at the time, but it -- it**

19 **was a lady.  I can't think of her name.  Barbara -- oh, my**

20 **goodness.  I can't think of her name.  Barbara -- I -- you know,**

21 **but her name was Barbara something.**

22 Q.  Thank you.  How many people worked at the Central

23 campus library when you were there?  And -- and if it changed

24 over time, why don't we focus on like 2012 to 2014, that period.

25 **A.  Can I have some paper?  I need to think about this.**

Page 26

1 **May I have a pen?  Thank you.  I would say about 15.  There's**

2 **probably somebody I'm missing.**

3 Q.  And how many of those 15 were reference librarians who

4 might actually sit at the reference desk that you would sit at?

5 **A.  Oh, okay.  I would say about seven.  That includes the**

6 **part-time reference librarians.**

7 Q.  Okay.  And how many full-time and how many part-time?

8 **A.  We -- at the time, I remember three part-time**

9 **librarians.**

10 Q.  Well, go ahead, and then I'll ask a different question.

11 **A.  I would say five full-time.**

12 Q.  Okay.  Let's focus on the five full-time employees.  It

13 was you, John Brower?

14 **A.  Uh-huh.**

15 Q.  And who were the other three?

16 **A.  Okay.  You had me, John Brower.  You had, at the time,**

17 **Laura White -- well, Daisy Ngo.  Daisy was there when I started.**

18 **And you had Rosalind Alexander, and then you had Greg Schneider.**

19 **Even though he worked in collections, he did work at the**

20 **reference desk.  And at that time, we did have Karen, and**

21 **sometimes she worked at the reference desk.  So I included them,**

22 **if they worked at the reference desk.**

23 Q.  What were the library's hours?

24 **A.  We opened from -- it was 7:00 or 7:30 a.m., and we**

25 **closed at 9:00 p.m. at night.  If I'm right, 9:00 p.m.**

Page 27

1 Q.  And that's Monday through Friday or does that include

2 Saturday?

3 **A.  Monday through Friday.  Well, Fridays we closed early.**

4 **Let's say Monday through Thursday, we opened at 7:30 to 9:00.  On**

5 **Fridays, we closed at either 3:00 or 5:00.  It changes hours in**

6 **the summertime.  So if it was a regular fall, I believe it was**

7 **3:00 o'clock.  So you still opened at 7:30, but you closed at**

8 **3:00.  And then you had Saturday, which would be from 9:00 a.m.,**

9 **if I'm right, 2:00 or 3:00 p.m.  Then you had Sunday.  We opened**

10 **up at 12:00 noon, and we closed at 5:00.  We were open 7 days a**

11 **week.**

12 THE WITNESS:  Right?  Oh, I can't -- I'm looking

13 at you like --

14 Q.  (BY MS. BROWN)  And -- and so would you agree that your

15 supervisor had an obligation to prepare a schedule so that all

16 those work hours were covered for the students?

17 **A.  That is correct.**

18 Q.  But -- and that was the supervisor's job, not the --

19 the reference librarian's job, to make the schedule?

20 **A.  If John was out or if someone called in, our policy**

21 **among ourselves is that we would fill in for our colleague.  So**

22 **there were times when John was out himself, and another librarian**

23 **would say -- whoever came in first.  Like Rosalind would be a**

24 **morning person.  She would come in like at 7:30 with John.  So if**

25 **John would call in, Rosalind would say, John is not here today.**

Page 28

1 **Can you work his hours?  I'll work this hour, this hour, that.**

2 **So if a schedule was made and if someone called in sick or had to**

3 **be out, then the person -- whoever stepped up to fill that role**

4 **would say, can you work these hours so we can have coverage at**

5 **the desk?**

6 Q.  So everyone had to be flexible?

7 **A.  Yes.**

8 Q.  Do you agree that it was important for your supervisor

9 to know if an employee was going to be late or needed to leave

10 early?

11 **A.  Yes.**

12 Q.  Because that impacts staffing.  Would you agree?

13 **A.  And I informed my employer and supervisor every time**

14 **that I was late or needed to leave early.**

15 MS. BROWN:  All right.  Objection, nonresponsive.

16 Q.  (BY MS. BROWN)  But you agree that was important for

17 your supervisor to know -- for any employee either coming in late

18 or -- or having to leave early?

19 **A.  I have a question.  What did you mean by objection,**

20 **nonresponsive?**

21 Q.  Well, my question asked you only about whether you

22 agreed that your library supervisor's responsibilities

23 including -- included making sure that he or she knew if an

24 employee was going to be late or had to leave early.  I was

25 asking only about the authority or responsibilities of the



Page 181

1 with them?

2    A.   I remember one year, I got a good evaluation, and I

3 still questioned it.  So I don't know if that was the year or

4 not; but I know one year I got a good evaluation, and I still

5 filed a protest.  So I would look at it and get that date.

6    Q.   Okay.  If you challenged the 2016 evaluation, you can,

7 you know, correct your deposition answer to -- to reflect that

8 if -- if you're not sure today.

9         Did you ever have a conversation with John Brower

10 about the Mary Tyler Moore Show?

11    A.   Yes.

12    Q.   When was that?

13    A.   I don't know the exact date, but yes.  He said

14 something derogatory.

15    Q.   What did he say?

16    A.   It was about -- if I'm right, it was about women.  And

17 he did say something about black people.  It was just --

18    Q.   Well, to the best of your memory, what did he say that

19 offended you?

20    A.   It's just -- it's always something.  It's like no

21 matter how many times you tell him -- my goodness.

22    Q.   Well, where were you when this conversation occurred?

23    A.   It's always at the reference desk.  Just ridiculous.

24    Q.   And what was the context?  Were you guys talking about

25 television, TV shows from the '70s?

Page 182

1    A.   No.  I'm a librarian.  I don't even watch TV.  I'm not

2 a TV person.  No.  No.  I don't have time.  I get home at 7:00

3 o'clock at night.  I don't have time.

4    Q.   And so did John just out of the blue start talking

5 about the Mary Tyler Moore Show?

6    A.   He just comes to the reference desk, and he just says

7 weird stuff.  And I think he said something about black people

8 the first time, and I remember writing it up.  And if I'm right,

9 I either sent it to Karen or Vickie Del Bello.  It's always one

10 of them.  It's somebody in HR.  It's just -- yes, I remember.

11 It's just -- it's always something.

12    Q.   But what exactly did he say that was derogatory to

13 black people?

14    A.   I would have to think about it.  Let me write it down.

15 If I had the questions ahead of time, I would -- it's just --

16 it's always -- it's like -- it's like a bad dream.  It's like you

17 can't keep -- you just -- it's just horrible.  He always said

18 something derogatory about black people.  Always.

19    Q.   Well, what about the Mary Tyler Moore Show did he say

20 in conjunction with that conversation?

21    A.   I know I wrote it up in some type of complaint.  I

22 would just have to look for it.

23    Q.   Sitting here today, you can't remember?

24    A.   I remember him saying something derogatory and

25 unprofessional.  I just don't know -- remember exactly what he

Page 183

1 said.  But I remember him coming to the reference desk and I'm

2 saying, oh, not this again.  When will this ever stop?  It just

3 keeps going and going and going.

4    Q.   Is -- is John Brower a talkative kind of guy?  Was he

5 chatty?

6    A.   I think John Brower is a bully.  I think John Brower

7 knows what's going to upset you and get up under your nerves, and

8 I think he does that purposely to bother and humiliate me.

9 That's what I think.

10    Q.   We talked a lot today about John Brower.  Is there

11 anything we haven't talked about today about him that makes you

12 believe that he was discriminating against you on the basis of --

13 of race?

14    A.   Yes.

15    Q.   What else?

16    A.   During -- I think it was in 2016, 2017, my niece came

17 to live with me during the summertime.  I remember this

18 specifically.  She had to come to work with me that day.  It was

19 a Friday.  She had to come to work early.  And John

20 specifically said she cannot come in here.  She was a minor.  She

21 was in high school, and he said she cannot come in the library.

22 And Phyllis had brought her niece -- her niece to work.  This is

23 a girl who was late in college -- or did she go to college?

24 Because Phyllis used to always talk about her niece.  And

25 Phyllis' niece sat behind the circulation desk.  And I'm

Page 184

1 thinking, but you're telling a minor she can't come into the

2 library, but you allow her to sit behind the circulation desk, as

3 if she was an employee or work study student.  And my niece was

4 just sitting at a table.  It was just unbelievable.  I was like I

5 can't believe this.

6    Q.   How old was your niece?

7    A.   My niece was 16.

8    Q.   And how old was Phyllis' niece?

9    A.   That girl was grown.  I'm like I can't believe --

10    Q.   She was an adult?

11    A.   Yes.  I couldn't believe it.

12    Q.   And did John tell you why your niece couldn't sit in

13 the library?

14    A.   He said she can't come in the library.  And I'm looking

15 at him.  I'm thinking, what am I supposed to do with her?  Tell

16 her to sit outside?  It was horrible.  It was -- I just -- I just

17 couldn't even see the reasoning behind it.  It's like everybody

18 gets preferential treatment there.

19    Q.   Well, how long were you planning on having your niece

20 at the library that day?

21    A.   She stayed the whole day with me.  I mean, I can't get

22 rid of her.  I mean -- I mean, you don't -- what are you supposed

23 to do?  I mean, you can't get rid -- she's a child.  You can't do

24 that.

25    Q.   And what about Phyllis' niece?  How long was she at the

APPENDIX 005



Page 185

1  library?

2     A.  The whole day.  Behind the -- behind the circulation

3  desk.  She was there.  I remember that clearly.

4     Q.  And this was in the '16-'17 school year?

5     A.  Yes.  I remember that.

6     Q.  Any other incidents about John Brower that --

7     A.  He referred to my brother.  One day -- my brother is

8  tall -- well, about -- I say taller than John.  James is younger

9  than me.  So James had only come to the library once, but that

10  was after the incident.  And he made this derogatory comment.  It

11  was a student in the library.  He was dressed horribly bad.  And

12  he said, Tracy, is that your brother?  And I looked at him like

13  no.  My brother is a professional.  First of all, he don't even

14  live in Houston.  Second of all, he works in the petrochemical.

15  He can't -- he couldn't even be dressed like that because you

16  can't work and dress like that.  He just picked this random

17  person, random black person who was dressed really horribly bad;

18  and then he says, is that your brother?  I'm thinking what would

19  make you say something like that?  What would make you reference

20  to my brother looking like that?  I mean, if I'm 45, means James

21  is 43.  Nobody dresses like that, that age.  It was so ugly and

22  derogatory.  And I was like, what would make you reference my

23  brother like that?  I'm like, this is ridiculous.  I mean, I

24  don't even understand it.

25     Q.  The individual he was pointing to, was he using the

Page 186

1  library services?  Had he been talking to you?

2     A.  He was -- no.  He didn't talk to me that day.  He just

3  pointed a random black student out.  A student.  But he was -- he

4  was not dressed professionally.  I mean, students don't dress

5  professionally.  I dress professionally.  But he was not dressed

6  in a way that was becoming and that you would want to associate.

7  And John said, is that your brother?  And I looked at him, and I

8  was just flabbergasted.  I was just utterly -- it was just --

9     Q.  Was -- was anyone around to hear him make that comment?

10     A.  He does this at the reference desk.  It was just --

11     Q.  So nobody was around?

12     A.  It's derogatory.  I mean, he doesn't talk loud like,

13  hey, Tracy, is that your brother?  He doesn't say it like that.

14  But he walked up to the reference desk.  I didn't invite this

15  conversation.  And then he points out that student.  He said,

16  Tracy, is that your brother?  I'm looking at him.  I'm like, no.

17  My brother would never be seen in anything like that.  No.  We're

18  all professionals.  We don't do stuff like that.  We don't dress

19  like that.  We're conservative.  We weren't raised by my parents

20  like that.  Why would you even pick out somebody like that?  It

21  was just ugly and derogatory.

22     Q.  I've seen an e-mail, and we'll talk about it in a few

23  minutes, where you say our staff is racist.  Who -- who are you

24  referring to when you say our staff is racist?

25     A.  I'm referring to Karen and John and people who act

Page 187

1  racist.  I mean, you don't have to -- well, what do I consider

2  racism?  I believe they're racists.  That's just my opinion,

3  so --

4     Q.  Okay.  Why do you believe Karen is a racist?

5     A.  She enables John's behavior and doesn't correct the

6  behavior.  Other people have witnessed his racist behavior.  He

7  screamed at a student one day.  A black student.  It was the end

8  of the day, and he just walked up to her and started screaming.

9     Q.  What did he scream?

10     A.  He couldn't -- because he couldn't go home.  It was the

11  end of the day, and John just walked up to that student.  It was

12  a black young lady, and he just started screaming at her.  And

13  Amanda Rose was in the library.  Everybody just stopped and

14  looked, and I was like, oh, my God.

15     Q.  What did he scream at her?

16     A.  He was like, do you know I can't go home because of

17  you?  And he screamed it loud.  And I was just looking at her.

18  I'm like it was other students in the library, so why did he pick

19  her out?  I don't know.  But he just walked up to her and just

20  started screaming.  And I'm looking at him, and I'm thinking, why

21  don't you just leave?  Just say I got to go, because we're still

22  here, and we will shut down the library.  But why would you

23  scream at that girl like that?

24     Q.  And you claim Amanda Rose saw that?

25     A.  Oh, yes.  Amanda Rose saw that.  It was horrible.  It

Page 188

1  was horrible.

2     Q.  Okay.  You said Karen enabled John.  Anything else

3  you're pointing to where -- where you believe Karen is a racist?

4     A.  Let's go back to the first incident when Obama and the

5  key rink, and he said she's a Republican.  It does not matter

6  what your party affiliation is, but you can't tell somebody a key

7  chain.  I never spoke to you about -- or then president elect or

8  running office, whatever he was at that time.  I never said

9  anything, and he made an assumption just because I had an Obama

10  key chain.  And I was like I'm looking at him.

11     Q.  Well, no excuse me for -- for interrupting.  My

12  question was about Karen.  Did Karen say anything to you that was

13  racial?

14     A.  We had a -- I remember she called a meeting in her

15  office.  So who was supposed to be at the meeting?  Me, John,

16  Karen, Pamela Wells, and Talicia.  So the meeting was in her

17  office.  She sent it via e-mail.  And John was already in the

18  office.  And for some reason, I happened to get there first

19  before everybody else.  Why?  I don't know.  I should have been

20  last.  And then that's when they made comments, oh, we can't say

21  things like that anymore because of you-know-who.  And I'm

22  sitting in the room, looking at them.  And I'm like, really?

23     Q.  And when was this?

24     A.  That was towards the end.  That was after the

25  renovation, because her office was bigger, and it could hold more



Page 201

1  2:04 p.m., you're telling him that you're leaving work at 10:00

2  and returning at 1:15 and that you'll stay until 9:00.  You're

3  telling him, I'm going to make up my time by staying late, but

4  you're directing him that this is what you're going to do.  You

5  didn't ask for permission, as stated in procedure 4-17, correct?

6  A.  Yes.  Before this e-mail, I sent John a series of

7  e-mails with three doctors' appointments.  So this is not the

8  first e-mail I sent him about my doctors' appointments, because

9  they were all listed on the same date.  And I gave an approximate

10  time about how much -- because he wanted to know.  So this is not

11  the correct chain.

12  Q.  But what you're saying here is you -- even if you told

13  him you had doctors' appointments, what you're doing here is

14  telling him you're going to make up the time?

15  A.  Because I had already asked him permission in the first

16  e-mail.  I've already done that.

17  Q.  And he granted you permission?

18  A.  Yes.  And then this was a subsequent e-mail, because I

19  already told you way in advance that I had these doctors'

20  appointments.  And this is saying, okay.  So I left -- this has

21  happened that day, on Thursday.

22  Q.  So if you flip it over, we're now at the 2:13 p.m.

23  A.  Okay.

24  Q.  And he's telling you, it's as easy as saying, hello,

25  John and Karen, I left work at 10:00 a.m. and returned to work at

Page 202

1  1:15 p.m. or 1:50 p.m.  Is it okay if I make up the time?  I will

2  stay until 9:00 p.m.

3          And then you respond to him in the e-mail at 2:25

4  p.m., what I got from this meeting was being accurate about your

5  time.  What I interpret you got out of the meeting was begging to

6  make up the time.  And then you put in bold, as an employee, I

7  should not have to beg.  It is a slave mentality that you try to

8  lord over me with your ruling class comment?

9  A.  Yes.  And that's one of those comments you asked

10  earlier, and that's when he was talking -- this is after he made

11  comments at the reference desk.  I remember this now.  And he

12  came -- he came -- he brought up this comment.  He was talking

13  about minorities.  And I said, you know what?  We are

14  participating and voting more.  He said, you know what?  We're

15  still the ruling class, Tracy.  I looked at him.

16  Q.  And when was this?

17  A.  This happened --

18  Q.  No.  No.  The ruling class comment?

19  A.  This happened at the reference desk.  It happened at

20  the reference desk.

21  Q.  When?

22  A.  2017.  It had to be 2017 or 2016.  It wasn't very far,

23  but it happened.  It was after the renovation.  I remember that.

24  I mean, the exact date you want me -- I would have to look on

25  some paperwork, but, yes, I remember that.  I remember it.

Page 203

1  Q.  And who was there to hear that comment, other than you?

2  A.  Me.  He -- but that doesn't mean it didn't happen.

3  Yes.  He came and told me.  Why would you come to the reference

4  desk and say something derogatory and rude?  I don't come to your

5  office and say something rude and derogatory.  I don't come

6  around you at the reference desk and say something rude and

7  derogatory.

8  Q.  And you viewed it as -- I'm using your words here.

9  That in order -- if -- if you were to ask permission to make up

10  your time, as stated in Procedure 4-17, that that is the

11  equivalent of a supervisor making you beg, and that it was a

12  slave mentality --

13  A.  No.

14  Q.  -- for him to ask you to show some diplomacy in your

15  e-mails?

16          MR. HOLMES:  Go ahead.

17  A.  Okay.  What I'm saying is I informed him like he said.

18  Tracy, tell me the dates that you have doctors' appointments.

19  This is not the right e-mail chain of command.  I sent three

20  dates.  I said how much time I was going to make up.  So he

21  already knew.  On the day of, because now this is more accurate,

22  I said, this is what happened.  This is just a statement of fact.

23  I've already asked you for permission.  You granted for

24  permission, but you're saying subsequent e-mails, you still keep

25  asking when you already gave me permission.  So you gave me

Page 204

1  permission two weeks ago when I made the appointments because, as

2  I say, these are specialists.  You can't call today and get an

3  appointment tomorrow.  It just doesn't work like that.

4  Especially when you're out in Katy anyway.  None of my doctors

5  work like that.  So I e-mailed him and let him know those three

6  dates.  So then on the day of, this is the day I actually went to

7  the doctor.  This is the day that surgery was actually said,

8  Tracy, you're having surgery.  It's bad.  You need to have

9  surgery.  So this is July the 15th.  This is I just came in to

10  work.  You know, I came in at 10:00 today.  I left work at 10:00

11  today.  I returned at 1:15.  I went to see Dr. McGarvey out on

12  I-10 and Katy past on the Grand Parkway.  So in order to make up

13  that time, I have flex time, I was only working four days.  So in

14  order to get paid, because I used all of my sick bank time, I had

15  to stay.  I've already received permission.

16  Q.  (BY MS. BROWN)  Well, let me ask you.  Is there a

17  difference between flex time and an alternate or alternative

18  schedule?

19  A.  You have to get approval.  I applied for that time.

20  Because if that's the case, I would have had to come to work five

21  days a week.  I was only coming Monday through Thursday.  I was

22  coming in early, staying in later.  I was working four 10s.

23  Q.  So flex time is a completely different concept from

24  the alternative schedule?

25  A.  But I applied for it and got approved.



Tracy Renee Timmons                                                              Pagess 205..208

Page 205

1    Q.   But even if you have an alternative schedule that's
2    been approved, that's still different from flex time in a given
3    workweek?
4    A.   Well, no.  Not to me.  I -- I don't know what you're
5    trying to say, but what I'm saying is I applied for a different
6    schedule to work four 10s.  I got approved to work four 10s.  So
7    I did that.  But I also had doctors' appointments during this
8    period.  So I e-mailed John earlier, way in advance and told him
9    like three days.  He said, okay.  You can go to these doctors'
10   appointments.  So on the day of the appointment, I just wrote a
11   quick e-mail saying I left work at 10:00 today.  I returned at
12   1:50, because the e-mail was sent at 2:04.  So I just came in to
13   the office.  This is just a simple statement of fact.  This is
14   nothing else.  And then I said, to make up my time, I need to
15   stay until 9:00.  But you already gave me permission way in
16   advance.
17   Q.   And you've produced all those other earlier e-mails?
18   A.   Yeah.  The college has them.  Yeah.  Everybody has
19   them.
20   Q.   Well, I'm asking what you have?
21   A.   Do I have them in my possession?  I remember before I
22   left, I asked for everything.  So I will look for everything.  I
23   know I turned in everything, everything the college has through
24   the server, and they asked not to destroy any documents.  So yes,
25   it was -- yes.  Definitely.  I sent those e-mails.  It was like

Page 206

1    three days that I had.  And these were all second opinions from
2    Dr. McGarvey.  That's who did the surgery.
3    Q.   We've been going quite a bit of time.  Why don't we
4    just take a five-minute break.
5         VIDEOGRAPHER:  Going off the record, the time is
6    4:26 p.m.
7         (Recess from 4:26 p.m. to 4:40 p.m.)
8         VIDEOGRAPHER:  Going back on the record, beginning
9    Media No. 4.  The time is 4:40 p.m.
10   Q.   (BY MS. BROWN)  Ms. Timmons, we were talking before the
11   break about you having a meeting with John and Karen, you know,
12   sometime after 2:00 o'clock, regarding making up time off in
13   general?
14   A.   Yes.
15   Q.   And then you sent the e-mail that we just discussed
16   where you made a comment that they had a slave mentality and the
17   ruling class comment?
18   A.   That's correct.
19   Q.   And after that e-mail, did you meet again with Karen
20   and John the very same day?
21   A.   After I sent the e-mail, at the end of the day, Karen
22   and John came to my office; and they both said, Tracy, we want to
23   discuss the e-mail that you sent to John.
24   Q.   And tell us everything you remember about that meeting.
25   A.   Basically, she said the e-mail was inappropriate for

Page 207

1    insubordination, and I disagreed with her.  I said -- I said,
2    what I got out of the meeting was try to keep -- don't depend --
3    well, I had sent off a request to IT because when I turned in my
4    leave form, John put on the little sticker.  He says, Tracy, I
5    don't think you made up all this time.  So I was insulted that he
6    would think that I would steal time.  So the only way I could
7    prove I actually worked the time was I didn't use -- I think I
8    used key cards and the actual time I logged in my computer.  So I
9    sent the e-mail request to IT.  I said -- and from that time
10   period of the pay -- pay period.  I said, please give me all the
11   times I either swiped my key card or logged into my computer.
12   So -- because, I mean, that's the only way I could prove that I
13   did what I actually did.
14   Q.   And you made that request that --
15   A.   To IT.
16   Q.   Between the meetings with Karen?
17   A.   Before the meeting with Karen.
18   Q.   Before the first meeting with Karen?
19   A.   Because he -- when I turned in my leave form, John sent
20   the leave form back to me and said, Tracy, I don't believe you
21   made up the time.  So that's when I sent out an e-mail to IT
22   saying, please give me the dates and time -- and I put the dates
23   and the periods that he in question.  I said, either swipe my key
24   card or when I logged in and logged off my computer.  Because I
25   always log off my computer when I leave work.  So I said, you're

Page 208

1    going to have something that says I was here this -- this day.
2    And I put the request in, and they didn't respond fast.  So I
3    ended up calling him.  I said, I really need this information
4    because they don't believe I worked.  And I said, if you could
5    get it to me as fast as possible, I would appreciate it.
6    Q.   And who did you speak to?
7    A.   He was a guy in IT.  And every time I call, he picks up
8    the phone.  I forgot his name, but it's in the request I made to
9    IT.  And I want to say -- God doggit.  I can see him.  Come on,
10   Tracy.  Come on.  Brian.  I'm pretty sure his name is Brian.  I'm
11   pretty sure.  And it was in an e-mail request.  I'm pretty sure
12   his name is Brian.  Pretty sure.  Can't be 100 percent, because I
13   don't have the e-mail in front of me.  But he sent back the days
14   and times that I either hit it with my key card or I logged on my
15   computer.  And then it proved that I did work most of the hours.
16   But then Karen said -- she came back in the meeting, and she
17   said, Tracy, did you take a lunch on these days?  I said, yes, I
18   did.  Well, we have to subtract your lunchtime.  I said, okay.
19   If I did it wrong or didn't do it right, I have no problems with
20   that.  So I ended up getting docked with my pay.  I did make up
21   my time, but what I didn't calculate in was my lunchtime.  And
22   she said, we got -- we got to dock your lunchtime.  I said, I
23   have no problems with that.  And then he did it.  And then he
24   said, well, in the future, I don't want you to depend on IT to
25   keep track of your time.  I said, well, I made up the time, but



Page 209

1 John questioned my -- you know, he questioned my integrity like I
2 would steal time from the college, like I would actually cheat
3 them.  I said, I didn't cheat anybody out of any time.  I came in
4 early or I stayed late.  And so that was the meeting.  Because
5 payroll -- it was like on a Friday, and payroll had to be turned
6 in.  And she said, Tracy, I'm doing you a favor.  I said, well, I
7 don't want you doing me any favors.  I said, if you get paid, I just
8 don't get paid.  She said, no.  I'm leaving out early today, and
9 I'm going to take your time in to payroll because this has to
10 get -- put in today.  Today, payroll is due.  And it's due by
11 a certain time.  You got to get it in by a certain time for them
12 to process it.  So that was that.
13        So that was like two or three days.  I'm thinking
14 about two or three days.  So after that -- so I had e-mailed them
15 ahead of them.  Like I said, this is not the right chain of
16 e-mail.  I put like three days that I had to go.  I gave an
17 estimate of when I was going to leave.  I told him on some
18 e-mails, I'm leaving from home.  Some e-mails, I'm coming in; and
19 I gave an estimate about how much time.
20        Then I went.  On the actual day, that's when I
21 just wrote a quick e-mail.  So it wasn't like asking permission,
22 because I already got permission.  This was just a simple
23 statement of facts.  Came in at this time.  Left at this time.
24 This is how long I'm going to stay or can stay.  And so that was
25 the day I went to Dr. McGarvey.  I won't forget that day.  He

Page 210

1 said, you got to have surgery.  Your knees are horrible.  He
2 said, you got to do it.  And I said, okay, what's the first day?
3 He said, June the 30th.  I said, okay.  Let's go.  I'm ready,
4 because I'm in pain.
5        So when I came in, because I just came in at 1:50.
6 Sent the e-mail at 2:04.  I just sent a quick e-mail because I'm
7 just documenting my time.  I had already asked for permission and
8 got permission.  And then that's when he said, oh, well, every
9 time you e-mail me, you got to get permission.  I'm like, here we
10 go again.  Have mercy.  Here we go again.  So I said -- and then
11 I said -- you know, so it's just a statement of fact.
12   Q.   Well, if I could, let me just ask the question about
13 something you just said.  Do you disagree with John's comment
14 that employees shouldn't depend on IT for accounting for their
15 time?
16   A.   I marked down my time.  He questioned my time.  And IT
17 proved that I did actually work all those days and make up that
18 time.
19   Q.   Well, but we can't have every employee asking IT to
20 pull all that information?
21   A.   But you questioned my integrity.  So that's why I had
22 to get proof.  Because you questioned my integrity.  Because when
23 I turned in the leave form, I put the dates and time and how much
24 I worked and made up the time.  But when you put on a yellow
25 sticky -- and he came.  He said, Tracy, I don't believe you did

Page 211

1 this.  I'm looking at him like -- because that's the quickest way
2 to get fired, is to cheat on your time.  So why would you do
3 something simple as that?  No.  Don't get me -- no, you don't
4 cheat on your time.  You don't need to cheat.  So I said, well,
5 Tracy, how do you prove that you did what you said you did?  Only
6 way you can prove it, because you -- it's not a system that I can
7 log in to and see every time I hit my key card.  You have to get
8 that information to IT.  So I kept up with my time.  He just
9 didn't believe me.  So the only way I could prove that I actually
10 did what I had -- I did was to contact IT, and IT gave me a list
11 of all those days that were in question.  And then when we went
12 to Karen's office, the one thing she got me on, she said, Tracy,
13 did you subtract your lunch time?  I said, no.  She said, well,
14 you got to go back and subtract your lunch time.  And I think I
15 ended up missing like maybe four to six hours of pay, maybe.  Not
16 for sure how much pay I lost.
17   Q.   And when Karen asked about subtracting lunch, she
18 wasn't mean about it.  She's like, oh, we just need to get the
19 math correct?
20   A.   Well, I mean, that's not -- I'm not saying that's the
21 point.  But the point is what precipitated all this, IT proved
22 that I did work all those hours, that I made up my time.  But he
23 said, you didn't do it.  There's no way you could have possibly
24 made up this time.  I'm like, why would I lie
25 about this?  Because the part-time staff is there.  They see me.

Page 212

1 They see when I leave.  You -- you have the work study students.
2 You have people who work at circulation.  Why -- you can't lie.
3 Plus there's a camera outside the library.  So if somebody look
4 on the camera, they can see when you leave or come.  So it's not
5 like, oh, why would I lie about my time when you have all these
6 people who can see me.  Nobody is going like, okay, Tracy, you
7 can leave, and I'll -- and I'll say you were working late.  You
8 can't do that because they can say, okay, Tracy, since you always
9 log off your computer, when did you log off your computer?
10   Q.   Did John say to you, I don't believe you?
11   A.   Yes, he did.
12   Q.   Those were his words?
13   A.   Yes, he did.
14   Q.   In front of Karen?
15   A.   No.  He came to my office.  After I turned in my leave
16 form, he said, Tracy, I don't believe you made up your time.  I'm
17 looking at him.  I said, okay.  Yes, he did.  He said exactly
18 that.  I remember that.
19   Q.   So the second meeting on June 15, 2017, John and Karen
20 come to your office, and they're talking with you about the
21 e-mail that you had sent after John had asked you to use
22 different language in requesting to flex your time?
23   A.   I had already gotten permission.
24   Q.   I understand.
25   A.   Okay.



Page 213

1    Q.   And you have shared that with us, and I -- I'm not
2  trying to interrupt.  I just -- we're trying to -- you know.
3    A.   Okay.  Move it along.
4    Q.   Yeah.  We're trying to move it along for everyone
5  including -- including you.
6    A.   Okay.
7    Q.   How did this meeting begin?  I'm talking the second
8  meeting.  So this is the end of the day when they come to your
9  office.
10   A.   Okay.  Okay.  Okay.  Okay.
11   Q.   Now, are they sitting in chairs in front of your desk,
12  and you're at your desk?
13   A.   Okay.  Yes.
14   Q.   Okay.
15   A.   So it's -- so my office is about half of this size, all
16  clear glass kind of like this, but no film, no cover.  So it's
17  open.  I'm the very last office, I guess, on the right-hand side
18  of the building.  I'm not for sure, but I -- I consider it the
19  right because I'm right-handed.  So it's on this side.  I'm the
20  very last office.  I'm in the corner.  So Rudy is at the front
21  desk.  I'm in the corner.  There's nobody next to his office.  I
22  sent the e-mail out.  Close to the end of the day, they come both
23  -- John come into my office.  And she sat down and she said,
24  Tracy, this is not an appropriate e-mail.  It's insubordination.
25  And I said, I disagree with you.

Page 214

1    Q.   Which part did she say was inappropriate?
2    A.   Slave mentality.
3    Q.   Okay.  And you said you disagreed?
4    A.   Uh-huh.
5    Q.   And -- and then what was said next?
6    A.   She said -- I said, it's true.  You have a slave
7  mentality.  This is a buildup.  This is a buildup for -- since
8  2012.  Since I wrote that letter to Barbara Hanson.  So this is
9  not just one incident.  This is a buildup.  I said, you have a
10  slave mentality.  All the comments that you made, everything that
11  you've done, the negative comments about black people, the
12  negative comments about my brother, the negative -- the way you
13  treat me and my niece versus Phyllis and her niece.  You have a
14  slave mentality.
15   Q.   And you said all that at that meeting?
16   A.   Yes.  She said it was a word salad, but it wasn't a
17  word salad.  So she said that was insubordination.  And I said,
18  okay, but I stand by what I said.  You have a slave mentality.
19   Q.   And you said that to her or were you speaking about
20  John or both of them?
21   A.   Well, I wrote the e-mail to John.  John, you have a
22  slave mentality.  So I sent the e-mail out.  Then about -- what
23  time did I send it out?  At the end of the day, they came back to
24  my office.  Okay.  So I sent the e-mail -- I guess I sent the
25  e-mail at 2:40.  Then 2:06.  Okay.  So 2:25.  So then they came

Page 215

1  to my office about 4:30.  So they waited I guess about two -- one
2  and a half hours.  I don't know.  Then they came to my office.
3    Q.   And I know you're aware that Karen alleges that you
4  raised your voice at her?
5    A.   She -- they both had the meeting, say, okay.  That's
6  when she gave me another copy of the paper saying you have to ask
7  for permission.  And I said, I did ask for permission.  I was
8  given permission; but I said, I'm going to stick this right here
9  because the office is an L-shape.  It's a credenza right here.
10  And she gave it -- gave it to me.  I put some tape on it.  I
11  stuck it right there on my desk.  I said, I will always have this
12  because I will look at it every day when I come in.  So I said,
13  okay.  So --
14   Q.   Did you raise your voice during this meeting?
15   A.   I was talking as I was talking today.  So the emotion I
16  was showing today, may have been a little heated, but as -- as
17  today.
18   Q.   So you deny raising your voice at all?
19   A.   I won't say I deny, but I didn't scream at her.  I
20  didn't try to intimidate her like she said I did.  I never hit
21  her.  I never made an attempt to hit her.  I never hit anybody.
22   Q.   Well, and I didn't ask if you hit her or tried to hit
23  her or whether you screamed.  I was asking whether you raised
24  your voice at Karen Blankenship?
25   A.   I was -- our meeting started off as I was speaking

Page 216

1  today at this meeting.  So my voice has modulated up and down
2  depending on -- so then that's when she excused John from the
3  room.  And then I said, Karen, I'm not a nigger.  I said, that's
4  what you treat me like.  You treat me like I'm a nigger.  I said,
5  I'm not a nigger.  She said, Tracy, I would never think of you
6  like that.  I said, yes, you do.  You treat me like I'm a nigger.
7  And then I started giving her examples.  She said, no, Tracy.
8  That's not me.  I think you're professional.  I said, okay, but
9  I'm not a nigger.  And I said, I am not a nigger.  She said,
10  Tracy.  Then she said -- she said something about I had to
11  tell -- this is a fireable offense.  I said, you have to do what
12  you have to do, but I'm not a nigger.
13        So I don't know how many times I said it.  I
14  probably did let -- more today than I did at the meeting, because
15  she didn't stay that long.  After I said that, she got very
16  offended.  But I don't know why she got offended, because you've
17  been treating me like that for the last what, five years.  I
18  don't know why you're offended because you've been doing it all
19  this time.  So why would you be offended when I actually put a
20  name to what you do?  I'm telling you what you do.  So she left.
21   Q.   Before you go on, if I could, since we're still talking
22  about her being in your office, just now when you were telling us
23  that you told me the N-word and you were pointing as you
24  you said that, you -- you know, not pointing, pointing and
25  tapping on the desk just now, is that what you did during the



Page 277

1    A.  For my knee surgery in 2017.

2    Q.  Did you pay your COBRA benefits?

3    A.  Yeah.  But I had -- I had signed up for Aflac while I

4  was at San Jacinto College.  I signed up while I was working

5  there.  Like two months in advance or something.

6    Q.  So in this lawsuit, you're asking San Jacinto College

7  to pay for your medical bills?

8    A.  If I hadn't have lost my jobs, I would have those.  So

9  I --

10    Q.  And those medical costs, you still have -- you have not

11  paid yet?

12    A.  No.  I have bill collectors hounding me.

13    Q.  Any other out-of-pocket expenses that you are seeking

14  from San Jacinto College in this case?

15    A.  Can I get back to you on that?  I don't know what the

16  right answer is.

17        MR. HOLMES:  If you can't think of any, just say

18  you can't think of any.

19    A.  Okay.  At this time, I can't think of any.  I want my

20  medical bills paid.

21    Q.  (BY MS. BROWN)  Well, I am not going to quite pass the

22  witness.  It's just contingent on what you end up producing in

23  terms of any other supplements.  And so I would like to pass the

24  witness, but there's a tiny chance that if you supplement, that

25  we might have questions.  I hope it doesn't come to pass.

Page 278

1        MR. HOLMES:  Yeah.  We've discussed that off the

2  record, and the -- we'll be reasonable about that.  If there's

3  something that she produces that was previously requested and

4  that -- we can -- we'll cross that bridge when we come to it.

5        MS. BROWN:  But if you have questions, you are

6  welcome to ask questions.

7        MR. HOLMES:  You need to say the magic words.

8        MS. BROWN:  Well, I -- I guess I'm passing the

9  witness today, but contingent on --

10        MR. HOLMES:  Okay.

11        MS. BROWN:  -- the necessity of reopening if

12  there's any new documents that require questioning.

13        MR. HOLMES:  Right.  Okay.

14        (Examination at 6:35 p.m.)

15            EXAMINATION

16  BY MR. HOLMES:

17    Q.  A couple -- a couple questions I do have for you.

18  Number one --

19        MR. HOLMES:  By the way, you're getting sound

20  okay?  Good.

21    Q.  (BY MR. HOLMES)  On the making up time issue that --

22  the discussions you were having with -- in July of 2017 about

23  what you were doing to make up time, did you feel that there was

24  a racial component to that?

25        MS. BROWN:  Objection to form.

Page 279

1    Q.  (BY MR. HOLMES)  Go ahead and answer.

2    A.  Yes, I do.

3    Q.  Okay.  Explain to us what -- why you felt there was a

4  racial component to that.

5    A.  Because other people had come in late.  They didn't

6  have to fill out times.  They didn't have to send out e-mails or

7  anything.  They came in late, and they went about their day as

8  is.  I was the only person subjected to this.

9    Q.  Okay.  What was the race of these other people?

10    A.  White.

11    Q.  Okay.  Now, the meeting you had with Ms. Blankenship on

12  the 15th that we've discussed, first of all, where did it happen?

13    A.  In my office.

14    Q.  Was the door open or closed?

15    A.  Closed.

16    Q.  Could you see out of your office?

17    A.  Yes.  It was windows like this, but without the

18  frosting.

19    Q.  Who did you see outside?

20    A.  Nobody.

21    Q.  What did you -- what was the -- what was the subject

22  matter of your discussion with Ms. Blankenship?

23    A.  The e-mail and how I felt that they had a slave

24  mentality and that they treated me horribly.

25    Q.  All right.  The -- when you raised those issues, what

Page 280

1  were you raising them in response to?

2    A.  It was a totality of how John was treating me and

3  everything.  His attitude to me, how he addressed me, how he

4  talked to me, how he badgered me, how he asked me to do things he

5  didn't ask other people to do, how he said things to me, how he

6  talked about my family.  Yes.

7        MR. HOLMES:  Okay.  That's all I've got.

8        (Further Examination at 6:37 p.m.)

9          FURTHER EXAMINATION

10  BY MS. BROWN:

11    Q.  Ms. Timmons, in -- in the discovery responses, the

12  interrogatories that we sent to you, we asked you in

13  Interrogatory 5 to describe for us all the times the college

14  treated white employees leniently.  And in your answer, you gave

15  the example -- the only example you gave is Pamela Wells and John

16  Brower and Laura White.  Do you see on Interrogatory 5?

17    A.  Yes, I do.  I would like to add to that.

18        MR. HOLMES:  Okay.  Let her -- let her ask the

19  question.

20    A.  Okay.

21    Q.  (BY MS. BROWN)  And let me ask you on Interrogatory 5

22  where you're referring to Pamela Wells and John Brower and Laura

23  White, you indicated you had requested information.  You say here

24  the Freedom of Information Act to get times when those people

25  were at work or not at work?



**Karen Blankenship**

```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION

 3   TRACY TIMMONS               )
                                 )
 4        Plaintiff,             )
                                 )
 5   VS.                         )   No. 4:18cv4368
                                 )
 6   SAN JACINTO COLLEGE,        )
                                 )
 7        Defendant.             )

 8

 9   ---------------------------------------------------------

10                        ORAL DEPOSITION

11                      KAREN BLANKENSHIP

12                      October 29, 2019

13   ---------------------------------------------------------

14

15        ORAL DEPOSITION OF KAREN BLANKENSHIP, produced as a

16   witness at the instance of the Plaintiff and duly sworn,

17   was taken in the above-styled and numbered cause on the

18   29th day of October, 2019, from 1:58 p.m. to 2:37 p.m.,

19   before Beverly Ann Smith, Certified Shorthand Reporter

20   in and for the State of Texas, reported by computerized

21   stenotype machine at the offices of THOMPSON & HORTON,

22   3200 Southwest Freeway, Suite 2000, Houston, Texas,

23   pursuant to the Federal Rules of Civil Procedure and the

24   provisions stated on the record or attached hereto.

25
```

**Karen Blankenship**

(Page 2)

```
1                    APPEARANCES
2
3  FOR THE PLAINTIFF:
4       Mr. David C. Holmes
        Attorney at Law
5       13201 Northwest Freeway, Suite 800
        Houston, Texas  77040
6       Telephone: 713-586-8862
        Fax:  713-586-8863
7       E-mail: dholmes282@aol.com
8  FOR THE DEFENDANT:
9       Ms. Lisa A. Brown
        THOMPSON & HORTON, L.L.P.
10      Phoenix Tower, Suite 2000
        3200 Southwest Freeway
11      Houston, Texas  77027
        Telephone: 713-554-6767
12      Fax:  713-583-8884
        E-mail: lbrown@thompsonhorton.com
13
14 ALSO PRESENT:
15      Ms. Anna Robshaw
        THOMAS & HORTON, L.L.P.
16
17
18
19
20
21
22
23
24
25
```

(Page 4)

```
1                    KAREN BLANKENSHIP,
2  having been first duly sworn, testified as follows:
3                    EXAMINATION
4      BY MR. HOLMES:
5      Q.  All right.  Would you state your name for the
6  record?
7      A.  My name is Karen Blankenship.
8      Q.  How are you currently employed?
9      A.  Library director at San Jacinto College.
10     Q.  Okay.  I don't want to spend a whole lot of
11 time on your biography.  But -- so, let me just ask a
12 couple of broad questions.
13     A.  Okay.
14     Q.  Where are you from originally?
15     A.  I was born in Dallas.  So, I'm a Texan.
16     Q.  Okay.  Run us through your education.  Just,
17 again, I don't want to belabor it.  Just give me the
18 high points.
19     A.  My undergraduate degree is from University of
20 Texas at Austin, and my master's degree is from
21 University of North Texas in Denton.
22     Q.  Okay.  Again, I don't want to spend a lot of
23 time on your employment history.  If you just give me,
24 you know -- I don't care about high school jobs and
25 things like that.  I'm talking about -- now about things
```

(Page 3)

```
1                    INDEX
2                                             PAGE
3  KAREN BLANKENSHIP
4  Examination by Mr. Holmes ........................4
   Signature Page ...............................35
5  Court Reporter's Certificate ....................37
6
7                    EXHIBITS
8  EXHIBIT      DESCRIPTION                      PAGE
9  1            Email chain ending 6/15/17 from   8
                Timmons to Blankenship Re:
10              Employee Harassment
   2            6/9/17 email from Timmons to      13
11              Blankenship Re: Circulation
                Phyllis Bent
12 3            Email chain ending 6/19/17 from   14
                Timmons to Brower Re: Time Make
13              Up June 15, 2017
   4            Written statement of             18
14              Blankenship
   5            Notice of Termination            32
15
16
17
18
19
20
21
22
23
24
25
```

(Page 5)

```
1  in libraries, which is -- you know, run me through just
2  the general outline of what your employment history has
3  been.
4      A.  Okay.  I worked for Harris County Public
5  Library as a selection assistant, and I started that in
6  the early Nineties.  Then I went to graduate school
7  while I was working there.  And then I did -- after I
8  got my master's, I was a children's librarian for two
9  and a half years with Harris County Public Library.
10         And then I was hired at San Jacinto
11 College.  At the time, my title was electronic resources
12 librarian.  And then gradually, after several years, I
13 became the -- well, my title was changed to systems
14 librarian.  Then I was technical services manager slash
15 systems librarian, and finally director.
16     Q.  Okay.  About what -- about what year did you
17 start San Jacinto?
18     A.  I think it was 1997.
19     Q.  Close enough --
20     A.  Yeah.
21     Q.  -- for what we're doing.
22         About what -- about when did you become a
23 library director?
24     A.  I think it was fall of 2008.
25     Q.  All right.  Let's hit some of the cast of
```

**Karen Blankenship**

(Page 6)

1  characters.  Who is John Brower?

2  **A.   John Brower is a librarian supervisor.  He's**

3  **the head of public service.**

4  Q.   Are you -- are you his supervisor?

5  **A.   Yes, I am.**

6  Q.   Okay.  About how long have you been his

7  supervisor?

8  **A.   As long as he's been at the college.  So, seven**

9  **years --**

10  Q.   All right.

11  **A.   -- maybe.  Seven or eight years.**

12  Q.   Okay.  And who is Tracy Timmons?

13  **A.   Tracy Timmons is a former reference librarian**

14  **at the college.**

15  Q.   And who was her supervisor?

16  **A.   John Brower.**

17  Q.   You know, during the period of time she worked

18  there, what kind of interactions would you typically

19  have with her?  That's a pretty broad question.  So, let

20  me break it down a little bit.

21  The -- you weren't her direct supervisor?

22  **A.   That's correct.**

23  Q.   So, I mean, just as a typical broad

24  brushstroke, 35,000-foot perspective, what was your

25  working relationship?  How did it work?

(Page 7)

1  **A.   With...?**

2  Q.   Tracy Timmons.

3  **A.   With Tracy?  Well, it's a very small staff.**

4  **So, sometimes I work on a project with her.  I'd see her**

5  **at the reference desk.  Sometimes I wouldn't see her at**

6  **all.  I mean, it varied.**

7  Q.   Where was your office relative to hers?

8  **A.   Across the library.**

9  Q.   All right.  Now, you're aware, I assume, that

10  over a period of years, Ms. Timmons had made a number of

11  complaints about both you and Mr. Brower.  Correct?

12  MS. BROWN:  Objection to form.

13  Q.   (By Mr. Holmes) Are you aware of that?

14  **A.   Yes.**

15  Q.   Okay.  What did you understand the general

16  nature of her complaints about Mr. Brower to be?

17  **A.   Well -- well, she had a -- she had several**

18  **complaints.  She complained that he was too demanding**

19  **about her schedule, that he had behaved inappropriately.**

20  **She accused him of bigotry or racism -- and/or racism.**

21  **She accused him of not following her accommodations as**

22  **specified.  Those were the type of complaints that she**

23  **would make.**

24  Q.   What did you understand, generally speaking, to

25  be the complaints that she was making about you?

(Page 8)

1  **A.   About me?**

2  MS. BROWN:  Objection to form.

3  Q.   (By Mr. Holmes) You still have to answer.

4  **A.   Oh.  I guess -- well, I don't know.  I think**

5  **she just felt that I didn't -- she said to me that she**

6  **didn't feel like I had taken any action with her**

7  **concerns.**

8  Q.   Okay.  Let me -- actually, I want to start with

9  this document, which will be Exhibit 1.  Helps if I put

10  the number on it.

11  (Exhibit 1 marked)

12  Q.   (By Mr. Holmes) Now, the first document -- the

13  first e-mail at the top of this -- at the beginning of

14  this, I'm not going to ask you about right now.  I'm

15  going to ask you about it later.

16  **A.   Okay.**

17  Q.   What I really want to ask you about is the

18  e-mails that are -- that apparently were attached to

19  this as part of a chain, and that starts down at the

20  bottom of the first page with a e-mail from Tracy

21  Timmons to Gretchen Rapp.

22  **A.   Uh-huh.**

23  Q.   Let me start with:  Who's Gretchen Rapp?

24  **A.   She's in H.R. department at the college.**

25  Q.   Okay.  Now, first of all, other than possibly

(Page 9)

1  being attached to Ms. Timmons' e-mail up at the top, had

2  you ever seen these e-mails before?

3  **A.   I don't remember.  You mean ever?**

4  Q.   Prior to the -- well, okay.  That was a

5  terrible question; so, let me ask this again.

6  The top e-mail is dated June 15th.

7  **A.   Yes.**

8  Q.   The e-mail that's below it is February 1st.

9  **A.   Okay.**

10  Q.   Prior to June 15th had you seen these e-mails

11  before?

12  **A.   I had not seen the very top one that Tracy sent**

13  **on the 15th.  I had not seen the discussion between**

14  **Gretchen and Tracy.  I don't remember if I've actually**

15  **seen this e-mail before.**

16  Q.   Okay.  Let me -- had you ever -- let me be more

17  specific.  I'm now looking at the e-mail that starts

18  about halfway on the second page, which is San Jacinto

19  College, page 46 stamped down at the bottom.

20  **A.   Okay.**

21  Q.   The first paragraph, Ms. Timmons talks about a

22  incident involving the bathroom in the grand lobby.  Do

23  you see that?

24  **A.   Yes, I do.**

25  Q.   Were you -- had you ever heard about that

**Karen Blankenship**

(Page 10)

1 before?
2     A.    About this incident?
3     Q.    Yes.
4     A.    Yes.
5     Q.    When did you first hear about that?
6     A.    Right after it happened, John came and spoke to
7 me.
8     Q.    What did he -- what did he say to you?
9     A.    He said he was clearing the library, as we do.
10 At the close of each business day, one of the things we
11 do is we knock on the bathroom doors and open them to
12 make sure nobody's in the bathrooms.
13     Q.    Okay.
14     A.    And, so, you know, if the door is locked, we
15 keep knocking till somebody responds because that
16 usually means somebody's in there.  But we have to make
17 sure everyone is out of the building at the close of
18 business when we leave.  So, we always check the
19 bathrooms; but we also check the study rooms, things
20 like that.
21     Q.    Okay.  And this says he came into the bathroom
22 while she was in the bathroom and had her panties down.
23 Did he say anything to you about that?
24     A.    Yes.  He said that the door was not locked.
25 She did not respond when he knocked on the door; and,

(Page 11)

1 so, he was just doing a visual check to make sure the
2 bathroom was empty.  It's a single-person bathroom.
3 And...
4     Q.    Okay.
5     A.    -- she -- you know --
6     Q.    Did you remember him -- did you ever talk to
7 Ms. Timmons about that?
8     A.    I don't remember if I spoke to Tracy about it.
9 No, I don't.
10     Q.    Okay.  The next paragraph, it talks about --
11 again, I'm not -- you know, it speaks for itself what it
12 says.  But it talks about mentioning Mary Tyler Moore
13 and illegal interview questions, there being but one
14 black person on the television show.
15          Did -- had you heard about that allegation
16 that she'd made before?
17     A.    I do not remember hearing about -- about this
18 particular allegation.
19     Q.    Okay.  Then it says, next -- next paragraph,
20 that Karen scheduled -- again, it speaks for itself.
21 I'm just -- you can read the exact words.
22     A.    Uh-huh.
23     Q.    But she scheduled a meeting in her office, and
24 the only people who were present were Karen, John, and
25 Tracy Timmons.  "We can't talk about those things

(Page 12)

1 because of you know who."  Do you know anything about
2 that?
3     A.    I remember the incident.  I don't remember the
4 exact day.  But we were getting ready to start a new
5 project, and I did not want to discuss the project until
6 everyone there -- was there to discuss it.  And, so, I
7 didn't say -- I don't believe I said we can't talk about
8 those things because of you know who.
9     Q.    Okay.  And the last page, again, it speaks for
10 itself; but she says "He is creating a hostile work
11 environment and do everything in his power to make me
12 uncomfortable.  Karen does not address the behavior."
13          Had you ever heard that was her viewpoint?
14     A.    She had said to me that -- that I never correct
15 him on his behavior.  And I replied that I cannot
16 discuss any corrections or, you know, employee
17 discipline with another employee, that I can only speak
18 to the person and H.R.
19     Q.    All right.  Well, is it fair to say that these
20 issues between Ms. Timmons and Mr. Brower and, I guess,
21 also yourself had been going on for a number of years?
22          MS. BROWN:  Objection to form.
23     A.    I think Tracy had several issues while she was
24 employed at the library.
25     Q.    (By Mr. Holmes) I'm -- specifically about

(Page 13)

1 issues regarding Mr. Brower and yourself?
2     A.    Yes.
3          (Exhibit 2 marked)
4     Q.    (By Mr. Holmes) Okay.  I'm not sure entirely --
5 I'm going to show you another document, Exhibit 2.  And
6 I just saw this for the first time today when it was
7 produced; and I just really, more than anything else,
8 want to ask you what you -- what this is about.
9          This Exhibit 2 is an e-mail from Tracy to
10 you dated June 9th, 2017, regard -- Subject:
11 Circulation Phyllis Bent.
12     A.    Uh-huh.
13     Q.    And do you remember this incident?
14     A.    I remember seeing this e-mail.  I'm not sure
15 what she's referring to here about John managing the
16 circulation desk.  I vaguely remember this -- somebody
17 using the study room, but that's not unusual.
18     Q.    Well, she talks about, in the first paragraph,
19 "I get tired of Phyllis complaining about John and his
20 management style or policies."
21          Do you recall anything about that?
22     A.    Did I recall Tracy talking to me, or Phyllis?
23     Q.    Well, let's start with Tracy.  Do you remember
24 Tracy talking to you about this?
25     A.    No.  I think this was about the same time Tracy

**Karen Blankenship**

(Page 14)

1  had had an issue with Phyllis, but I don't remember --
2  sorry.  (Inaudible).
3      Q.   Huh?
4      A.   She wants her boss's job.  I'm sorry.  I just
5  think it's funny.
6      Q.   Huh.  Well, okay.  I'm just -- do you remember
7  having any discussions with Phyllis about this?
8      A.   I -- I know Phyllis has talked to me about
9  how -- that John is the supervisor of the student
10  assistants and that she feels that that makes her role
11  unclear.  And we have worked to try to clear that up for
12  her.
13      Q.   Okay.
14      A.   Yeah.
15      Q.   Let's go on to Exhibit 3.
16              (Exhibit 3 marked)
17      Q.   (By Mr. Holmes) Now, you, I assume, are
18  familiar with this e-mail, which we have discussed
19  previously in the case just in general.
20      A.   Yes.
21      Q.   This is the slave-mentality e-mail.
22              MS. BROWN:  Well, objection to form.
23      Q.   (By Mr. Holmes) The -- how did you come to
24  learn about this?
25      A.   This -- this e-mail?

(Page 15)

1      Q.   Yes.
2      A.   John forwarded it to me and Vickie Del Bello
3  from the human resources department.
4      Q.   She did what?
5      A.   John forwarded this e-mail to me and Vickie Del
6  Bello at human resources.
7      Q.   Okay.  What did you understand -- okay.  First
8  of all, did you understand whether you had any
9  responsibilities within the system at San Jacinto
10  College to respond to this?
11      A.   To this e-mail?
12      Q.   Yes.
13      A.   I felt that I did, yes.
14      Q.   Okay.  What did you feel your responsibilities
15  were?
16      A.   I felt my responsibilities were to, again,
17  clarify for this employee that she is required to seek
18  permission from her supervisor to make up time as well
19  as taking time off for appointments and whatnot, and to
20  check in with him when she returns to work.
21          John Brower is her supervisor, and it's
22  his responsibility to provide for the public staffing of
23  the library.  And this was a -- Tracy had an ongoing
24  issue with her accountability.
25      Q.   Well, that's -- specifically did you feel that

(Page 16)

1  you had any responsibility to address the
2  slave-mentality comment?
3      A.   I felt I did, yes.
4      Q.   What responsibility did you feel you had with
5  respect to that comment?
6      A.   I felt that it was an uncourteous, rude, and
7  insubordinate statement, that it was unprofessional and
8  that that was just inappropriate for the workplace.
9      Q.   Okay.  But you did, that day, have a meeting
10  with Ms. Timmons and Mr. Brower.  Correct?
11      A.   Yes.
12      Q.   Prior to that meeting, did you talk to Ms. Del
13  Bello?
14      A.   Yes.
15      Q.   What did you discuss with Ms. Del Bello?
16      A.   I discussed with Ms. Del Bello that I was going
17  to be meeting with Tracy again to clarify that Tracy had
18  to check in with her supervisor and get his permission
19  before taking time off or making up time.  And I also
20  brought a copy -- brought a copy of the procedure that
21  clarifies, so that Tracy would have a written record of
22  the procedure that requires an employee to seek
23  permission from her supervisor.
24      Q.   Did you discuss the slave-mentality comment
25  with Ms. Del Bello?

(Page 17)

1      A.   Yes.
2      Q.   Okay.  What do you recall about that
3  discussion?
4      A.   I don't remember.  Honestly, I don't remember.
5      Q.   Well, do you remember -- did Ms. Del Bello give
6  you any instructions for talking to Ms. Timmons?
7      A.   I don't remember.  Usually Vickie just reminds
8  us to follow college policies when -- P.R. procedures
9  when -- you know, and to show the employee how they can
10  make the correction.
11      Q.   Okay.  Was there some policy or procedure that
12  you had in mind with respect to the slave-mentality
13  comment?
14      A.   Not to my knowledge, no.
15      Q.   Okay.  Did you talk to Mr. Brower before you
16  had that meeting?
17      A.   I think we had already talked to Vickie
18  Del Bello at one point that day; so, that's probably
19  when I talked to John.  I don't remember exactly the
20  timing.
21      Q.   Do you remember any -- anything Mr. --
22  Mr. Brower had to say about the slave-mentality comment?
23      A.   I think he was -- he appeared shocked that she
24  would say something like this.  It -- it was an unusual
25  thing to say.

**Karen Blankenship**

(Page 18)

1  Q.  But in the past, prior to this, she had
2  complained about bigotry on the part of Mr. Brower.
3  Correct?
4  A.  Yes.  To human resources, yeah.
5  Q.  Well, had she ever said that to you?
6  A.  Oh, yeah.
7  Q.  And in the -- any event, let's come up to the
8  meeting, which will be Exhibit 4 now, which I'm going
9  to -- this is your statement.
10          (Exhibit 4 marked)
11  Q.  (By Mr. Holmes) This particular version was the
12  one that I already had in my file that was in the T.W.C.
13  file, which is why --
14  A.  Right.
15  Q.  -- you see this -- this 37, it looks like, "B"
16  at the top.
17  A.  Okay.
18  Q.  There may be a cleaner copy out there.
19          But when did you write this?
20  A.  I don't remember.  I don't know if I wrote it
21  after the meeting or if I wrote it perhaps the next day.
22  Q.  Okay.  The -- let's talk about, aside from what
23  the document says, your recollection of the meeting.
24  Where was the meeting -- where did the meeting take
25  place?

(Page 19)

1  A.  In Tracy's office.
2  Q.  At the beginning, who was there?
3  A.  Myself, Tracy, and John Brower.
4  Q.  Okay.  How did it -- how did the meeting start
5  off?
6  A.  It started okay.  I wanted to talk to Tracy
7  about how she's supposed to record her time, her leave
8  time, and how she's supposed to request time off and how
9  she's supposed to request making up time.
10  Q.  Okay.  Did Mr. Brower say anything as part of
11  that?
12  A.  Not very much.  I don't remember saying --
13  speaking very much.
14  Q.  The -- now, you say here in the second
15  paragraph, your statement, "The meeting became -- began
16  fairly rocky as Tracy took exception to us questioning
17  her."
18  A.  Uh-huh.
19  Q.  What do you mean it "became fairly rocky" and
20  that she "took exception"?
21  A.  She -- I'm trying to -- it was almost -- she
22  acted almost as if we didn't have the right to be
23  questioning her time and her desire to make up time.  It
24  was like she felt like we were impertinent for
25  requesting that she follow the policy -- or pardon me --

(Page 20)

1  the procedure of the college in requesting time.
2  Q.  Okay.
3  A.  So, she was, you know...
4  Q.  Well, I mean -- I mean, the -- there are only
5  three people who were actually in the room at that time.
6  A.  Right.
7  Q.  You're one of them.  Can you, as best you can,
8  put into words how she was acting that made you feel
9  that it was -- with that, what did she say, what did she
10  do that made you think it was getting rocky?
11          MS. BROWN:  Objection to form.
12  A.  She raised her voice.  And I don't remember
13  exactly what she said, but I think she felt like she
14  shouldn't have to ask for time off or the ability to
15  make up time for the time she'd taken off.
16  Q.  (By Mr. Holmes) Did she say that, or is that
17  your impression?
18  A.  She did say that she shouldn't have to ask John
19  for permission.
20          And then I produced the doc- -- well, she
21  already had a copy of the Procedure 417; and you do have
22  to seek permission from your supervisor to take off time
23  and to make up time, if you wish.
24  Q.  Okay.  But you understand -- prior to that
25  you'd seen her e-mail, which is Exhibit 3 -- that she --

(Page 21)

1  she was apparently perceiving a racial component to
2  this.
3  A.  I think that Tracy was mistaken.  She was --
4  already been getting note of a corrective action about
5  how you're supposed to request time off as well as
6  making up time, and she was not following what we had
7  stated.
8          And I think John gave a very good
9  statement right here that said, "Is it okay if I make up
10  the time?"  That would have been just fine.  This was --
11  this was an example that he gave her that I would expect
12  all employees to do.
13  Q.  Okay.  Having seen Exhibit 3, did you know that
14  there was some potential for friction of this meeting?
15  A.  Tracy frequently had issues with her time.  She
16  had difficulty tracking her own time as well as her
17  requests or non-requests for making up time.
18          And we had even specified to her
19  previously that she could e-mail -- send e-mail in
20  requests asking for time off or to make up time, and
21  that would give her kind of a tracking mechanism that
22  she could follow.
23  Q.  Well, that wasn't what I -- what I meant.  She
24  made this slave-mentality comment.
25  A.  Oh, I'm sorry.

**Karen Blankenship**

(Page 22)

1    Q.   I mean, when you went into that meeting, did
2  you perceive that there was a potential for some sort of
3  friction or some sort of --
4       A.   Over that comment?
5       Q.   -- acrimony?
6       A.   No, I didn't think that there would be acrimony
7  over that.  I -- I personally felt like that was -- I
8  actually felt like she was trying to say that she didn't
9  have to ask him for permission to make up time.  She
10  shouldn't have to.  That's how I saw it.  She'd
11  already -- he'd already given her another example of how
12  to make up time, but what do you remember that she
13  that -- that example.
14       Q.   It says here, "At this point, Tracy raised her
15  voice and started talking about a previous E.E.O.C.
16  complaint" --
17       A.   Right.
18       Q.   -- "and blank [sic] Donald Trump," et cetera.
19       A.   Right.
20       Q.   As best you can remember -- and I know it's
21  been a long time, but what do you remember that she
22  said, as best you can recall?
23       A.   It was -- she was difficult to understand
24  because she was very agitated at this point and she was
25  quite loud.  I couldn't actually track everything she

(Page 23)

1  was saying.  It was -- it was -- like I said here, it
2  was like word salad.  It was very disjointed.
3            I excused John from the room, and I rose
4  to conclude the meeting.
5       Q.   Okay.  Let's talk about that.  Why did you
6  excuse John?
7       A.   Because she was saying things to him -- I'm
8  trying -- I don't remember exactly what she was saying,
9  but I just felt that we need to bring this meeting to a
10  close.  And, so, I excused John.  I told him to go ahead
11  and leave and that -- I rose to leave, also.
12       Q.   All right.
13       A.   I mean, it was to bring a very quick end to the
14  meeting.
15       Q.   By the way, just -- I haven't asked this
16  question.  Let's talk physically about the office you
17  were in.
18       A.   Uh-huh.
19       Q.   About how big was the office?
20       A.   It's rather small, actually.
21       Q.   Okay.  I'm not good with dimensions.  But what
22  would it be?  Like, 10 by 10, 15 by 15?
23       A.   Oh, I don't think it's that big.  It's just
24  large enough to have a desk with a credenza, two small
25  chairs in front, and a bookshelf.

(Page 24)

1    Q.   Okay.  And the room had a door?
2       A.   Yes.
3       Q.   Correct?
4            So, when you were in there, was the door
5  closed?
6       A.   Yes.
7       Q.   All right.  So, John leaves.  Is the door
8  closed again?
9       A.   Yes, he shut the door behind him.
10       Q.   Was there anybody out in the hall?
11       A.   Well, it opens onto the library itself, into
12  the open area of the library.  There's not a hallway.
13       Q.   Is there a copying machine or something out
14  there?
15       A.   Not near this -- the offices.  There's three
16  offices in a row.  The copy machine is over near the
17  service desk, the reference desk.
18       Q.   Any event, was there anyone standing right
19  outside the office?
20       A.   No.  Not to my recollection, no.
21       Q.   Okay.  Any event, so, John -- you say, you
22  know -- well, John leaves the -- the meeting.  You say
23  in here, "I asked her to please not make comments like
24  she did in her e-mail" --
25       A.   Yes.

(Page 25)

1    Q.   -- "as it was insubordinate and rude, and
2  that's not how we communicate."
3       A.   Right.
4       Q.   Was that with John there or after he left?
5       A.   That was after he left.
6       Q.   Okay.  And she began screaming at you,
7  according to this.  When you say screaming at you, what
8  do you mean?  I mean --
9       A.   I mean, she was -- she was -- she was screaming
10  very loud, and she was rocketing kind of back and forth
11  in her chair.  She was slamming stuff around on her
12  desk, and then she started beating on her desk with her
13  fist.
14       Q.   Okay.  Did she bang her head on her desk?
15       A.   No, I did not see her do that.
16       Q.   Okay.  I just -- I may be mistaken.  I thought
17  I'd seen a reference to that at some point.
18            The -- I mean, did she -- did she start to
19  get up?
20       A.   I was afraid she was going to get up, but I
21  left as quickly as I could -- I was already standing up
22  because I'd rose to leave and I was standing at the side
23  of her desk.  And she was hitting her fist on her desk.
24            And at first I couldn't move, and I was
25  afraid -- I was afraid that she would hit me, and then I

**Karen Blankenship**

(Page 26)

1  managed to leave -- leave -- leave and go to my office.
2      Q.   Okay.  Did -- well, just be clear:  Did she
3  actually make any motions directed at you?  Did she
4  start to get up?  Did she, you know, start to take a
5  swing at you, anything like that?
6      A.   Well, no.  She was rocketing around in her
7  chair.  So, I wouldn't have been able to tell if she was
8  about to get up or not because she wasn't sitting still.
9  I mean, I was afraid that she was going to get up and
10  hit me.
11     Q.   Well, there was a desk between you.
12     A.   No, there was not.  I was standing at the side
13  of the desk.  Like, she was here; I was, like, right
14  here.
15     Q.   Okay.  Did -- so, if you're standing at the
16  side of the desk, you could see her legs, I would
17  assume.
18     A.   No, because she was sitting at the desk.
19     Q.   So, her legs were under the desk?
20     A.   I think so.  I'm not -- she can't sit, you
21  know, all the way up to the desk, but...
22     Q.   Right.  Understood.
23          I guess, just to be clear -- I understand
24  you were concerned that she might get up, that she might
25  do things.  But I guess the -- I want to be clear on

(Page 27)

1  what she actually did.
2          So, did she actually, to your -- from
3  what -- from your perception, start to get up?
4      A.   I'm not sure.  I know she was -- as I
5  mentioned, she was moving around in her chair and
6  beating on her -- her desk.  And I was afraid that --
7  that -- I was afraid that she was going to hit me.  I
8  mean, I wasn't that far from her.
9      Q.   Well, did she make any motion...
10     A.   I left.
11     Q.   Before you left, did she make any motion, you
12  know, towards hitting you?  I mean, did she draw back
13  her arm and...?
14     A.   She was -- as I said, she was moving around in
15  her chair.  She was pounding on her desk.  And when --
16  then -- and she was also, like, slamming stuff around on
17  her desk.
18          So, I just left.  I wasn't going to -- I
19  didn't want to stay there.  I wanted to get out.
20     Q.   All right.  The -- you say that I'm -- you
21  know, she said:  'I'm not a N-word.  I'm not an
22  expletive N-word, and he is not going to treat me that
23  way.'
24          You understood that "he" was referring to
25  Ms. -- Mr. Brower?

(Page 28)

1      A.   Yes.
2      Q.   And it goes on to say:  'He's not going to
3  treat me like an N-word.'
4      A.   Uh-huh.
5      Q.   Did you make any comments about -- you know,
6  about you treating her that way?
7      A.   She did -- I think she called me a racist at
8  some -- at some point during this; but, honestly, she
9  was -- she was so -- I don't know the right word.  She
10  was so agitated that it was hard to track what she was
11  saying.  I remember this because it was quite shocking.
12  These words were quite shocking.
13     Q.   All right.  The -- just to be clear, I guess,
14  when he talks about -- when she talked about Mr. Brower
15  treating her like an N-word, did you understand that she
16  felt that that -- that he was doing that with -- in
17  connection with the time issues?
18     A.   Did I understand that?
19     Q.   Yeah, at the time.
20     A.   I -- I guess she was talking about the time
21  issues.  I don't think this is accurate, if that's what
22  she thought.
23     Q.   All right.  And, again, the -- well, we've
24  already covered this, that you understood that she
25  had -- she believed that he was a bigot.

(Page 29)

1      A.   Yes.
2      Q.   All right.  So, at this point you say that you
3  returned to your office to call Vickie Del Bello.
4  Correct?
5      A.   Yes.
6      Q.   All right.  What do you remember, if anything,
7  talking to Ms. Del Bello about?
8      A.   I just remember that I called her and told her
9  what happened.  I don't remember exactly what I said
10  because I was -- I was still crying.  I was very upset.
11          And it was the end of the workday.  So, I
12  had to calm down before I could drive home.  I don't
13  remember exactly what I said to Vickie, but I did tell
14  her what happened.
15     Q.   If you go back to Exhibit 1, the -- this was an
16  e-mail that Ms. Timmons sent you later in the -- it says
17  at 5:53.  Would that have been before or after you
18  left -- left the office?
19     A.   That was after I left.
20     Q.   Did you -- when did you first see this?
21     A.   I think I saw it probably the next day when I
22  came in to work on Friday.
23     Q.   Did you ever discuss this with Ms. Timmons?
24     A.   No.
25     Q.   Did you ever discuss -- I'm talking -- when I

**Karen Blankenship**

(Page 30)

1 say "this," I mean --
2    A.   You mean this e-mail from the 15th?
3    Q.   Right.  Did you ever discuss this with anybody?
4    A.   Yes, I forwarded it to Vickie Del Bello.
5    Q.   What do you remember discussing?  Did you
6 discuss this e-mail with her?
7    A.   With Vickie Del Bello?
8    Q.   Yes.
9    A.   Yes, I must have done.
10   Q.   You remember anything about that?
11   A.   No, I don't really remember.
12   Q.   All right.  Let's go through what happens
13 afterwards.  You come -- you know, you talk to Vickie
14 Del Bello --
15   A.   Yeah.
16   Q.   -- on the evening or before you left work on
17 the 15th.
18   A.   Right.
19   Q.   And have you told us anything you remember --
20 everything you remember about that conversation?
21   A.   Yes.  I believe so, yes.
22   Q.   Okay.  What happened the next day?
23   A.   The next day, I came to work.  That may have
24 been when I wrote my statement about what happened.  It
25 was a short day.  We only work four hours on Friday in

(Page 31)

1 the summer.  So, I don't remember anything else that
2 day.
3    Q.   Did somebody ask you to write that statement?
4    A.   Yes, Vickie asked me to write what happened.
5    Q.   Okay.  Do you -- do you know whether there was
6 an investigation of the -- what happened on the 15th?
7    A.   Yes, I believe there was.
8    Q.   What involvement did you have in that
9 investigation?
10   A.   I submitted my statement.  I don't remember if
11 Vickie discussed it with me further or if the provost
12 discussed it with me further.  I honestly don't
13 remember.  But I -- I did not conduct the investigation.
14   Q.   Well, no.  I wasn't suggesting --
15   A.   Yeah.
16   Q.   I'm just asking what you remember -- I mean, do
17 you know who did conduct the investigation?
18   A.   I believe it was Vickie Del Bello and our
19 provost, Van Wigginton.
20   Q.   Okay.  Now, I just wanted to make sure what
21 involvement you had in that in terms -- you know, did
22 you -- do you remember talking to Van Wigginton about
23 it?
24   A.   I don't really remember, but I may have done --
25   Q.   Yeah, fair enough.

(Page 32)

1    A.   Yeah.
2    Q.   Do you have any specific recollections of
3 talking to Ms. Del Bello other than what you've told us?
4    A.   No, because shortly after this I went on
5 vacation.  My sister was here; so, I wasn't work...
6    Q.   When did you find out that Ms. Timmons had been
7 terminated?
8    A.   I don't know exactly when I found out.
9    Q.   And the next exhibit is 5.
10   A.   Actually, I think I was still on vacation.
11   Q.   Okay.  Not sure why this one has yellow marks
12 on it.  So, I'll mark this one as the exhibit.  The --
13 this must have caught some yellow when it was in my bag.
14        (Exhibit 5 marked)
15   Q.   (By Mr. Holmes) Any event, this is just a copy
16 of the termination letter, which is on the 27th.
17        Do you know were you -- would you still
18 have been on vacation at that point?
19   A.   I think I was.
20   Q.   Okay.  Well, I just wanted to -- you know, just
21 to make sure I've covered as much as I can.  But I'm
22 specifically looking for any input that you had into the
23 investigation, information you supplied, conversations
24 between the 15th and the time she was terminated.
25        Is there anything else you specifically

(Page 33)

1 remembered we haven't talked about?
2    A.   No.  I -- nothing.
3    Q.   Okay.  Did you ever talk to Mr. Brower about
4 what happened?
5    A.   Oh, yes, of course.
6    Q.   You know, what do you remember discussing with
7 Mr. Brower?
8    A.   He asked -- well, I mean, he had been there for
9 part of the meeting and he was worried about what was
10 going on when -- he told me later he was worried when he
11 heard Tracy yelling and banging.  But, you know, we
12 tried -- you know, after Tracy was suspended, we tried
13 not to talk about it because that was H.R. business.  It
14 wasn't our business anymore.
15   Q.   Well, have you had any subsequent conversations
16 with him about it?
17   A.   Like --
18        MS. BROWN:  Objection to the extent you're
19 going to intrude on our litigation -- anticipation of
20 litigation privileges.
21        MR. HOLMES:  Sure.  I'm not talking about
22 as part of an investigation later on.  Let me be very
23 clear on that because that -- you know, that's a fair
24 point.
25   Q.   (By Mr. Holmes) First of all, of course, I'm

**Karen Blankenship**

(Page 34)

1  never asking any questions about what you discussed with
2  your lawyers; and I'm not talking about any litigation
3  investigation that may have taken place.
4         I'm talking about workplace conversations
5  that you might have had with Mr. Brower.
6     A.  After this?
7     Q.  After this.
8     A.  I'm sure we've talked about it.  It was very
9  traumatic.  I'm sure we've discussed it.
10    Q.  Did you know who took Tracy Timmons' position
11 as research librarian?
12    A.  As reference librarian?
13    Q.  Reference.  I'm sorry.
14    A.  I -- hang on.  I think it's -- I think it must
15 have been Nicole Burgin, who is currently a reference
16 librarian.
17         MR. HOLMES:  Okay.  That's all I have.
18 I'll pass the witness.
19         MS. BROWN:  We will reserve our questions.
20         (Proceedings concluded at 2:37 p.m.)
21
22
23
24
25

(Page 35)

1              CHANGES AND SIGNATURE
2  PAGE LINE  CHANGE              REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

(Page 36)

1      I, KAREN BLANKENSHIP, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5      _____
6                     KAREN BLANKENSHIP
7
8  THE STATE OF _____)
9  COUNTY OF _____)
10
11     Before me, _____, on this day
12 personally appeared KAREN BLANKENSHIP, known to me or
13 proved to me on the oath of _____ or through
14 _____ (description of identity card
15 or other document) to be the person whose name is
16 subscribed to the foregoing instrument and acknowledged
17 to me that he/she executed the same for the purpose and
18 consideration therein expressed.
19     Given under my hand and seal of office on this _____
20 day of _____, _____.
21
22              _____
23              NOTARY PUBLIC IN AND FOR
24              THE STATE OF _____
25 My Commission Expires: _____

(Page 37)

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
2                  HOUSTON DIVISION
3  TRACY TIMMONS          )
                          )
4     Plaintiff,          )
                          )
5  VS.                    )   No. 4:18cv4368
                          )
6  SAN JACINTO COLLEGE,   )
                          )
7     Defendant.          )
8             REPORTER'S CERTIFICATE
9        ORAL DEPOSITION OF KAREN BLANKENSHIP
10              October 29, 2019
11     I, Beverly Smith, Certified Shorthand Reporter in
12 and for the State of Texas, hereby certify to the
13 following:
14     That the witness, KAREN BLANKENSHIP, was duly sworn
15 and that the transcript of the deposition is a true
16 record of the testimony given by the witness;
17     That the deposition transcript was duly submitted on
18 _____ to the witness or to the attorney for
19 the witness for examination, signature, and return to me
20 by _____.
21     That pursuant to information given to the deposition
22 officer at the time said testimony was taken, the
23 following includes all parties of record and the amount
24 of time used by each party at the time of the
25 deposition:

**Karen Blankenship**

(Page 38)

```
 1      David C. Holmes ( 0 h 39 m )
              Attorney for Plaintiff
 2      Lisa A. Brown ( 0 h 0 m )
              Attorney for Defendant
 3
 4      That a copy of this certificate was served on all
 5  parties shown herein on _____ and filed
 6  with the Clerk.
 7      I further certify that I am neither counsel for,
 8  related to, nor employed by any of the parties in the
 9  action in which this proceeding was taken, and further
10  that I am not financially or otherwise interested in the
11  outcome of this action.
12      Further certification requirements pursuant to
13  Rule 203 of the Texas Code of Civil Procedure will be
14  complied with after they have occurred.
15      Certified to by me on this 14th day of November,
16  2019.
17
18
19                         _____
20                         Beverly Smith, CSR
                           Texas CSR 3554
21                         Expiration: 10/31/2021
                           Southwest Reporting Service
22                         Firm Registration No. 189
                           826 Heights Boulevard
23                         Houston, Texas  77007
                           T:713-650-1800 F:713-650-6245
24
25
```

(Page 39)

```
 1      FURTHER CERTIFICATION UNDER TRCP RULE 203
 2
 3      The original deposition was/was not returned to the
 4  deposition officer on _____.
 5      If returned, the attached Changes and Signature
 6  page(s) contain(s) any changes and the reasons therefor.
 7      If returned, the original deposition was delivered
 8  to David C. Holmes, Custodial Attorney.
 9      $_____ is the deposition officer's charges to the
10  Plaintiff for preparing the original deposition and any
11  copies of exhibits;
12      The deposition was delivered in accordance with Rule
13  203.3, and a copy of this certificate, served on all
14  parties shown herein, was filed with the Clerk.
15      Certified to by me on this _____ day of
16  _____, 2019.
17
18
19                         _____
20                         Beverly Smith, CSR
                           Texas CSR 3554
21                         Expiration: 10/31/2021
                           Southwest Reporting Service
22                         Firm Registration No. 189
                           826 Heights Boulevard
23                         Houston, Texas  77007
                           T:713-650-1800 F:713-650-6245
24
25
```

# San Jacinto College
## Personnel Action Request

**Effective Date**: 01/04/2012

**Employee** Tracey Timmons          **G#** G00814191

**Position** Reference Librarian     **Department** Library          **Campus** Central

---

## Employee-Initiated Actions

**Name Change**

From_____          New Address _____
To_____

For a name change, please attach a copy          Phone _____
of your new Social Security card or receipt

- [ ] Cancel Legal Coverage*          [ ] Cancel TSA Annuity*
- [ ] Cancel Vision Coverage*         [ ] Cancel Cancer Coverage*          *Effective first of the month following receipt of the form
- [ ] Salary Change: Draw 9/9 or 9/12 (Circle one)

---

## College-Initiated Actions

- [x] New Hire      Replaces whom? Mildred Joseph
- [ ] Rehire
- [ ] Reassignment          Is this position budgeted?  [x] Yes    [ ] No
- [ ] Promotion             Is this position funded by a grant? [ ] Yes  [x] No
                            (If yes, percent of salary from grant ____%)

**Classification**
- [x] Full-time non-teaching (40 hours)    [ ] Part-time staff (19 1/2 hours/week or less)
- [ ] Full-time faculty                    [ ] Student Assistant (19 1/2 hours/week or less and 6+ Credit Hours)
- [ ] Adjunct faculty                      [ ] Federal Work Study (19 1/2 hours/week or less)
- [ ] Temporary (specify classification and terms of employment)_____

### POSN

A99883    RECEIVED

|              | From | To |
|--------------|------|-----|
| [x] **Salary**   |      | $4,541.67 monthly |
| [x] **Campus**   |      | Central |
| [x] **Band**     |      | CLID |
| [x] **Position** |      | Reference Librarian |
| [x] **Department** |    | Library |

JAN 23 2012

HUMAN RESOURCES

FOAP information must be completed

| 100100 | 41064 | 612000 | 420100 | 100% |
|--------|-------|--------|--------|------|
| FUND   | ORG   | ACCT   | PROG   | Percent |

- [ ] Resignation
- [ ] Retirement
- [ ] Termination for Cause (Documentation Required)
- [ ] No Longer Employed (Use this box for something other than Resignation, Retirement, or Termination. i.e. No longer a student, Cleaning up old records, etc. Please provide an explanation below.)
- [ ] Not Eligible for Rehire
- [ ] Additional Information

---

Tracy Timmons                1/4/12          [signature]               1/4/12
Employee                     Date            Administrative Supervisor  Date

[signature]                  1/4/12          [signature]               1-18-12
Department Supervisor        Date            Campus President or Designee   Date

                                                               1-20-12

D-personnelactionrequest.indd - Revised 04/2009

APPENDIX 023

### SAN JACINTO COLLEGE
### JOB DESCRIPTION
### November 2010

**TITLE**:     Librarian CC

**DEPARTMENT**:   Lee Davis Library

**SECURITY SENSITIVE**:   Yes

**FLSA STATUS**[1]:   Exempt

**GRADE**:     25

**FUNCTION**: reference librarian

**CURRENT INCUMBENT(S)**:

**REPORTS TO**:   Librarian Supr CC

**SUPERVISES**:

**MAJOR REPONSIBILITIES**:

| Essential Job Functions[2] | Frequency D, W, M, Q, A[3] | %Time |
|---|---|---|
| 1. Provide reference service (in person, online, phone or email) for students, faculty, administrators and the general public. | D | 70 |
| 2. Bibliographic instruction (library instruction, by class or for individuals). | D | 15 |
| 3. Collection development | D | 10 |
| 4. Liaison with campus departments to determine materials needed to support curriculum. | D | 4 |



EXHIBIT
*Timmons*
2

---

[1] A, B, CAFÉ, CHILD, IA and IB bands are Non-exempt, all other bands are Exempt
[2] All job functions MUST add up to 100%
[3] D=daily, W=Weekly, M=monthly, Q=quarterly & A=annually

| Additional Job Functions: | Frequency D, W, M, Q, A | %Time |
|---|---|---|
| 1. Other duties as assigned. | D | 1 % |

## REQUIRED/MINIMUM QUALIFICATIONS

### Knowledge, Skills and Abilities:
Basic computer skills
Knowledge of reference work
Ability to work in collaboration with others.

### Education and Experience:

**Required Education:**   **Master's Degree from American Library Association accredited program**

**Preferred Education:**   **Master's Degree from American Library Association accredited program**

**Required Experience:**   **Reference experience**

**Preferred Experience:**   **Reference experience in an academic library**

### Licenses/Certifications:

#### Required Licenses/Certifications:

#### Preferred Licenses/Certifications:

| Work Environment | Frequency D, W, M, Q, A |
|---|---|
| Exposure to dust, mold | D |
| Office environment and computer strain | D |
| | |

| Physical Activity[4]: | Frequency D, W, M, Q, A |
|---|---|
| Lifting up to 50 pounds of force | D |
| | |

---

[4] Examples include: walking, running, sitting standing, etc.  Lifting up to 10, 25, 50 or over 100 pounds of force.

# 2016 Annual Performance Evaluation for Tracy R Timmons



SAN JACINTO
COLLEGE
Your Goals. Your College.

## Employee Information

| | |
|---|---|
| First Name: | Tracy |
| Last Name: | Timmons |
| Leader: | John W Brower |
| Department: | Library |
| SLT Member: | Van Wigginton |
| Campus: | CENTRAL |
| Hire Date: | 09/19/2011 |
| Employee Type: | Staff/Admin |
| Title: | Librarian |
| Employee ID: | G00814191 |

## Evaluation Information

| | |
|---|---|
| Originator: | Vickie N Del Bello |
| Review Period: | 05/04/2015 - 04/29/2016 |
| Due Date: | 08/31/2016 |

## Individual Performance Plan

### 1.1 Support the goals of the library director on service desk issues

**Category: Student Success**

**KPI:**
Support the goals of the library director on service desk issues

**Measure:**
1. Help students, faculty and all patrons with checking out and checking in materials and other circulation duties as required.
2. Assist patrons with Inter Library Loan.

| Start: | Due: | Status: | % Complete: |
|---|---|---|---|
| 09/01/2015 | 08/31/2016 | Completed | 100.0% |

**Tasks**

**Comments by Tracy R Timmons:**
Interlibrary loan statistics
August:    43
September 34
October    30
November 18
December 10
January    12
February   29
March      23

**Comments by John W Brower:**
Tracy is very good about staying on top of Inter Library Loans and has filled in at the Service Desk when needed to. She is warm and welcoming to the students and wants to help them.



EXHIBIT
28
Timmons

## 1.2 Improve Student Success by teaching Information Literacy

### Category: Student Success

**KPI:**
Improve Student Success by teaching Information Literacy

**Measure:**
Increase in Library Instruction Classes both in the library and in classrooms by 10% over FY2015.
Outreach to Faculty

| Start: | Due: | Status: | % Complete: |
|---|---|---|---|
| 09/01/2015 | 08/31/2016 | Completed | 90.0% |

### Tasks

**Comments by Tracy R Timmons:**
Library Instruction Statistics
September classes 8
October     classes 7
November classes 3
December classes 2
January     classes 0
February    classes 5
March       classes 3

**Comments by John W Brower:**
Tracy continues to do a great job teaching classes.  She hasn't had as many health science classes to teach this year as before, but every class she taught has been highly rated by the faculty.

## 1.3 Support Student Success by Outreach to Faculty.

### Category: Student Success

**KPI:**
Support Student Success by Outreach to Faculty.

**Measure:**
Keep accurate records of meetings, and emails with faculty.

| Start: | Due: | Status: | % Complete: |
|---|---|---|---|
| 09/01/2015 | 08/31/2016 | Completed | 100.0% |

### Tasks

**Comments by Tracy R Timmons:**
Participate in New Student Orientation, Stress Less Week, Raven Reference.
CALLR Meeting November 20, 2015
Stress  Less Week November 30- December 4 served refreshments students. Walked the library encouraging to attend activities.
May 2-6 Stress Less Week post flyers around campus and talk with students in the library encourage to participate library programs
Fill out Staff Activity Report for Program Review
Review 25 scholarship applications for the Foundation Office
New Student Orientation:
August 2
October 1
November 1
December 2
January 2

**Comments by John W Brower:**
Tracy has done a good job this year of increasing visibility in the Health Sciences Department with Raven Reference.  I look forward to even more outreach next year.

APPENDIX 027

**1.4 Support Student Success through answering Reference Questions. Customer service is the first priority and answers should be given quickly and accurately. Reference desk will be staffed when the library is open.**

Category: Student Success

**KPI:**
Support Student Success through answering Reference Questions. Customer service is the first priority and answers should be given quickly and accurately. Reference desk will be staffed when the library is open.

**Measure:**
Keep accurate statistics of questions asked. Monitor accuracy of answers given.

| Start: | Due: | Status: | % Complete: |
|---|---|---|---|
| 09/01/2015 | 08/31/2016 | Completed | 100.0% |

**Tasks**

Comments by Tracy R Timmons:
I work the reference desk 10 hours a week. I cover the desk when reference staff is attending professional development, sick or personal leave  Answer chat question when at the reference desk and in my office.
Worked in circulation when staff out the office.

Comments by John W Brower:
Tracy is very helpful to people who ask her for help on the reference desk.  She will go out of her way to help them and will not stop until the question is answered.  She is good at following up with them as well.

**1.5 Enhance quality of curricular content, personnel, and physical resources Support curriculum by continued development of the Program Review process. Support the Libraries district-wide via the technical services department and systems librarian. Assessment Project, SACS 5 year review**

Category: Student Success

**KPI:**
Enhance quality of curricular content, personnel, and physical resources
Support curriculum by continued development of the Program Review process.
Support the Libraries district-wide via the technical services department and systems librarian. Assessment Project, SACS 5 year review

**Measure:**
1. Assist with program review
2. Selection of materials for Collection Development

| Start: | Due: | Status: | % Complete: |
|---|---|---|---|
| 09/01/2015 | 08/31/2016 | Completed | 100.0% |

**Tasks**

Comments by Tracy R Timmons:
Program Review: Nursing and Medical Laboratory
 Two new programs have  been introduced Cardiovascular Imaging and Histology  working with Terri develop book collection.
Completed program review for Nursing: weed the collection, updating reference collection and moving items to circulation, and discussed with program director and faculty the need of the program. Participate in orientation during the fall and spring semester. Roving Reference was placed in the Health Science Building to provide another point of contact and help with research, which helped with student success.
 North Nursing Program Accreditation, I gave the site team a tour of library showing Reserves, Journals, Reference, and Circulation Collection. Also answered any question the team had about the collection.

Comments by John W Brower:
Tracy has grown in her Collection Development skills this year.  She has learned how to chose books that are appropriate for our collection.  She has worked with Terri to make good decisions on books.  She has also helped with the program review for her programs.

APPENDIX 028

## 1.6 Support institutionalizing Achieving the Dream by providing support of Instructional program. Support enhanced learning through Embedded Librarian program, LibGuides, and Bb Library resources and online databases.

Category: Student Success

**KPI:**
Support institutionalizing Achieving the Dream by providing support of Instructional program.
Support enhanced learning through Embedded Librarian program, LibGuides, and Bb Library resources and online databases.

**Measure:**
Statistics of how many library instruction classes provided to all classes.

| Start: | Due: | Status: | % Complete: |
|--------|------|---------|-------------|
| 09/01/2015 | 08/31/2016 | Completed | 100.0% |

**Tasks**

**Comments by Tracy R Timmons:**
Embedded Librarian for Diana Castillo for four sections and held web-based library tutorial online sections.
September classes 8
October    classes 7
November classes 3
December classes 2
January    classes 0
February   classes 5
March      classes 3

**Comments by John W Brower:**
Tracy always gets high ratings from professors on her Information Literacy Classes.  She also opened up new ground with online instruction for Castillo's Government classes.  She was able to help students in 4 different sections on a Saturday.  This is something we will be developing more in the future.

## 2.1 Pursue new relationships with our P-16 partners, especially PECHS

Category: P-16 Pipeline

**KPI:**
Pursue new relationships with our P-16 partners, especially PECHS

**Measure:**
1. support the local High Schools with library instruction and site visits
2. work with local schools in developing volunteer program

| Start: | Due: | Status: | % Complete: |
|--------|------|---------|-------------|
| 09/01/2015 | 08/31/2016 | Completed | 95.0% |

**Tasks**

**Comments by Tracy R Timmons:**
Worked Rudy and Rosalind to design a brochure to help students select fiction reading material English.

**Comments by John W Brower:**
Tracy has no been given many opportunities to develop this, since most of the Dual Credit classes are early in the morning or in La Porte, but she will be given more opportunity with this in the future.

## 4.1 Engage in Professional Develpment

Category: Our People

KPI:
Engage in Professional Develpment

Measure:
1. attend position appropriate training opportunities for staff including cultural diversity, student success at SJC, technical skills and customer service skills.
2. Make Professional Development plan for year.

| Start: | Due: | Status: | % Complete: |
|---|---|---|---|
| 09/01/2015 | 08/31/2016 | Completed | 100.0% |

Tasks

Comments by Tracy R Timmons:
I'm CALLR Secretary and Secretary Reference information Service Round Table- Texas Library Association.
Serve Local Arrangement Committee for Texas Library Association for Annual Conference 2016.
    Texas Library Association Annual Assembly July 7-10, 2015
    Recorded minutes of General Meeting, Committee Meeting, and executive Board Meeting
    Defended two program proposals, Both programs were presented at TLA Annual Conference.

Submitted Program SanJac Symposium 2016. The program was accepted by the committee. The title" African American Leaders and Innovators in Library Science" March 3, 2015
CALLR Meeting November 20, 2015
CAPR 5102 General Education evaluated writing assessments of students
CAPR 5412 Critical Thinking LEAP Rubric
ESHR 4001 Active Shooter
HREM 3002 San Jacinto College Policies and Procedures
HREM 3004 Employee Health Benefits
HREM 3002 Unlawful Harassment Prevention for Staff
HREM 2003 Prevention Discrimination and Sexual Violence
DIVS 3107   Diversity Module 4

Comments by John W Brower:
Tracy has really taken the lead in this area this year.  She is the Secretary for CALLR, and in TLA she's the Secretary of the Reference Information Services Round Table.  She also was on the local arrangements committee for the TLA  conference in Houston.  She also submitted a program and was accepted for the San Jac Symposium.  She also found professional development opportunities to attend which will benefit the library and San Jacinto College.

## Employee Values Assessment

This section defines the core values essential to the achievement of the College's strategic goals.

### Integrity: Ethical and Professional

We act in ways which instill confidence and trust.
Employee Rating: 3.0 - Often

### Excellence: In Everything We Do

We achieve quality results in everything we do.
Employee Rating: 3.0 - Often

### Accountability: It's Up To Us

We take responsibility for our commitments and outcomes.
Employee Rating: 3.0 - Often

APPENDIX 030

### Innovation: Lead The Way

We apply our knowledge, skills, insights, and imaginations to recognize opportunities, solve problems and recommend new solutions.

**Employee Rating:** 3.0 - Often

### Sense Of Community: Caring For Those We Serve and Ourselves

We demonstrate genuine concern for the well-being of our students, our community, and ourselves.

**Employee Rating:** 3.0 - Often

### Student Success: Our Ultimate Measure

We enable students to achieve their goals.

**Employee Rating:** 3.0 - Often

### Diversity: Celebrate the Differences

We celebrate the diversity of ideas and culture.

**Employee Rating:** 3.0 - Often

### Collaboration: We Work Together

We work together for the benefit of the college.

**Employee Rating:** 3.0 - Often

### Section Comments:

**Comments by Tracy R Timmons:**

I worked hard this year serve the San Jacinto College Community with participation **General Education Outcome Assessment**, gave insight and understand of how the common assignments are designed, how the library can play critical role in teaching student how to evaluate information and teaching information literacy skills. As an evaluator reading essays and working with faculty, helps the library promote mission of outreach.

College Service: I worked with the Foundation Office evaluation of scholarship essays. This also me helps inform students of many opportunities that the college has to help students pay for college, when teaching library classes. The evaluators play critical role in assessing the applicants and scoring the finish products. Participation in these college service activities helps in New Student Orientation, library instruction and faculty outreach.

San Jacinto College Symposium gave me opportunity share with faculty and students open forum about some great achievement and milestones in library science.

Professional Development:

Secretary of Consortium of Academic Library Learning Resources

Secretary Reference Information Service Round Table, now I'm Chair of the Round Table 2016-2017

Local Arrangement Committee, Texas Library Association 2015-2016 The local arrangement committee plans the local conference, which held in Houston, TX April 19- 22, 2016.

## Leader Values Assessment

This section defines the core values essential to the achievement of the College's strategic goals.

### Integrity: Ethical and Professional

We act in ways which instill confidence and trust.

**Leader Rating:** 3.0 - Often

### Excellence: In Everything We Do

We achieve quality results in everything we do.

**Leader Rating:** 3.0 - Often

## Accountability: It's Up To Us

We take responsibility for our commitments and outcomes.

Leader Rating: 3.0 - Often

## Innovation: Lead The Way

We apply our knowledge, skills, insights, and imaginations to recognize opportunities, solve problems and recommend new solutions.

Leader Rating: 3.0 - Often

## Sense Of Community: Caring For Those We Serve and Ourselves

We demonstrate genuine concern for the well-being of our students, our community, and ourselves.

Leader Rating: 2.0 - Sometimes

## Student Success: Our Ultimate Measure

We enable students to achieve their goals.

Leader Rating: 3.0 - Often

## Diversity: Celebrate the Differences

We celebrate the diversity of ideas and culture.

Leader Rating: 3.0 - Often

## Collaboration: We Work Together

We work together for the benefit of the college.

Leader Rating: 2.0 - Sometimes

Section Comments:

**Comments by John W Brower:**
Tracy believes in the values of San Jacinto College.  She has learned to do better this year on collaboration and is learning to work better with others.  She gives input at Reference meetings and listens to the ideas of others.  Through this she has helped the whole reference department go accomplish more outreach this year, and to teach more classes on the whole.  She is going a good job.

## Employee Performance Review & Evaluation

Faculty: Provide written responses that address each of the major evaluation areas. In completing your evaluation, please be sure to cover all of the major areas listed below. Refer to the Faculty Reference document as needed.
Professional StandardsPedagogical Standards (Instructional Design, Instructional Delivery, and Instructional Assessment);College ServiceProfessional Development

Department Chairs: Explain performance based on the requirements of the job description, include any critical activities that helped accomplish the College goals or objectives.

Staff & Administrators: Explain performance based on the requirements of the job description, include any critical activities that helped accomplish the College goals or objectives.

You may use one, two or three boxes in providing your responses.

APPENDIX 032

| Category: Employee-Summary of Performance | | |
|---|---|---|
| **Performance Detail:** | **Rating Definitions:** | **Weight:** |
| Performance based on the requirements of your job description and overall results in achieving your KPIs. | * Room for Improvement<br>* Valuable<br>* Notable | 100.0% |
| Category:<br>Employee-Summary of Performance | | |

**Employee Rating:** 3.0 - Notable

**Comments by Tracy R Timmons:**
I worked hard this year serve the San Jacinto College Community with participation **General Education Outcome Assessment**, gave insight and understand of how the common assignments are designed, how the library can play critical role in teaching student how to evaluate information and teaching information literacy skills. As an evaluator reading essays and working with faculty, helps the library promote mission of outreach.

College Service: I worked with the Foundation Office evaluation of scholarship essays. This also me helps inform students of many opportunities that the college has to help students pay for college, when teaching library classes. The evaluators play critical role in assessing the applicants and scoring the finish products. Participation in these college service activities helps in New Student Orientation, library instruction and faculty outreach.

San Jacinto College Symposium gave me opportunity share with faculty and students open forum about some great achievement and milestones in library science.

Professional Development:
Secretary of Consortium of Academic Library Learning Resources
Secretary Reference Information Service Round Table, now I'm Chair of the Round Table 2016-2017
Local Arrangement Committee, Texas Library Association 2015-2016 The local arrangement committee plans the local conference, which held in Houston, TX April 19- 22, 2016.

**Additional Employee Comments**

**Additional Employee Comments**

**Leader Performance Review & Evaluation**

Faculty: Provide written responses that address each of the major evaluation areas. In completing your evaluation, please be sure to cover all of the major areas listed below. Refer to the Faculty Reference document as needed.
Professional StandardsPedagogical Standards (Instructional Design, Instructional Delivery, and Instructional Assessment);College ServiceProfessional Development

Department Chairs: Explain performance based on the requirements of the job description, include any critical activities that helped accomplish the College goals or objectives.

Staff & Administrators: Explain performance based on the requirements of the job description, include any critical activities that helped accomplish the College goals or objectives.

You may use one, two or three boxes in providing your responses.

| Category: Leader-Summary of Performance | | |
|---|---|---|
| **Performance Detail:** | **Rating Definitions:** | **Weight:** |
| Performance based on the requirements of your job description and overall results in achieving your KPIs. | * Room for Improvement<br>* Valuable<br>* Notable | 100.0% |
| Category:<br>Leader-Summary of Performance | | |

**Leader Rating:** 2.0 - Valuable

**Comments by John W Brower:**
Tracy has made an effort over the last 7 months to be a part of the team.  She brings insights in Reference discussions and is willing to help when called upon.  Tracy has focused on her job and become more collaborative with her co-workers. She has also done a good job of reaching out to Health Science professors and students.  Her classes have all had very high rankings by professors.  She has also been very

APPENDIX 033

active professionally with CALLR and TLA.  She volunteered to be on the General Education Outcome Assessment committee too. She is a valuable employee.

**Additional Leader Comments**

Additional Leader Comments

**Employee/Leader Summary**

## Below is the rating summary of the employee self-evaluation and leader evaluation. This is not the final validated rating.

Calculated Overall Values Rating: 2.81 / 3.0

|  | Ratings | Weights |
|---|---|---|
| **Employee Values Assessment** | **3.0** / 3.0 | 25.0% |
| Integrity: Ethical and Professional | 3.0 - Often | |
| Excellence: In Everything We Do | 3.0 - Often | |
| Accountability: It's Up To Us | 3.0 - Often | |
| Innovation: Lead The Way | 3.0 - Often | |
| Sense Of Community: Caring For Those We Serve and Ourselves | 3.0 - Often | |
| Student Success: Our Ultimate Measure | 3.0 - Often | |
| Diversity: Celebrate the Differences | 3.0 - Often | |
| Collaboration: We Work Together | 3.0 - Often | |
| **Leader Values Assessment** | **2.75** / 3.0 | 75.0% |
| Integrity: Ethical and Professional | 3.0 - Often | |
| Excellence: In Everything We Do | 3.0 - Often | |
| Accountability: It's Up To Us | 3.0 - Often | |
| Innovation: Lead The Way | 3.0 - Often | |
| Sense Of Community: Caring For Those We Serve and Ourselves | 2.0 - Sometimes | |
| Student Success: Our Ultimate Measure | 3.0 - Often | |
| Diversity: Celebrate the Differences | 3.0 - Often | |
| Collaboration: We Work Together | 2.0 - Sometimes | |

Calculated Overall Review and Evaluation Rating: 2.25 / 3.0

|  | Ratings | Weights |
|---|---|---|
| **Employee Performance Review & Evaluation** | **3.0** / 3.0 | 25.0% |
| Performance based on the requirements of your job description and overall results in achieving your KPIs. | 3.0 - Notable | 100.0% |
| **Leader Performance Review & Evaluation** | **2.0** / 3.0 | 75.0% |
| Performance based on the requirements of your job description and overall results in achieving your KPIs. | 2.0 - Valuable | 100.0% |

**Overall Evaluation Summary**

### Please note the final Validated rating located to the right.

Validated Form Rating: 3.0 - Valuable

Calculated Form Rating: 4.06/5.0

|  | Rating | Weights |
|---|---|---|
| Individual Performance Plan | | 0.0% |

Support the goals of the library director on service desk issues

Improve Student Success by teaching Information Literacy

Support Student Success by Outreach to Faculty.

Support Student Success through answering Reference Questions. Customer service is the first priority and answers should be given quickly and accurately. Reference desk will be staffed when the library is open.

Enhance quality of curricular content, personnel, and physical resources Support curriculum by continued development of the Program Review process. Support the Libraries district-wide via the technical services department and systems librarian. Assessment Project, SACS 5 year review

Support institutionalizing Achieving the Dream by providing support of Instructional program. Support enhanced

APPENDIX 034

learning through Embedded Librarian program, LibGuides, and Bb Library resources and online databases.
Pursue new relationships with our P-16 partners, especially PECHS
Engage in Professional Develpment

| Employee Values Assessment | **3.0 / 3.0** | 25.0% |
|---|---|---|
| Integrity: Ethical and Professional | 3.0 - Often | |
| Excellence: In Everything We Do | 3.0 - Often | |
| Accountability: It's Up To Us | 3.0 - Often | |
| Innovation: Lead The Way | 3.0 - Often | |
| Sense Of Community: Caring For Those We Serve and Ourselves | 3.0 - Often | |
| Student Success: Our Ultimate Measure | 3.0 - Often | |
| Diversity: Celebrate the Differences | 3.0 - Often | |
| Collaboration: We Work Together | 3.0 - Often | |
| Leader Values Assessment | **2.75 / 3.0** | 75.0% |
| Integrity: Ethical and Professional | 3.0 - Often | |
| Excellence: In Everything We Do | 3.0 - Often | |
| Accountability: It's Up To Us | 3.0 - Often | |
| Innovation: Lead The Way | 3.0 - Often | |
| Sense Of Community: Caring For Those We Serve and Ourselves | 2.0 - Sometimes | |
| Student Success: Our Ultimate Measure | 3.0 - Often | |
| Diversity: Celebrate the Differences | 3.0 - Often | |
| Collaboration: We Work Together | 2.0 - Sometimes | |
| Employee Performance Review & Evaluation | **3.0 / 3.0** | 25.0% |
| Performance based on the requirements of your job description and overall results in achieving your KPIs. | 3.0 - Notable | 100.0% |
| Leader Performance Review & Evaluation | **2.0 / 3.0** | 75.0% |
| Performance based on the requirements of your job description and overall results in achieving your KPIs. | 2.0 - Valuable | 100.0% |

## Validation Meeting Notes

Section Comments:

Comments by John W Brower:
Tracy and I met on 7/12/16

## Signatures

Employee signature does not imply agreement or disagreement, only the acknowledgement that the discussion occurred.

Employee: *Tracy R Timmons*          *07/12/2016*
          Tracy R Timmons

Leader:   *John W Brower*            *08/24/2016*
          John W Brower

APPENDIX 035

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 460-2015-02987 |

**Texas Workforce Commission Civil Rights Division** and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Ms. Tracy Timmons** | **(713) 466-7097** | **07-28-1974** |

| Street Address | City, State and ZIP Code |
|---|---|
| **P. O. Box 2352, Houston, TX 77252** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **SAN JACINTO COLLEGE** | **500 or More** | **(281) 998-6150** |

| Street Address | City, State and ZIP Code |
|---|---|
| **8060 Spencer Hwy., Pasadena, TX 77505** | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☒ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☒ RETALIATION   ☒ AGE   ☒ DISABILITY   ☒ GENETIC INFORMATION
☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **06-08-2015**   Latest **06-16-2015**

☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I have requested accommodations at work due to my disabilities. My supervisor John Brower has told that I will still have to load paper in one of our larger copy machines and change the drum. Additionally, i tried to schedule doctor appointments and notified John. He has asked me to reschedule numerous times which impacts my doctors from renewing my accommodations. He never told me about FMLA and I have exhausted my sick and regular leave to go to doctor visits. John also asks questions about my disabilities randomly. He also makes comments such as I cannot discuss Obama because another employee is republican. He also said the new movie Annie was the worst movie ever created.

I believe that I am being discriminated against by being harassed because of disabilities in violation of the American's with Disabilities Act of 1990, as amended. Also I believe that I am discriminated against by being subjected to racially discriminatory comments and retaliated against because of my race (Black) and sex (Female), in violation of Title VII of the Civil Rights Act of 1964, as amended. Additionally, I believe my age (40) is a part of this discrimination I'm experiencing in violation of the Age Discrimination in Employment Act.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| Jun 18, 2015<br>Date            Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE<br>*(month, day, year)* |

*EXHIBIT Timmons*

APPENDIX 036

EEOC Form 161 (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: | **Tracy Timmons**<br>**P. O. Box 2352**<br>**Houston, TX 77252** | From: | **Houston District Office**<br>**Mickey Leland Building**<br>**1919 Smith Street, 7th Floor**<br>**Houston, TX 77002** |
|---|---|---|---|

| ☐ | *On behalf of person(s) aggrieved whose identity is*<br>*CONFIDENTIAL (29 CFR §1601.7(a))* | | |
|---|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **460-2015-02987** | **Michael Lightner,**<br>**Investigator** | **(713) 651-4989** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

#### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

On behalf of the Commission

**JAN 2 9 2016**

Enclosures(s)

Rayford O. Irvin,
District Director

*(Date Mailed)*

cc:
**Amber K. King**
**Attorney**
**THOMPSON AND HORTON, LLP**
**3200 Southwest Freeway**
**Phoenix Tower, Suite 2000**
**Houston, TX 77027**

**TWC- Civil Rights Division**
**101 East 15th Street**
**Room 144T**
**Austin, TX 78778**


EXHIBIT
12
Timmons

APPENDIX 037

Enclosure with EEOC
Form 161 (11/09)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court <u>under Federal law</u>.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

PRIVATE SUIT RIGHTS    --    **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *mailed* **to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

PRIVATE SUIT RIGHTS    --    **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

ATTORNEY REPRESENTATION    --    **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request <u>within 6 months</u> of this Notice.** (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

APPENDIX 038

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 460-2015-02987 |

| **Texas Workforce Commission Civil Rights Division** | | and EEOC |
|---|---|---|
| *State or local Agency, if any* | | |

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Ms. Tracy Timmons** | **(713) 466-7097** | **07-28-1974** |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| **P. O. Box 2352, Houston, TX 77252** | | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **SAN JACINTO COLLEGE** | **500 or More** | **(281) 998-6150** |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| **8060 Spencer Hwy.,  Pasadena, TX 77505** | | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| | | |

| DISCRIMINATION BASED ON *(Check appropriate box(es).)* | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| | Earliest / Latest |
| ☒ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN | **06-08-2015**  **06-16-2015** |
| ☒ RETALIATION  ☒ AGE  ☒ DISABILITY  ☒ GENETIC INFORMATION | |
| ☐ OTHER (Specify) | ☒ CONTINUING ACTION |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I have requested accommodations at work due to my disabilities. My supervisor John Brower has told that I will still have to load paper in one of our larger copy machines and change the drum. Additionally, I tried to schedule doctor appointments and notified John. He has asked me to reschedule numerous times which impacts my doctors from renewing my accommodations. He never told me about FMLA and I have exhausted my sick and regular leave to go to doctor visits. John also asks questions about my disabilities randomly. He also makes comments such as I cannot discuss Obama because another employee is republican. He also said the new movie Annie was the worst movie ever created.

I believe that I am being discriminated against by being harassed because of disabilities in violation of the American's with Disabilities Act of 1990, as amended. Also I believe that I am discriminated against by being subjected to racially discriminatory comments and retaliated against because of my race (Black) and sex (Female), in violation of Title VII of the Civil Rights Act of 1964, as amended. Additionally, I believe my age (40) is a part of this discrimination I'm experiencing in violation of the Age Discrimination in Employment Act.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| **Jun 18, 2015** _____ *(signature)*<br>Date      Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1. **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

2. **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3. **PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4. **ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5. **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

## NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so <u>within 15 days</u> of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

## NOTICE OF NON-RETALIATION REQUIREMENTS

Please notify EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

| From: | Timmons, Tracy |
|---|---|
| To: | Blankenship, Karen |
| Subject: | FW: Employee Harassment |
| Date: | Thursday, June 15, 2017 5:53:37 PM |

Hello Karen,

I want you to know I do not lie about what people say or do, also just because you are not around to witness the behavior does not mean it did not happen.

John told me my niece could not come into the library while, Phyllis sat behind the circulation desk. That is racism. What is so special about Phyllis that her niece can sit behind the desk like a work student, when she is visiting her aunt.

You do not have to believe me, but I'm not a liar.

Just like when Terry called Bobby from student success a **dike** at the reference desk, well that is sexual harassment and discrimination, because I did not invite that conversation and I do talk like that way about anybody, but I did not say anything, because you hold Terry in such high regard. But that does not mean she did not say it.

I also hold Terry in high regard she smart as whip and I have learn a lot about from, but there is side I don't like. (And I'm never going to report, because I honestly believe it was slip of the tongue, but I believe that with John Brower).

Our staff is racist.

Just like when Larry Gainor makes all sexual innuendoes at meeting that does not mean it not sexual harassment. It crude unwanted comments said in public forum and he is not chastise by any supervisor when there are three directors in the room.

You have right to believe what you believe that part of living in America, but also have a right to believe what I see and hear with my own eyes.

**P.S. John harasses about my accommodation's but Human Resource's has not notified him that I have them. Go Figure!**

Thank you,

Tracy Timmons

**From:** Timmons, Tracy
**Sent:** Wednesday, February 01, 2017 9:47 AM
**To:** Rapp, Gretchen
**Subject:** RE: Employee Harassment

I thought I was come to you when I have a problem.

Tracy

**From:** Rapp, Gretchen
**Sent:** Wednesday, February 01, 2017 9:38 AM
**To:** Timmons, Tracy
**Cc:** Del Bello, Vickie
**Subject:** RE: Employee Harassment

Tracy,

If you are not comfortable bringing this concern to Karen, you need to bring this to Van Wigginton. Please call his office and schedule a meeting to discuss.

*Gretchen Rapp*

Manager, Employee Relations ¦ San Jacinto College
4620 Fairmont Parkway, A.2-102G, Pasadena, Texas 77504
Office: 281.998.6314 ¦ Fax: 281.998.6165 ¦ www.sanjac.edu

**From:** Timmons, Tracy
**Sent:** Wednesday, February 01, 2017 8:31 AM
**To:** Rapp, Gretchen
**Cc:** Del Bello, Vickie
**Subject:** Employee Harassment
**Importance:** High

Hello Gretchen,

Last, Friday at the close of work day in the bathroom of the Grand Lobby John Brower came into bathroom while I was in the bathroom and I had my panties down, the library was cleared, I walked out with Rudy Silvia and I used the bathroom in the Grand Lobby.  I screamed.  He did apologize but this is a sequence of events is adding up.

Then Monday as I was leaving the desk and he was taking over, He mentioned Mary Tyler Moore and **illegal interview questions and there was one black person on the television show.  I specially mentioned in this type of behavior in the EEOC complaint, but it still happening.**

-

-

Tuesday, Karen scheduled a meeting in her office about before everybody else came to the meeting, thus the only people present where Karen, John and Tracy Timmons, is "we can't talk about those things because of you know who."

If they can't talk about of things then why are they constantly mentioning those things in front of

me, when I specifically the exact things in EEOC complaint.  He is creating a hostile work environment and do everything in his power to make me uncomfortable.  Karen does not address the behavior.

IT HAPPENING ALL OVER AGAIN!

Tracy Timmons

| | |
|---|---|
| **From:** | Brower, John |
| **To:** | Blankenship, Karen; Del Bello, Vickie |
| **Subject:** | FW: Time Make Up June 15, 2017 |
| **Date:** | Thursday, June 15, 2017 2:26:56 PM |

**John Brower MLS**
San Jacinto College
Head of Public Services/Lee Davis Library
8060 Spencer Hwy.
Pasadena, TX 77505
Library 281-476-1850 Direct 281-998-6150 x1600
www.sanjac.edu / www.facebook.com/sanjacintocollege /@SanJacCollege

**From:** Timmons, Tracy
**Sent:** Thursday, June 15, 2017 2:25 PM
**To:** Brower, John
**Subject:** RE: Time Make Up June 15, 2017

What I got from the meeting was being accurate about your time, what I interpret you got out of the meeting was begging to make up the time. **As an employee I should not have to beg it is a slave mentality that you try lord over me with your ruling class comment**.

Tracy Timmons

**From:** Brower, John
**Sent:** Thursday, June 15, 2017 2:13 PM
**To:** Timmons, Tracy
**Cc:** Del Bello, Vickie
**Subject:** RE: Time Make Up June 15, 2017

It's as easy as saying:
"Hello John and Karyn

I left work at 10:00 am and return to work at 1:50 pm. *Is it OK if I make up the time?* I will stay until 9:00 pm.

Thank you,

Tracy Timmons"

Thank you, John

**John Brower MLS**
San Jacinto College
Head of Public Services/Lee Davis Library
8060 Spencer Hwy.
Pasadena, TX 77505
Library 281-476-1850 Direct 281-998-6150 x1600
**www.sanjac.edu** / **www.facebook.com/sanjacintocollege** /@SanJacCollege

**From:** Timmons, Tracy
**Sent:** Thursday, June 15, 2017 2:10 PM
**To:** Brower, John
**Cc:** Del Bello, Vickie
**Subject:** RE: Time Make Up June 15, 2017

I stated the same way Karen asked in the meeting, please give the direct language that do want me to use.
Thank you

**From:** Brower, John
**Sent:** Thursday, June 15, 2017 2:06 PM
**To:** Timmons, Tracy
**Cc:** Blankenship, Karen
**Subject:** RE: Time Make Up June 15, 2017

Will you please keep track of the time you made up this month?  Also, I still want you to ask for permission.
If you will keep track, I'll allow it this time.
Thank you, John

**John Brower MLS**
San Jacinto College
Head of Public Services/Lee Davis Library
8060 Spencer Hwy.
Pasadena, TX 77505
Library 281-476-1850 Direct 281-998-6150 x1600
**www.sanjac.edu** / **www.facebook.com/sanjacintocollege** /@SanJacCollege

**From:** Timmons, Tracy
**Sent:** Thursday, June 15, 2017 2:04 PM
**To:** Brower, John
**Cc:** Blankenship, Karen
**Subject:** Time Make Up June 15, 2017

APPENDIX 045

Hello John and Karyn

I left work at 10:00 am and return to work at 1:50 pm.  I will stay until 9:00 pm.

Thank you,

Tracy Timmons

June 16, 2017

On Thursday, June 15, 2017, I was sitting at the reference desk on the first floor of the library.  Around 4:30 pm, I heard an audible but undistinguishable disturbance coming from the reference staff office area.

Rudy Silva

Carolyn Riddle
Lee Davis Library
Ext: 1584


Documentation of Incident occurring Thursday, June 15, 2017


At approximately 4:20 p.m. on Thursday, June 15, 2017, I was at the service desk when I observed Karen Blankenship and John Brower entering the office of Tracy Timmons, Reference Librarian. I was aware that there were existing problems with Ms. Timmons, so I stayed alert to any possibility.

Approximately one minute later I heard very loud shouting and noises, and I recognized that the shouting was from Ms. Timmons. John Brower then came to the service desk and instructed me to call the police. I dialed 5555 and was speaking to the emergency dispatcher when Mr. Brower came back and said that things were under control and not to have the police come to the library. I asked the dispatcher to cancel the request and I was told to call back if the police were needed.

I observed Ms. Timmons walk toward the West doors and leave the library.


End of Documentation

*Carolyn Riddle*

Carolyn Riddle
Library Assistant
Lee Davis Library
Ext: 1584



**Office of the Provost**

June 27, 2017

Tracy Timmons
Reference Librarian
Central Campus

Re: Notice of Termination

Dear Ms. Timmons:

The purpose of this correspondence is to inform you that your employment with the College will be terminated effective today, June 27, 2017.

I have completed my investigation and it has been determined that you demonstrated inappropriate behavior when Ms. Karen Blankenship was speaking with you about properly recording your leave time, and the need to request permission to flex your schedule. On Thursday, June 15, 2017, you became very aggressive and began yelling and banging your fist on the desk when Ms. Blankenship was reviewing the procedure. This behavior was extremely inappropriate and does not demonstrate the College values.

Based on this recent event, the Administration has made the decision to terminate your employment effective June 27, 2017.

Under Procedure 4-15, non-contractual employees are able to request a secondary review of their termination. The request must be in writing to the Vice President of Human Resources, within five (5) working days of the termination.

Your active employee benefits through the Employee Retirement System (ERS) will terminate effective June 30, 2017. You may obtain information regarding continuation of health benefits from the Human Resources Department at 281-998-6115 or by contacting ERS at 877-275-4377. You may also access ERS at http://www.ers.state.tx.us/

Sincerely,

Van A. Wigginton, Provost
Central Campus

**Atlantic Steel Company** *and* **Kenneth Chastain.** Case 10–CA–13634

September 28, 1979

## DECISION AND ORDER

By Members Penello, Murphy, and Truesdale

On December 15, 1978, Administrative Law Judge Walter H. Maloney, Jr., issued the attached Decision in this proceeding. Thereafter, Respondent filed exceptions and a supporting brief, and the Charging Party filed an answering brief.

Pursuant to the provisions of Section 3(b) of the National Labor Relations Act, as amended, the National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board has considered the record and the attached Decision in light of the exceptions and briefs and has decided to affirm the rulings of the Administrative Law Judge, and to adopt his findings and conclusions only to the extent consistent herewith.

Although an arbitrator had previously upheld the discharge of Kenneth Chastain for calling his supervisor a "lying s.o.b.," the Administrative Law Judge found that the arbitrator confined his decision to legal issues arising under the contract and failed to consider whether the conduct amounted to an unfair labor practice. The Administrative Law Judge found that Respondent violated Section 8(a)(1) and (3) of the Act by discharging Chastain because, at the time Chastain made the remark, he was discussing a grievance and therefore was engaged in protected concerted activity. Respondent maintains that Chastain was discharged for insubordination, and that the Board, under its *Spielberg* doctrine,[1] should defer to the arbitrator's award which upheld the lawfulness of the discharge. We agree with Respondent.

The facts, as found by the arbitrator, are relatively simple.[2]

Around 2 p.m. on November 3, 1977, employee Kenneth Chastain, during his regular work shift, approached his foreman in the production area, and asked him a question about assignment of overtime by seniority. Chastain was concerned that a probationary employee had worked overtime. Shortly thereafter, the foreman returned with an answer, also

---

[1] *Spielberg Manufacturing Company*, 112 NLRB 1080 (1955).

[2] We defer to the arbitrator's factual findings for the reasons stated in *The Kansas City Star Company*, 236 NLRB 866 (1978), to wit: (1) The findings are consistent with the record evidence; (2) there are no irregularities in the proceedings; and (3) there are no facial errors in the factual findings.

We note, as discussed *infra*, that there is a factual parrallel between the contractual and unfair labor practice questions which makes the arbitrator's factual findings controlling for purposes of resolving the unfair labor practice. Indeed, the arbitrator's decision implictly resolved the unfair labor practice, and we defer to this resolution.

---

stating that he had asked all of the crew to take the overtime. Based on the testimony of four witnesses—two employees, the foreman, and Chastain—the arbitrator found that, as the foreman was walking away from the area, Chastain turned to another employee and either called the foreman a "lying son of a bitch" or stated that the foreman had told a "m— f— lie" (or was a "m— f— liar") as to whether he had asked the entire crew to work overtime. The foreman heard his statement and told Chastain to go to the office. Chastain was suspended pending discharge and thereafter terminated.

At the arbitration hearing, Chastain claimed that the foreman had been harassing him for circulating a petition concerning benefits, and that the discharge was part of that harassment. Other claimed harassment was the foreman's complaint that he was spending too long in the bathroom, and that the foreman had poked him in the chest with a finger, insisted that he wear his hardhat, and objected to his rejection of certain of Respondent's products as defective.[3] The foreman denied all of these claims except the complaint about his going to the bathroom too frequently. In any event, the arbitrator found that Chastain had not been disciplined for any of these incidents, and that Respondent did not rely on them as grounds for the discharge.

The arbitrator also noted, as conceded by both Respondent and the Union, that Chastain was discharged on the basis of his entire record, and not solely because of the incident with the foreman. In the preceding 3 years, Chastain had been suspended twice and given two warning letters. The first suspension, for poor work performance which curtailed production, was grieved but not taken to arbitration. The second suspension—which occurred only 10 months before the final incident—was for cursing in the presence of female clerks in violation of a supervisor's directive not to use such language. This suspension was grieved and taken to arbitration, whereupon the same arbitrator who issued the instant decision upheld the suspension but reduced it from 2 days to 1 day. The arbitrator also observed in the present proceeding that Chastain had a poor attendance record—32 instances of tardiness, 1 of which concerned his leaving early with no apparent excuse, and 7 unexcused absences.

Based on all of the above, the arbitrator concluded that Respondent had good cause for the discharge. He found that Chastain had properly questioned the foreman about overtime, and that the foreman had acted promptly to answer the question. The arbitrator, concluding that Chastain's obscene reaction to the supervisor was unwarranted insubordination, noted that:

---

[3] Chastain filed five grievances claiming harassment.

---

245 NLRB No. 107

If Mitchell [the foreman] was in error in stating the entire crew had been offered the overtime, a grievance was the proper way to correct the mistake. But the use of insulting, obloquous [sic] language to other employees about their supervisor in the hearing of the supervisor cannot be regarded as "mere disrespect." On the contrary it shows a willful disregard for constituted industrial authority, a challenge to the dignity and character of the foreman, [and] a derrogation [sic] of the authority necessary to direct the working forces. Under any definition, this, in the setting it was found, constitutes insubordination.

Furthermore, the arbitrator found that any alleged harassment by Respondent played no role in the decision to discharge, since these alleged incidents were not "a causitive [sic] factor for Grievant's utterance concerning Mitchell. Grievant's language was a reaction to information supplied by Mitchell at Grievant's request. In this there was obviously disagreement, but not provocation." He also found that, while a supervisor once cursed an employee without being disciplined, that single event did not constitute a practice which would justify Chastain's language "in the circumstances where it was uttered." Finally, the arbitrator concluded that the discharge was warranted because Respondent did not discharge Chastain because of one insubordinate act. Rather, the discharge was part of a pattern of progressive discipline by Respondent, which included a prior suspension for a similar act.

Applying the analytical framework of the majority in *The Kansas City Star Company, supra,* the Administrative Law Judge refused to defer to the arbitrator's decision. He stated two reasons for refusing to defer: (1) The arbitrator had not decided the underlying unfair labor practice, and (2), alternatively, the arbitrator's conclusion, based on the facts found by the arbitrator, was not consistent with Board law.

We do not agree with the Administrative Law Judge. Rather, applying *Kansas City Star* and other *Spielberg* precedent to this case, we find that the Board should defer to the arbitrator's decision. In *Raytheon Company,*[4] cited in *Kansas City Star* and here by the Administrative Law Judge, the Board added the requirement to *Spielberg* that, in order for the Board to defer, the arbitrator must have considered the unfair labor practice in his decision. Since that time, there has been little discussion by the Board as to what this requirement means. Must the arbitrator actually discuss the unfair labor practice, or is it sufficient that he or she considered all of the evidence relevant to the unfair labor practice in determining whether the discharge was lawful under the

contract? A review of the decisions shows that, while it may be preferable for the arbitrator to pass on the unfair labor practice directly, the Board generally has not required that he or she do so. Rather, it is necessary only that the arbitrator has considered all of the evidence relevant to the unfair labor practice in reaching his or her decision. For example, in *Raytheon, supra,* the Board refused to defer to an arbitrator's decision because "the arbitrator did not, and was advised that he could not, even consider evidence that protected concerted and union activities were possible causes for the discharges."[5] Accordingly, the record which was developed before an arbitrator was inadequate for resolving the unfair labor practice.

Similarly, in *Clara Barton Terrace Convalescent Center, a Division of National Health Enterprises-Delfern, Inc.,*[6] also relied on here by the Administrative Law Judge, the Board, with Members Penello and Walther dissenting, refused to defer because the arbitrator had not considered the unfair labor practice issue either explicitly *or* implicitly. Even assuming an "implicit" resolution of the alleged unfair labor practice, that "implicit decision necessarily conflicted with the Act's protection."[7] Thus, while refusing to defer in that instance, the Board recognized that the *Spielberg* doctrine could be satisfied where the arbitrator's decision *implicitly* resolved the unfair labor practice.

More recently, in *Kansas City Star, supra,* the Board, with Chairman Fanning and Member Jenkins dissenting, deferred to the findings of the arbitrator in resolving the legality of the discharge of several strikers and the subsequent rescission of the collective-bargaining agreement. On the first issue, the arbitrator not only made all of the factual findings necessary to deciding the legality of the discharges, but he also decided that the discharges did not violate the Act. On the second issue, however, he made the requisite factual findings, but he did not determine the legality of rescission under the Act. The Board nevertheless deferred to his findings with respect to *both* issues. This was because the findings were both complete and comprehensive and factually parallel to the unfair labor practice question.

In the instant case, the arbitrator's findings are also complete and comprehensive[8] and factually parallel to the alleged unfair labor practice. Thus, with re-

---

[4] 140 NLRB 833 (1963), enforcement denied 326 F.2d 471 (1st Cir. 1964).

[5] 140 NLRB at 886.

[6] 225 NLRB 1028 (1976).

[7] 225 NLRB at 1029.

[8] This factor distinguishes this case from *Electronic Reproduction Service Corporation; Madison Square Offset Company, Inc.,* and *Xerographic Reproduction Center, Inc.,* 213 NLRB 758 (1974), where the Board deferred to the arbitrator's decision, even though he had not considered evidence that the employee had been discharged for union activity. That Decision, however, was effectively overruled in *Max Factor & Co.,* 239 NLRB 804 (1978), where Member Murphy expressed her disagreement with it. Chairman Fanning and Member Jenkins dissented in the original Decision.

816                                   DECISIONS OF NATIONAL LABOR RELATIONS BOARD

spect to the confrontation between the supervisor and Chastain, the arbitrator considered the testimony of both participants, as well as three employees who observed the events.[9] On the basis of all of their testimony, he made a factual determination of what occurred.[10] As part of his findings, he concluded that Chastain could formally grieve his complaint about overtime, but that his questions in that regard did not justify his statements about the supervisor.

In concluding that Chastain's statements were unjustified, the arbitrator also considered Chastain's allegation that he was discharged as part of a pattern of harassment for having circulated a petition concerning benefits. He rejected this claim and found that Chastain was discharged on the basis of his entire disciplinary record, including the uttering of the obscenities about the supervisor, and not as part of any campaign of harassment. We are satisfied that the arbitrator thoroughly considered all of the evidence and made factual findings that are clearly supported by the evidence. Accordingly, we defer to his factual findings.[11]

We also disagree with the Administrative Law Judge's conclusion that deferral was not warranted because the arbitrator's conclusion was repugnant to the Act. The Administrative Law Judge stated:

> Without in any way disturbing the arbitrator's credibility findings or his factual analysis, it is clear from facts he found that this Respondent had invaded Chastain's rights under Section 7 of the Act.

According to the Administrative Law Judge, Chastain's questions about overtime constituted a grievance and protected concerted activity. Therefore, when Chastain used the term "lying son of a bitch," or "m— f— lie" (or "liar"), the Administrative Law Judge reasoned that this conduct, as a part of the *res gestae* of the grievance, was also protected. As support for this conclusion, he relied on two lines of precedent. The first group of cases[12] dealt with formal

grievances or negotiating sessions which were conducted away from the production area. There, in the heat of discussion, an employee uttered an obscenity or used extremely strong language. In that context, the employee's conduct was found to be protected as part of the *res gestae*. Under the other line of precedent, represented by *Merlyn Bunney and Clarence Bunney, partners, d/b/a Bunney Bros. Construction Company*,[13] and *Interboro Contractors, Inc.*,[14] the Board concluded that an individual employee's complaint under the contract about working conditions constituted protected concerted activity. The employee in question, however, made no obscene or insulting statement.

The Administrative Law Judge cited no decisions, however, and we know of none, where the Board has held that an employee's use of obscenity to a supervisor on the production floor, following a question concerning working conditions, is protected as would be a spontaneous outburst during the heat of a formal grievance proceeding or in contract negotiations. To the contrary, the Board and the courts have recognized (as did the Administrative Law Judge in passing) that even an employee who is engaged in concerted protected activity can, by opprobrious conduct, lose the protection of the Act.[15]

The decision as to whether the employee has crossed that line depends on several factors: (1) the place of the discussion; (2) the subject matter of the discussion; (3) the nature of the employee's outburst; and (4) whether the outburst was, in any way, provoked by an employer's unfair labor practice.

To reach a decision, the Board or an arbitrator must carefully balance these various factors.

Here the arbitrator considered the factors which the Board considers, and concluded that the employee's discharge was warranted and based on reasons not repugnant to the Act.[16] He noted that the incident

---

[9] These employees testified on behalf of the Union. Only one of them testified at the hearing before the Administrative Law Judge.

[10] Contrary to the Administrative Law Judge, the arbitrator's findings were not based on a crediting of the testimony of the supervisor. While Respondent urged the arbitrator to credit the supervisor, the arbitrator made his factual findings on the basis of the corroborated testimony of all of the witnesses.

[11] We specifically repudiate our concurring colleague's misinterpretation of our opinion herein. Contrary to his statement, we neither agree nor disagree with the arbitrator's determination—our sole consideration is whether the arbitrator passed on all relevant aspects of the matter now before us and reached a conclusion which is not repugnant to the Act, in accord with *The Kansas City Star Company, supra.*

[12] The cases cited by the Administrative Law Judge were *Thor Power Tool Company*, 148 NLRB 1379 (1964), enfd. 351 F.2d 584 (7th Cir. 1965) (grievance meeting in employer's office); and *Crown Central Petroleum Corporation v. N.L.R.B.*, 430 F.2d 724 (5th Cir. 1970) (grievance proceeding). He also cited *N.L.R.B. v. Cement Transport, Inc.*, 490 F.2d 1024 (6th Cir. 1974). In

that case the court held that an employee's use of obscenity during an organizational campaign was protected. That situation is very different from the one herein.

[13] 139 NLRB 1516 (1962).

[14] 157 NLRB 1295 (1965).

[15] *Hawaiian Hauling Service, Ltd.*, 219 NLRB 765, 766 (1975).

[16] By contrast, in *Sea-Land Service, Inc.*, 240 NLRB 1146 (1979) (Member Penello dissented), Member Truesdale concurred with Chairman Fanning and Member Jenkins in finding that the arbitrator's decision on an issue similar to that presented here was repugnant to the Act. In *Sea-Land*, an employee had filed a grievance following a reprimand for his work, and then the employer disciplined him in writing for having filed the grievance. The employee was presented with the discipline letter at a meeting with the supervisors over the grievance. When the employee saw the letter, he stated:

> . . . [T]he company may be crazy if they think that they can give [me] instructions like this. [I] can stand on the highest mountain shouting anything [I] want to about the President of the United States . . . . [I] could say anything [I] wanted to anybody anytime [I] wanted to, and, Kay Miller, you must be out of your f— mind if you think you can change me.

He was summarily discharged for that outburst, and his discharge was upheld by an arbitrator. Member Truesdale refused to defer in that instance because the outburst occurred away from the production floor, it concerned a formal grievance, and, most significantly, the outburst was provoked, as

817

occurred on the production floor during working time (not at a grievance meeting), that the employee's question about overtime expressed legitimate concern which could be grieved, and that the supervisor had investigated and answered his question promptly; but, nevertheless, the employee had reacted in an obscene fashion without provocation and in a work setting where such conduct was not normally tolerated. He further considered the employee's past record and concluded that, considered together, this record established a reasonable basis for the discharge.[17]

We find nothing in the arbitrator's decision that is repugnant to the Act. Indeed, a contrary result in this case would mean that any employee's offhand complaint would be protected activity which would shield any obscene insubordination short of physical violence. That result would not be consistent with the Act. Accordingly, we conclude that it will effectuate the purposes of the Act to give conclusive effect to the grievance award, and, on that basis, we shall dismiss the complaint in its entirety.

## ORDER

Pursuant to Section 10(c) of the National Labor Relations Act, as amended, the National Labor Relations Board hereby orders that the complaint herein be, and it hereby is, dismissed in its entirety.

MEMBER PENELLO, concurring:

For somewhat different reasons than my colleagues, I agree that this case should be deferred to the arbitration award which found that grievant Chastain had been discharged for cause; i.e., insubordination. The question before the arbitrator was essentially the same as the unfair labor practice issue herein; i.e., whether Chastain's conduct was so opprobrious as to make Chastain unfit for further employment. The arbitrator found that it was:

> But the use of insulting obloquous [sic] language ["m— f— liar" or "lying son-of-a-bitch"] to other employees about their supervisor in the hearing of the supervisor cannot be regarded as "mere disrespect." On the contrary it shows a willful disregard for constituted industrial authority, a challenge to the dignity and character of the foreman, a derrogation [sic] of the authority necessary to direct the working forces.

The arbitrator found that Chastain was discharged because he cursed his supervisor and that, under the circumstances, Chastain had thereby crossed the line

separating acceptable from unacceptable behavior. On this basis, and this basis alone, I find that the arbitrator's award is not clearly repugnant to the purposes and policies of the Act. As the other *Spielberg* standards are not at issue, I would accordingly defer to the award. In my opinion, further consideration or analysis is neither necessary nor warranted. See my dissents in *Hawaiin Hauling Service, Ltd.*, 219 NLRB 765, 767 (1975); *Clara Barton Terrace Convalescent Center*, 225 NLRB 1028, 1029 (1976); *Ad Art, Incorporated*, 238 NLRB 1124 (1978); and *Sea-Land Service, Inc.*, 240 NLRB 1146 (1979).

My colleagues go to some length to distinguish the instant case from those cited above. Yet each case involves an arbitration award which found that the grievant had cursed a management official under circumstances in which such behavior was unacceptable. Of course there are differences in the cases, but they are differences of degree rather than kind. The only real distinction my colleagues have made is that they believe the arbitrator herein has made the right decision—that his award fully squares with Board precedent, that he applied the precise determinants of what is unacceptable behavior, and, ultimately, that his award reached a result with which they agree. My colleagues' standard for deferral is, thus, whether the award is in accord with the Act and Board precedent rather than the *Spielberg* standard of whether the award is clearly repugnant to the Act or wholly at odds with Board precedent. My colleagues' mistake, I believe, is that they first look to the unfair labor practice complaint and hearing rather than to the arbitration award. In my view, my colleagues have not "deferred" to the arbitrator's award but have "adopted" it as if the arbitrator were some sort of unofficial administrative law judge. Deferral under such a standard furthers neither the aim nor the efficient administration of the Act but encourages full litigation before the Board of deferrable disputes. Strict attention to *Spielberg* standards would, however, further the purposes of the Act by encouraging the reliance on collective-bargaining and its correlative offspring, grievance arbitration. Accordingly, I would *defer* to the arbitration award herein and dismiss the complaint in its entirety.

## DECISION

### A. *Statement of the Case*

WALTER H. MALONEY, JR., Administrative Law Judge. This case came on to be heard before the undersigned in Atlanta, Georgia, upon an unfair labor practice complaint,[1] issued by the Regional Director for Region 10, which al-

---

found by the arbitrator, by the employer's own unfair labor practice—disciplining the employee for filing a grievance. Thus, in his view, the arbitrator's result was not consistent with Board law.

[17] Member Murphy did not participate in *Sea-Land Service, Inc.*, *supra*, and finds it unnecessary to express a position on that holding at this time.

[1] The principal docket entries in this case are as follows: Charge filed herein by Kenneth Chastain, an individual, against Respondent on May 2,
*(Continued)*

leges that the Respondent. Atlantic Steel Company,[2] violated Section 8(a)(1) and (3) of the Act. More particularly, the complaint alleges that Respondent discharged Charging Party Kenneth Chastain because Chastain was engaging in concerted, protected activities and in union activities. Respondent maintains that Chastain was discharged for cursing a supervisor and that the Board, under its *Spielberg* doctrine[3], should defer to an arbitrator's award which upheld the discharge. Upon these contentions the issues herein were drawn.[4]

### B. *The Unfair Labor Practices Alleged*

For many years Respondent has operated a steel fabricating plant in Atlanta, Georgia. It employs between 1,050 and 1,125 employees in its production and maintenance unit. For more than 30 years, Respondent has maintained a collective-bargaining relationship in this unit with Local 2401 of the United Steelworkers of America. Its most recent contract with the Union became effective on August 1, 1977, for 3 years. At the same time that the parties concluded a collective-bargaining agreement of general application, they also conclude a supplemental unemployment benefit plan agreement governing the same bargaining unit for the same period of time.

Respondent has maintained a supplemental unemployment benefit plan (SUB) for its unit employees, in accordance with which it was formerly obligated to contribute an amount equal to 5 cents per hour per employee up to a stated ceiling. When unit employees were laid off, the Company supplemented their unemployment compensation checks from this fund. In the winter of 1976–77, the fund went dry because of a large number of layoffs and a substantial number of short work weeks due to cold weather. As a result, Respondent posted a notice at the plant in January or February advising employees of the condition of the fund. It also discussed the problem with Union officials. The SUB fund was the subject of negotiations in the summer of 1977, in the course of which the Company agreed to an 8-cent-per-hour per employee contribution and a higher fund limitation.

Kenneth Chastain, the Charging Party in this case, started to work for the Respondent in 1973. At the time of his discharge on November 4, 1977, he was employed as a galvanizer helper in the Mill Galvanizing Department. His immediate foreman was Ruzzie Mitchell, who is familiarly known as "Rev." I credit Chastain's testimony that, in the

fall of 1977, he and other employees in the Mill Galvanizing Department were unhappy about the operation of the fund, so Chastain circulated a petition at the plant, directed toward the Union, asking the Union to discuss the SUB fund problem at a union meeting. He collected about thirty signatures on the petition. I also find that his foreman, Mitchell, was aware that Chastain was circulating this petition.[5]

Chastain asserts that, during this same period of time, he was having difficulty with Mitchell, a difficulty he attributes to Mitchell's resentment of his effort in circulating a petition. Specifically, Chastain complains that Mitchell poked him in the chest while speaking to him and later bumped into him deliberately. He testified that Mitchell followed him and his Shop Steward Joe R. Garrett to the bathroom and criticized them for spending excessive amounts of time therein. Chastain also complains that Mitchell required him to place an inspection tag on a roll of fence which Chastain felt was defective, thereby making Chastain liable for a possible conduct memorandum (written reprimand) in the event that the purchaser of the fence returned it as defective. On November 2, the day before the incident which triggered his discharge, Chastain filed a grievance against Mitchell for harassment.

For its part, Respondent was less than enchanted with Chastain. During his 4-1/2 year tenure, he received disciplinary warnings for absenteeism and slowness on the job. He was also given a layoff for refusing to follow his foreman's orders respecting the use of a sledge hammer to knock certain angles in line, and another layoff for cursing in the presence of female office employees. This latter incident was taken to arbitration, at which the arbitrator upheld the Company's action while reducing the layoff from 2 days to 1 day.

On November 3, Chastain learned that a probationary employee named Cook had been given overtime by Mitchell while others, including himself, who worked under Mitchell's supervision and who had greater seniority, had been bypassed. Chastain felt that this assignment was a contract violation[6] and complained to Mitchell about his

---

[1] 1978; complaint issued on May 23, 1978; Respondent's answer filed on May 31, 1978; hearing held in Atlanta, Georgia, on October 17, 1978; briefs filed by the Charging Party and Respondent with the undersigned on or before November 13, 1978.

[2] Respondent admits, and I find, that it is a corporation which maintains an office and factory in Atlanta, Georgia, where it is engaged in the manufacturing of chain link fence and other steel products. During the preceeding calendar year, Respondent has shipped from its Atlanta, Georgia, place of business directly to points and places outside the State of Georgia goods and merchandise valued in excess of $50,000. Accordingly, Respondent is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act. Local 2401, United Steelworkers of America, AFL–CIO, is a labor organization within the meaning of Sec. 2(5) of the Act.

[3] *Spielberg Manufacturing Company*, 112 NLRB 1080.

[4] The transcript herein is hereby corrected.

---

[5] Mitchell was an unreliable and evasive witness. He denied at the hearing in this case that he knew Chastain was circulating a petition. He even denied knowing that the fund had run dry or that any problem had arisen concerning it. Respondent's witness Ronald J. Dervales, when pressed, admitted that Mitchell had stated at an earlier arbitration hearing that, in fact, he had been aware that Chastain had been circulating a petition on a clipboard.

[6] The contract provision relating to incidental overtime states:

The procedure for filling day-to-day temporary vacancies involving overtime is established in accordance with the provisions of Section 6.7 of the Collectively Bargained Contract, and is applicable to the following departments and occupations where specified:

\*      \*      \*      \*      \*

#### Mill Galvanizer

1. Sequence to be followed when there is an operating turn immediately preceding the turn on which the vacancy exists:

(a) By an Employee performing the assignment on the turn immediately preceding the turn on which the vacancy exists.

(b) By a qualified Employee from the turn immediately preceding the turn on which the vacancy exists, in the order of descending Occupational Seniority, starting with the occupation next below the vacancy. Such Employee doubling over with double on the occupation he worked the preceding turn, and the Employee scheduled to work that occupa-

loss of overtime and the assignment of overtime without regard to seniority. Mitchell said he would check up on the matter and get back to Chastain. Mitchell went to the office and spoke with Alton Beck, another foreman, and returned a few minutes later to the spot where Chastain was working. Two other employees, Shop Steward Garrett and Robert Dougherty, were also working in the same vicinity. I credit Chastain that Mitchell replied to Chastain's complaint by telling him that in fact Mitchell had asked Chastain to work overtime. Chastain denied this assertion and asked Mitchell if he had also asked all the other employees to work overtime. Mitchell replied that he had done so. Dougherty and Garrett denied Mitchell's assertion, whereupon Mitchell threw up his hands, turned, and walked away. When Mitchell had walked about 15 feet from where these employees were working, Chastain spoke to Garrett, asked if he had "gotten . . . down" what Mitchell had said, and asked Garrett if he had "heard that lying s.o.b.?"[7] Mitchell turned around and ordered Chastain to come to the office with him. Chastain insisted on being accompanied to the office by a union representative, so Mitchell agreed to permit Garrett to be present. At the office, Mitchell called a security guard. When the guard arrived, he told the guard that he was suspending Chastain, subject to discharge, for calling him "a lying s.o.b." and asked the guard to remove Chastain from the premises. The guard complied with the request.

Mitchell made a written notation of the incident in Chastain's personnel file and also reported it orally to his immediate superior, Bruce Davis, the superintendent of warehousing and shipping. On the following day, a meeting took place between Davis, Personnel Director Dervales, and Mill Superintendent Robert Mills. They reviewed the incident in question, as well as Chastain's personnel record, and thereafter they decided to discharge Chastain. Dervales testified that the decision was somewhat difficult since the Company had never before discharged an employee for cursing.[8] The Union filed a grievance over the discharge and took the matter to arbitration before James P. Whyte, a professor of law at William and Mary Law School and one of the two regular arbitrators who hear cases arising under the contract between Respondent and the Union. On January 6, 1978, Professor Whyte rendered an award upholding the discharge of Chastain. The award was based on the contract rather than upon the provisions of the Act. Professor Whyte stated that the case before him turned upon the credibility of witnesses who told divergent stories concerning the events which precipitated the discharge. He preferred Mitchell's version, found that Mitchell's recitation of the facts spelled out a case of insubordination, and decided that the Company was justified in attaching the penalty of discharge to the infraction of the contract so found because of Chastain's history of misconduct as an employee.

tion will "push up" if qualified, as will qualified Employees above him until the vacancy is filled.

(c) By an Employee qualified to perform the assignment.

[7] Chastain denies using the epithet "s.o.b." I credit Mitchell to the effect that Chastain did use that term.

[8] Unlike the arbitrator, I take it as well established that the use of profane and obscene language is commonplace among supervisors and employees alike at Respondent's plant, as indeed it is in almost any industrial setting

## C. Analysis and Conclusions

Normally remarks made by employees during the course of a grievance meeting or collective bargaining constitute protected activity, even though they may include profane or disrespectful language. The reason for this rule was set out by the Fifth Circuit in *Crown Central Petroleum Corporation v. N.L.R.B.*, 430 F.2d 724, 731 (1970):

It has been repeatedly observed that passions run high in labor disputes and that epithets and accusations are commonplace. Grievance meetings arising out of disputes between employer and employee are not calculated to create an aura of total peace and tranquility where compliments are lavishly exchanged. . . .

. . . a grievance proceeding is not an audience, conditionally granted by a master to his servants, but a meeting of equals—advocates of their respective positions. . . .

We seek neither to rank improprieties or epithets, nor to unnecessarily generalize for a class of cases peculiarly tied to their facts. However, within the confines of a grievance meeting, it would require severe conduct indeed to convince us that the interest of fair give and take between equal parties to bargaining could be justifiably submerged.

There is an exception to this rule for statements which are so opprobrious as to make the employee unfit for further service. In a plant where obscenity and profanity of speech are commonplace, this exception could hardly apply to Chastain's statement to Garrett about Mitchell. The fact that an employee's language is inaccurate or questions the veracity of an employer does not remove the protective mantle of Section 7 of the Act. *Walls Manufacturing Company, Inc. v. N.L.R.B.*, 321 F.2d 753 (D.C. Cir. 1963). Thus, calling an employer a damned liar,[9] an s.o.b.,[10] or a horse's ass[11] during a grievance discussion have been held not to be so outrageous as to destroy an employee's protection under Section 7. The Board and the courts have gone so far as to hold that strong language about an employer, uttered by an employee to other employees during the course of an organizing effort, is entitled to similar recognition and protection. *N.L.R.B. v. Cement Transport Co., supra.* A complaint made by an employee to a union representative for the purpose of enforcing the provisions of an existing collective bargaining agreement amounts to a grievance in the course of which statements made by the employee are entitled to statutory protection in the absence of outrageous or opprobrious language. There is no requirement that the remarks be uttered during a formal meeting, held pursuant to contract provisions, before the conditional immunity outlined above comes into play. *Interboro Contractors, Inc.*, 157 NLRB 1295 (1966); *Bunney Brothers Construction Company*, 139 NLRB 1516 (1962).

The context of the remarks for which Chastain was discharged was Mitchell's asserted misapplication or violation

[9] *Crown Central Petroleum Corp., supra.*

[10] *N.L.R.B. v. Cement Transport Company*, 490 F.2d 1024 (6th Cir. 1974).

[11] *Thor Power Tool Company*, 148 NLRB 1379 (1964), entd. 351 F.2d 584 (7th Cir. 1965).

of the contract (and related written understandings) concerning manner in which overtime must be assigned. Thus, his initial remarks to Mitchell were a grievance in the generic sense of the word. On two occasions, Mitchell had assigned overtime to the least senior employee in a fourteen-member crew. Chastain, among others, was unhappy about this action.[12] When Chastain expressed his opinion that this was contract violation, Mitchell gave him a response which he found unsatisfactory, whereupon Chastain turned to his shop steward and suggested that Garrett make a note of Mitchell's reply, namely Mitchell's claim that he had offered overtime to the other members of his crew before offering it to a probationary employee. This request could have no other meaning than a suggestion to Garrett to institute a formal written grievance against Mitchell. In the course of this conversation, Chastain called Mitchell a lying s.o.b. While this expression of contempt was uttered on the floor of the plant rather than in a company office or across the table at a formally convened and structured grievance meeting, it was certainly made to express disagreement concerning a possible contract violation and as the first step in preparing to take further action to enforce the contract. Under a long line of Board and court cases cited above, Chastain was engaged in protected, concerted activity when he made the statements concerning Mitchell, and such remarks are part of the *res gestae* of this activity. Accordingly, when Respondent discharged Chastain for uttering these remarks, he violated Section 8(a)(1) and (3) of the Act.[13]

### 1. The deferral to arbitration

The Board has long maintained a rule that it will defer to the award of an arbitrator which arises from proceedings which are fair and regular and in which all parties have agreed to be bound by the decision, if the decision of the arbitrator is not clearly repugnant to the purposes and policies of the Act. *Spielberg Manufacturing Co., Inc., supra.* The procedural approach used by the Board in determining whether or not to defer to an award was recently explicated in Member Truesdale's concurring opinion in *The Kansas City Star Company,* 236 NLRB 866, 869 (1978).

> On the other hand, the majority's approach—used in part by my dissenting colleagues—preserves the purpose and doctrine of *Spielberg.* The majority reviews the record evidence, sees no irregularities in the proceedings and no facial errors in the arbitrator's legal conclusion to see if, on the facts he has found, it is consistent with Board law. Finding that it is, and that the arbitrator has actually considered Board law in ruling on all of the discharges—including Ellis—the majority defers to the arbitrator's decision. This approach is more consistent not only with past *Spielberg* deci-

sions, but also with the strong labor policy which favors voluntary arbitration.

The question arising here is whether Professor Whyte's decision of January 6, 1978, is repugnant to the purposes and policies of the Act because it does not address or resolve the unfair labor practice which is at issue in this case.[14]

Beginning with *Monsanto Chemical Company,* 130 NLRB 1079 (1961), the Board has refused to defer to arbitration awards when the decision of the arbitrator fails to address and resolve the unfair labor practice allegation which is at issue before the Board. In *Raytheon Company,* 140 NLRB 883 (1963), the arbitrator addressed himself exclusively to the contract issue presented to him by the grievant and took no evidence which would permit him to evaluate the presence or absence of an unfair labor practice. The Board refused to accept his award as dispositive because he failed to undertake a resolution of the unfair labor practice which had been alleged in the Board case. Other and later cases, involving both discharges and various aspects of the statutory duty to bargain in good faith, have adopted the same rationale. *Clara Barton Terrace Convalescent Center,* 225 NLRB 1028 (1976); *Ryder Technical Institute,* 199 NLRB 570 (1972); *The Kroger Company,* 226 NLRB 512 (1976); *Alfred M. Lewis, Inc.,* 229 NLRB 757 (1977).

Where the Board has improperly deferred to arbitration awards, the courts have intervened to require it to perform its statutory duty. Thus, in *Banyard* v. *N.L.R.B.,* 505 F.2d 342 (1974), the D.C. Circuit remanded a case to the Board for determination on the merits as to whether an employee's refusal to work was protected under Section 502 of the Act, because the arbitrator failed to do so and the Board had refused to inquire into the merits of the award. In *Stephenson* v. *N.L.R.B.,* 550 F.2d 535 (1977), the Ninth Circuit remanded a case to the Board for a determination on the merits because the Board had improperly deferred to an arbitration award which was vague on the issue of whether the arbitrator had decided the unfair labor practice claim, and because "the record is bare as to whether the arbitration panel was willing or able to consider the unfair labor practice charge." 550 F.2d at 546.

If we apply Board Member Truesdale's procedural approach to the arbitration award at hand, we find that most of the evidence presented in this case was also presented to the arbitrator. We also find that the arbitrator confined his decision to legal issues arising under the contract and failed to mention, even in passing, the legal issue as to whether the facts found amounted to an unfair labor practice. Without in any way disturbing the arbitrator's credibility findings or his factual analysis, it is clear from facts he found that this

---

[12] In deciding this case, I intimate no opinion as to whether Chastain or Mitchell was correct concerning the merits of the dispute over the proper manner of assigning overtime.

[13] Normally, where an employee who holds no union office is discharged under these circumstances, the violation is regarded as an infringement of Sec. 8(a)(1). Where, as here, the employee is seeking to enforce the terms of a union-negotiated contract, the discharge amounts to an 8(a)(3) violation as well.

[14] The General Counsel does not argue that the arbitration proceedings were attended by any procedural irregularities. It appears from the record that Chastain requested permission of the Union to permit his own personal attorney to appear at the arbitration hearing and that the Union denied him such permission. It further appears that Chastain rejected the services of the Union's regularly retained counsel and preferred that his case be presented by the Union's business agent rather that the Union's lawyer. The denial of the right to be represented by an attorney of one's own choice, where the expense of retaining the attorney is borne by the grievant, is a serious procedural irregularity. However, it does not appear that either Respondent or the arbitrator was responsible for preventing the appearance of Chastain's lawyer, and it would be unfair to set aside an award in Respondent's favor because of something which the Union did.

Respondent had invaded Chastain's rights under Section 7 of the Act. However, the arbitrator failed to arrive at this conclusion. The Board cannot deprive employees of statutory rights by depriving them of a forum in which to redress those rights. If an arbitrator's award is to merit deference, it must own up to standards of employer conduct laid down by Congress and applied by the Board and the courts. When an award fails to meet such standards, it is repugnant to the purposes and policies of the Act. Even though it may be in consonance with the terms of a collective bargaining agreement, it cannot serve as a barrier preventing the Board from performing its statutory duty.

Upon the foregoing findings of fact, and upon the entire record herein considered as a whole, I make the following:

## CONCLUSIONS OF LAW

1. Respondent Atlantic Steel Company is an employer engaged in commerce within the meaning of Section 2(2), 2(6) and 2(7) of the Act.

2. Local 2401, United Steelworkers of America, AFL–CIO, is a labor organization within the meaning of Section 2(5) of the Act.

3. By discharging Kenneth Chastain because he engaged in concerted, protected activities and in union activities, Respondent herein violated Section 8(a)(1) and (3) of the Act.

4. The unfair labor practices recited above in Conclusion of Law 3 have a close, intimate, and substantial effect on the free flow of commerce within the meaning of Section 2(6) and 2(7) of the Act.

## THE REMEDY

Having found that Respondent has committed certain unfair labor practices, I will recommend that it be ordered to cease and desist therefrom and to take other actions designed to effectuate the purposes and policies of the Act. As a discharge for engaging in union activities and in concerted protected activities goes to the heart of the Act, I will recommend that the Board issue a so-called broad 8(a)(1) order designed to suppress any and all violations of that section of the Act. *J. C. Penney Co., Inc.,* 172 NLRB 1270, fn. 1 (1968). The recommended order will also provide that the Respondent be required to reinstate Kenneth Chastain to his former or substantially equivalent employment and to make him whole for any loss of earnings which he may have suffered by reason of the action it took, in accordance with the *Woolworth*[15] formula, with interest thereon computed in accordance with the adjusted prime rate used by the Internal Revenue Service for tax payments. *Florida Steel Corporation,* 231 NLRB 651 (1977); *Isis Plumbing & Heating Co.,* 138 NLRB 716 (1962). I will also recommend that the Respondent be required to post a notice, advising its employees of their rights and of the remedy in this case.

[Recommended Order omitted from publication.]

---

[15] *F. W. Woolworth Company,* 90 NLRB 289 (1950).

**Plaza Auto Center, Inc. *and* Nick Aguirre.** Case 28–CA–22256

August 16, 2010

DECISION AND ORDER

By Chairman Liebman and Members Schaumber and Pearce

On July 21, 2009, Administrative Law Judge Lana H. Parke issued the attached decision. The General Counsel filed exceptions and a supporting brief.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board has considered the decision and the record in light of the exceptions and brief and has decided to affirm the judge's rulings, findings,[1] and conclusions only to the extent consistent with this Decision and Order, and to adopt the recommended Order as modified and set forth in full below.[2]

The General Counsel excepts to the judge's dismissal of the complaint allegation that the Respondent unlawfully discharged employee Nick Aguirre following his outburst at a meeting with the Respondent's owner and sales managers. The General Counsel contends that Aguirre was engaged in protected concerted activity at the meeting and that his outburst was not so egregious as to lose the protection of the Act under *Atlantic Steel Co.*, 245 NLRB 814 (1979). We find merit in the exceptions.

Facts

The Respondent, which sells preowned automotive vehicles, hired Aguirre in August 2008 as a salesperson.[3] On his first day of work, the Respondent was conducting one of its periodic tent sales in a Sears parking lot. When Aguirre inquired as to what restroom he should use during the sale, his coworkers laughed and pointed in various directions. Sales Manager Juan Felix pointed toward the Sears store and a gas station across the street. At a sales staff meeting the following week, Aguirre asked whether the Respondent gave employees a break and a meal during the tent sales, and Felix responded, "You're always on break, buddy . . . you just wait for customers all day," adding that if Aguirre did not like the

way that the Respondent operated, he could leave at any time.

At the next tent sale, Aguirre asked other employees about the Respondent's compensation system, and they told him that the salesmen were paid straight commission with no guaranteed minimum. Aguirre also discussed how the salespeople could alternate restroom breaks. However, when he asked Felix if he could take a break to eat and use the restroom, Felix refused, again telling Aguirre that if he did not like it he could leave. Felix also reiterated to Aguirre and the other salesmen that they were always on break.

At the next sales staff meeting, another employee raised the subject of pay. Sales Manager Gustavo MacGrew responded that if the employees did their jobs right, including following procedures, doing test drives, and completing paperwork, and did not give cars away for free, they would make money. When Aguirre sold a vehicle listed on the Respondent's Flat List[4] as carrying a commission of $1000–$2000, he was surprised to receive a check for only $150 gross. His colleagues agreed that the amount was unfairly low, and Aguirre confronted Felix, who replied that the Respondent had given the vehicle away almost for free.

During a later sales staff meeting, the Respondent's owner, Tony Plaza, mentioned that there were scratches on a vehicle and threatened to deduct the repair cost from all of the salesmen's pay unless the person responsible came forward. Aguirre asserted that the cost should instead be shared by all employees who had access to the vehicle. At the same meeting, Plaza raised the subject of employee negativity, stating that he had a stack of applications from which he could easily hire. Employee Oscar Martinez brought up breaks and meal periods, adding that Felix had been disrespectful when Martinez asked about them. Plaza answered that the Respondent was trying to work out the break issue.

In October, Aguirre told Felix that he wanted to know which cars carried a good commission, because he thought that the Respondent was stealing his money. Felix answered that if Aguirre did not trust the Respondent, he was welcome to go elsewhere.

Aguirre subsequently contacted a State wage and hour agency. He told his coworkers that the "Labor Commission" said that employees should get minimum wage as a draw against commissions and that he would inform Office Manager Barbara Montenegro after he obtained more information. On October 28, Aguirre asked Montenegro whether salesmen were entitled to a minimum

---

[1] The General Counsel has excepted to some of the judge's credibility findings. The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect. *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951). We have carefully examined the record and find no basis for reversing the findings.

[2] We have modified the conclusions of law, amended the remedy, and substituted a new notice for that of the administrative law judge.

[3] All dates are 2008 unless otherwise indicated.

[4] The Flat List shows vehicles that have been on the lot for an extended time and predetermined commissions intended as an incentive for the salesmen to sell those vehicles.

355 NLRB No. 85

494 DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

wage draw, and she replied that the Respondent did not pay minimum wage and that, if he wanted a minimum wage job, the sales job was not the job for him. Aguirre told her that he had spoken with the State Labor Board and asked if she could find the answer, perhaps by asking Plaza.

On the same afternoon, Felix called Aguirre into his office to meet with Plaza, Felix, and MacGrew. Felix had just informed Plaza that Aguirre complained about everything, including not trusting the Respondent concerning commissions and not knowing the Respondent's cost of vehicles. Plaza began the meeting by stating that Aguirre was "talking a lot of negative stuff" that would negatively affect the sales force. Aguirre said that he had questions about vehicle costs, commissions, and minimum wage. Plaza admitted responding that Aguirre needed to follow policies and procedures, including the pay structure, and that he should not be complaining about pay. He added that car salesmen normally did not know the cost of vehicles. At least twice, Plaza said that if Aguirre did not trust the Respondent, he did not need to work there. Aguirre became upset and told Plaza that he was an "F'ing mother F'ing," an "F'ing crook," and "an asshole," and that he was stupid, nobody liked him, and everyone talked about him behind his back. At one point, Aguirre stood up in the small office, pushed his chair aside, and said that, if he was fired, Plaza would regret it. Following Aguirre's outburst, Plaza fired him. The judge found that the Respondent had discharged salesman Eddie Yemes in 2008 for telling Felix at a tent sale to "f— himself."

### Discussion

As an initial matter, the judge determined that Aguirre's questioning of the Respondent's policies concerning breaks, restroom facilities, and compensation constituted protected concerted activity under the Act. Moreover, she found that the Respondent's statements in response to Aguirre's inquiries, that if he disliked the Respondent's policies he did not need to work there, violated Section 8(a)(1). No party excepted to these findings. The judge further found that the Respondent terminated Aguirre because of his outburst toward Plaza. We adopt these findings. We also adopt the judge's findings of fact concerning the October 28 meeting, which are largely based on her assessment of credibility.

### The *Atlantic Steel* Analysis

Because Aguirre's outburst occurred at a meeting held in the context of his protected concerted activity, the judge applied the test set forth by the Board in *Atlantic Steel*, 245 NLRB 814, 816 (1979), for determining whether the conduct was so egregious as to lose the pro-

tection of the Act.[5] In *Atlantic Steel*, the Board identified four factors to be balanced in the determination: (1) the place of the discussion, (2) the subject matter of the discussion, (3) the nature of the employee's outburst, and (4) whether the outburst was, in any way, provoked by the employer's unfair labor practices. As the judge here correctly observed, the Act allows some latitude for impulsive conduct by employees in the course of protected concerted activity, but, at the same time, recognizes that employers have a legitimate need to maintain order.[6] The balance between these policy concerns lies at the heart of the *Atlantic Steel* analysis.

*Factors 1, 2, and 4:* We agree with the judge that the first, second, and fourth *Atlantic Steel* factors favor a determination that Aguirre's conduct was protected. With respect to the first factor, the place of the discussion, the meeting took place in Felix's office, in the presence of only management officials. Montenegro, whose office is adjacent to Felix's, testified that she could hear Aguirre speaking in a loud voice but could not hear what he was saying. Under these circumstances, his outburst could not have undermined workplace discipline at the Respondent's facility. As to the second factor, the subject matter of the discussion, the discussion involved Aguirre's protected concerted activity of raising questions about terms and conditions of employment, particularly the Respondent's policies pertaining to breaks and compensation. Finally, with regard to the fourth factor, whether the employee was provoked, at least twice during the meeting, the Respondent reiterated to Aguirre its frequent warning that if he did not like the Respondent's policies he did not need to work there. The judge found, and we agree, that these statements were unlawful and provocative responses to Aguirre's inquiries. *Felix Industries*, supra, 331 NLRB at 145.

*Factor 3:* Contrary to the judge, we do not find that the third factor, the nature of the outburst, favors the loss of protection, or that this factor warrants an ultimate conclusion that Aguirre forfeited his Section 7 protections.

---

[5] The judge also analyzed Aguirre's discharge under the Board's test in *Wright Line*, 251 NLRB 1083, 1089 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982). That test, however, provides a means of resolving questions of employer motivation. Here, it is undisputed that the Respondent terminated Aguirre because of his outburst in the October 28 meeting, which the judge found, and we agree, otherwise involved protected concerted activity. In such circumstances, *Atlantic Steel* provides the appropriate analysis. *Felix Industries*, 331 NLRB 144, 145–146 (2000), enfd. in relevant part 251 F.3d 1051 (D.C. Cir. 2001), supplemented 339 NLRB 195 (2003), enf. mem. 2004 WL 1498151 (D.C. Cir. 2004).

[6] *Tampa Tribune*, 351 NLRB 1324, 1324–1325 (2007), enf. denied sub nom. *Media General Operations v. NLRB*, 560 F.3d 181 (4th Cir. 2009); *NLRB v. Thor Power Tool*, 351 F.2d 584, 587 (7th Cir. 1965), enfg. 148 NLRB 1379, 1380 (1964).

The Board has found that communications in the course of protected activity are also protected unless they are "so violent or of such serious character as to render the employee unfit for further service." *St. Margaret Mercy Healthcare Centers*, 350 NLRB 203, 204–205 (2007) (citations omitted), enfd. 519 F.3d 373 (7th Cir. 2008). As the judge acknowledged, a single verbal outburst of insulting profanity does not exceed the bounds of the Act's protection. Thus, in *Burle Industries*, 300 NLRB 498 (1990), enfd. 932 F.2d 958 (3d Cir. 1991), the Board found that an employee did not forfeit protection when, in the course of encouraging employees to leave the facility due to a possible chemical spill, he called a supervisor a "f'ing asshole" for wanting employees to work despite the fumes. The judge there found that the employee overreacted when he believed that the supervisor was making light of the situation, but that the outburst was attributable to frustration and "animal exuberance" in the heat of the moment.

Here, the judge variously labeled Aguirre's "cursing and derogating" of Plaza as "belligerent," "menacing," and "at least physically aggressive if not menacing." Although we do not condone Aguirre's outburst toward Plaza, the judge's characterizations of it are inconsistent with her own factual findings and overstate its severity in light of the evidence. Because the judge's descriptions are unsupported by the record, we do not rely on them; instead we assess Aguirre's conduct based on the credited evidence.[7]

In context, we find that Aguirre's profanity was not so opprobrious as to deprive him of statutory protection. Prior to the October 28 meeting, Aguirre on several occasions expressed concerns about the Respondent's policies and stated that he believed that its compensation policies violated state wage and hour requirements. The Respondent consistently dismissed his inquiries, which it viewed as demonstrating a negative attitude that it did not want to influence other employees. Moreover, the Respondent's unlawful refrain that if Aguirre did not like its policies, he could quit invited a strong reaction from Aguirre, which finally occurred when Plaza repeated the

statement at the October 28 meeting.[8] Unlike the employee in *Burle Industries*, supra, Aguirre uttered more than a single profanity against Plaza. Nevertheless, his was a single and brief outburst provoked by Plaza's failure to respond to Aguirre's concerns and his invitation, once again, that Aguirre work elsewhere.[9] Moreover, according to Aguirre's unrebutted testimony, Felix had also used obscene language, including "the F word," on several occasions in addressing sales employees, sometimes in the presence of MacGrew. Therefore, the record shows that profane language was not outside the range of conduct at the Respondent's facility.[10]

We further find that Aguirre's statement that if Plaza fired him he would regret it was not a threat of physical harm. The statement itself did not refer to such harm in any way. In the context of Aguirre's recent inquiry to a State agency regarding the employees' entitlement to a minimum wage draw against commissions, it seems clear that Aguirre was threatening legal consequences. Furthermore, the record shows no evidence of any physical harm or threat thereof by Aguirre during his employment. Under these circumstances, we find it much more likely that Aguirre was threatening to report the Respondent's practices to State authorities than to retaliate against the Respondent through violence.

---

[7] Our dissenting colleague would accept the judge's characterizations of Aguirre's conduct based on the premise that the judge was in a position to observe witnesses' representations of Aguirre's tone and body language, which are not apparent in the written record. However, it is the Respondent's responsibility to present on the record all relevant evidence supporting its position, including, where appropriate, testimony concerning a speaker's tone and gestures. The Respondent here has provided no such evidence that warrants the judge's descriptions of Aguirre's conduct. In addition, as discussed infra, the judge did not explain the basis of her findings, whether it be witnesses' nonverbal imitations of Aguirre's conduct or otherwise. Therefore, in reviewing the record based on the General Counsel's exceptions, we cannot rely on the judge's unexplained and unsupported characterizations.

[8] Plaza also admitted telling Aguirre at the meeting that he should not complain about the Respondent's pay structure. This statement was not separately alleged as unlawful.

[9] Compare *Aluminum Co. of America*, 338 NLRB 20, 21–22 (2002) (repeated incidents of ad hominem profanity against supervisor not emotional outburst provoked by officials of the employer and not within Act's protection).

In view of Plaza's invitation that Aguirre work elsewhere, and the judge's finding, with regard to the fourth factor, that Aguirre's outburst was provoked by Plaza, we find that the judge erred in stating that it occurred "[w]ithout extreme provocation from overt hostility or antagonism from [Plaza]."

The judge also cited the Respondent's September discharge of Yemes, whose misconduct she deemed less serious than Aguirre's because it was less extensive and not directed at the Respondent's owner. However, we do not find Yemes' discharge relevant to this case. As explained, the legality of Aguirre's discharge does not turn on the Respondent's motive or its past practice. Whether the Respondent discharged another employee in arguably comparable circumstances, lawfully or not, does not bear on whether Aguirre lost the protection of the Act.

[10] In finding that the Respondent satisfied its burden under *Wright Line* to show that it would have discharged Aguirre even in the absence of his protected concerted activity, the judge cited the Respondent's September discharge of Yemes for an arguably comparable outburst toward Felix at a tent sale. We do not find Yemes' discharge relevant to our decision. As explained, because the Respondent's motivation here is not at issue, the legality of Aguirre's discharge is appropriately analyzed under *Atlantic Steel* rather than *Wright Line*. Further, even if Yemes' discharge indicates that the Respondent did not tolerate obscene language on that occasion, the fact remains that such language was used in the Respondent's workplace, as demonstrated by Felix's own conduct.

496                                  DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

For these reasons, we disagree with the judge that Aguirre's verbal outburst was "belligerent," "physically aggressive," or "menacing." The judge also failed to identify any physical aggression that would support such a description, and we find none. In fact, the only physical movement by Aguirre that the judge found was his standing up and pushing aside the chair. However, even considering Aguirre's apparent frustration or anger during the meeting, it is not clear from the record, and the judge did not find, whether this was a hostile action or one of necessity in Felix's office, which Plaza testified was "really small," approximately 8 or 10 feet by 10 feet.[11] Moreover, neither Plaza's contemporaneous note nor the Respondent's position statement to the Board in response to the unfair labor practice charge referred to any physical conduct by Aguirre, and the judge found that the Respondent discharged him for his verbal attack, not for any physical threat.

Relying on the judge's findings of fact, we conclude that Aguirre's outburst, while vehement and profane, was brief and unaccompanied by insubordination, physical contact, threatening gestures, or threat of physical harm. Therefore, we find that his conduct did not render him unfit for further service and thus did not exceed the bounds of statutory protection under *Atlantic Steel*'s third factor.

Based on our determination that all of the *Atlantic Steel* factors weigh in favor of finding Aguirre's conduct in the October 28 meeting within the protection of the Act, we reverse the judge and conclude that the Respondent violated Section 8(a)(1) by discharging him.[12]

---

[11] In this regard, the judge acknowledged but did not resolve the inconsistencies in the testimony of the Respondent's witnesses. Thus, she did not determine whether Aguirre threw the chair (Felix), hit the desk (MacGrew), or "got on [sic] my face" (Plaza). None of these statements was corroborated by another witness, and the judge did not rely on them in her findings of fact.

[12] Cf. *Daimler-Chrysler Corp.*, 344 NLRB 1324, 1328–1328 (2005). In that case, as the judge found, only the second factor favored protection, and the Board found the employee's conduct repeated, profane, and insubordinate. Chairman Liebman dissented in *Daimler-Chrysler*. Member Pearce did not participate in that case and takes no position as to whether it was correctly decided.

Even assuming for the sake of argument that the third factor favors the loss of protection, the *Atlantic Steel* test requires a careful balancing of the four factors to determine whether the employee's conduct crossed the line of statutory protection. 245 NLRB at 816. On balance, we find that Aguirre's conduct did not cross that line. Factors 1, 2, and 4 clearly favor protection for the reasons discussed. Even if factor 3 favors depriving Aguirre of the Act's protection, we find that, in the circumstances here, it is outweighed by the other factors. We note particularly the absence of prior improper conduct, the Respondent's unwillingness to resolve the issues previously raised by Aguirre, and Plaza's provocation of the outburst. *Felix Industries*, 339 NLRB 195, 196–197 (2003).

## AMENDED CONCLUSIONS OF LAW

1. The Respondent is an employer engaged in commerce and a business affecting commerce within the meaning of Section 2(6) and (7) of the Act.

2. The Respondent violated Section 8(a)(1) of the Act by telling employees that they could quit or leave the Respondent's employ if they did not like company policies and/or procedures.

3. The Respondent violated Section 8(a)(1) of the Act by discharging employee Mark Aguirre because he engaged in protected concerted activity in order to discourage other employees from exercising their rights under the Act.

4. The unfair labor practices set forth above affect commerce within the meaning of Section 8(a)(1) and Section 2(6) and (7) of the Act.

## AMENDED REMEDY

We adopt the remedies recommended by the judge. In addition, having found that the Respondent violated Section 8(a)(1) by discharging employee Mark Aguirre because he engaged in protected concerted activity in order to discourage other employees from exercising their rights under the Act, we shall order the Respondent to offer Aguirre immediate reinstatement to his former job, or if that job no longer exists, to a substantially equivalent position, without prejudice to his seniority or any other rights and privileges previously enjoyed. We shall also order the Respondent to make Aguirre whole for any loss of earnings and other benefits suffered as a result of the discrimination against him. Backpay shall be computed in accordance with *F. W. Woolworth Co.*, 90 NLRB 289 (1950), with interest to be computed in the manner prescribed in *New Horizons for the Retarded*, 283 NLRB 1173 (1987). The Respondent shall also be required to expunge from its files any and all references to the discharge, and to notify Aguirre in writing that this has been done and that the discharge will not be used against him in any way.

## ORDER

The National Labor Relations Board adopts the recommended Order of the administrative law judge as modified and set forth in full below and orders that the Respondent, Plaza Auto Center, Inc., Yuma, Arizona, its officers, agents, successors, and assigns, shall take the action set forth in the Order as modified.

1. Cease and desist from

(a) Telling employees that they can quit or leave the Respondent's employ if they do not like company policies and/or procedures.

(b) Discharging or otherwise discriminating against any employee because he engaged in protected concerted

activity in order to discourage employees from exercising their rights under the Act.

(c) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2.  Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Within 14 days from the date of this Order, offer Nick Aguirre full reinstatement to his former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to his seniority or any other rights or privileges previously enjoyed.

(b) Make Nick Aguirre whole for any loss of earnings and other benefits suffered as a result of the discrimination against him, as set forth in the Amended Remedy section of this Decision.

(c) Within 14 days from the date of this Order, remove from its files any reference to the unlawful discharge, and within 3 days thereafter notify the employee in writing that this has been done and that the discharge will not be used against him in any way.

(d) Within 14 days after service by the Region, post at its Yuma, Arizona facility copies of the attached notice marked "Appendix."[13] Copies of the notice, on forms provided by the Regional Director for Region 28, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted.  Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material.  In the event that, during the pendency of these proceedings, the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since September 3, 2008.

(e) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

MEMBER SCHAUMBER, dissenting.

I agree with my colleagues and the judge that the first, second, and fourth factors of the *Atlantic Steel*[1] analysis

favor a finding that Nick Aguirre's conduct was protected by the Act.  As to the third factor, however, I would adopt not only the judge's findings concerning what occurred at the October 28, 2008 meeting, but also her assessment of the nature and seriousness of Aguirre's conduct.  Therefore, I agree with the judge that the third factor does not favor protection.  Moreover, like the judge, I would dismiss the complaint.

The critical evidence in this case is the testimony of Aguirre and the Respondent's officials, evidence that the judge is in a unique position to evaluate.  Thus, based on her observation of the demeanor of the witnesses, the judge credited the testimony of the Respondent's officials over that of Aguirre.  The majority has accepted this determination, in accordance with the Board's longstanding policy,[2] and I agree with my colleagues on this point.

However, the opportunity to view and evaluate witness demeanor is not the administrative law judge's only advantage.  The judge also gains important insights from the manner in which testimony is conveyed, including the witnesses' representations of a speaker's tone and body language.  The hearing transcript, on which the Board must rely, cannot adequately communicate these aspects of the witnesses' testimony.  Therefore, in a case such as this, which turns primarily on Aguirre's words and actions in the October 28 meeting, I would not overturn the judge's characterization of the pivotal events unless the record included compelling evidence that she was wrong.  I find no such evidence in this case.

In addition, I disagree with my colleagues that Felix's use of profanity toward employees and in MacGrew's presence indicates that the Respondent tolerated such language.  Aguirre conceded in his testimony that Felix had never used profanity when Plaza was present.  Moreover, Plaza's decision to discharge employee Eddie Yemes for uttering a single obscenity toward Felix shows that the Respondent in fact maintained a strict policy against profane language toward supervisors.

For the above reasons, I agree with the judge that the third factor of the *Atlantic Steel* analysis favors a finding that Aguirre forfeited the protection of the Act. Also like the judge, I find that, in balancing the test's four factors, substantial weight should be accorded to the third factor and, in cases of outrageous behavior, it can be determinative.[3]  In my view, this is such a case.  Plaza's statement that Aguirre could work elsewhere was unlawful but not

---

[13] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

[1] *Atlantic Steel Co.*, 245 NLRB 814 (1979).

[2] *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951).

[3] *Stanford Hotel*, 344 NLRB 558, 559 fn. 7 (2005) (stating my agreement with Chairman Battista's dissent on this point in *Felix Industries*, 339 NLRB 195 (2003), enfd. per curiam D.C. Cir. 2004) (No. 03–1221, 03–1239)).

498 DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

extreme, and Aguirre's shouted profanity was far out of proportion to this provocation. Accordingly, I would find that the Respondent lawfully discharged Aguirre under *Atlantic Steel*.

## APPENDIX

### NOTICE TO EMPLOYEES
### POSTED BY ORDER OF THE
### NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

## FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT tell employees that they can quit or leave our employ if they do not like our policies and/or procedures.

WE WILL NOT discharge or otherwise discriminate against any of you because you engage in protected concerted activity in order to discourage you from exercising your rights under the Act.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights guaranteed you by Section 7 of the Act.

WE WILL, within 14 days from the date of the Board's Order, offer Nick Aguirre full reinstatement to his former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to his seniority or any other rights or privileges previously enjoyed.

WE WILL make Nick Aguirre whole for any loss of earnings and other benefits resulting from his discharge, less any net interim earnings, plus interest.

WE WILL, within 14 days from the date of the Board's Order, remove from our files any reference to the unlawful discharge of Nick Aguirre, and WE WILL, within 3 days thereafter, notify him in writing that this has been done and that the discharge will not be used against him in any way.

PLAZA AUTO CENTER, INC.

*Joel C. Schochet, Atty.,* for the General Counsel.
*Alicia Z. Aguirre, Atty. (Law Office of Alicia Z. Aguirre, PLC),*
of Yuma, Arizona, for the Respondent.

## DECISION

### I. STATEMENT OF THE CASE

LANA PARKE, Administrative Law Judge. Pursuant to charges filed by Nick Aguirre (Mr. Aguirre), an individual, the Regional Director of Region 28 of the National Labor Relations Board (the Board) issued a complaint and notice of hearing (the complaint) on January 30, 2009. The complaint alleges that Plaza Auto Center, Inc. (the Respondent) violated Sections 8(a)(1) of the National Labor Relations Act (the Act). This matter was tried in Somerton, Arizona, on May 5, 2009.[1]

### II. ISSUES

1. Did Respondent violate Section 8(a)(1) of the Act by discharging Mr. Aguirre on October 28?
2. Did Respondent violate Section 8(a)(1) of the Act by threatening employees with unspecified reprisals and by inviting them to quit their employment?

### III. JURISDICTION

At all relevant times, the Respondent, an Arizona corporation, has been engaged in the business of selling pre-owned automotive vehicles with an office and place of business in Yuma, Arizona (the Respondent's facility).[2] In conducting its business operations during the 12-month period ending December 1, the Respondent derived gross revenues in excess of $500,000 and purchased and received at its facility goods valued in excess of $50,000, directly from points located outside the State of Arizona and from other enterprises located within the State of Arizona, each of which had received the goods directly from points outside the State of Arizona. I find Respondent has at all relevant times been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

### IV. STATEMENT OF FACTS

On the entire record, including my observation of the demeanor of the witnesses, and after considering the briefs filed by the General Counsel and the Respondent, I find the following events occurred in the circumstances described below during the period relevant to these proceedings:

The individuals named below, holding the stated positions with the Respondent, were supervisors within the meaning of Section 2(11) of the Act and comprised the management hierarchy of the Respondent:

| | |
|---|---|
| Tony Plaza Sr. (Mr. Plaza) | — Owner |
| Juan Felix (Mr. Felix) | — Sales Manager |
| Gustavo MacGrew (Mr. MacGrew) | — Sales Manager |
| Barbara Montenegro (Ms. Montenegro) | — Office Manager |

In its business, the Respondent utilized two shifts of sales personnel: 8 a.m. to 3 p.m. and 1 p.m. to 8 p.m. The Respondent had no employee break policy.[3] Periodically the Respon-

---

[1] All dates are 2008, unless otherwise specified.
[2] Unless otherwise explained, findings of fact herein are based on party admissions, stipulations, and uncontroverted testimony.
[3] However, according to Mr. Felix, employees could take breaks "whenever they want to most likely."

PLAZA AUTO CENTER, INC.

499

dent held vehicle sales events at a Sears parking lot in Yuma (Sears tent sale) over 3-day weekends, commencing Friday and concluding Sunday. The Respondent's vehicle salespeople and supervisors staffed the Sears tent sales. The Respondent compensated its salespeople by commission only.[4] The Respondent maintained a "Flat List" of vehicles for sale, i.e., vehicles that were hard to sell, for sale of which the Respondent paid its sales personnel an incentive fee called a "flat commission." The Respondent commonly held sales staff meetings each Wednesday.

Mr. Aguirre began working for the Respondent at the end of August as a salesperson. His first day of work coincided with a Sears tent sale. In the course of his first day, Mr. Aguirre asked fellow salespeople what restroom facilities he was to use. Some laughed and pointed in various directions. When Mr. Aguirre asked Mr. Felix the same question, Mr. Felix pointed to an area across the street from the parking lot where the Sears store and a Circle K gas station were located.[5]

On the following Wednesday, Mr. Aguirre attended a sales staff meeting at the Respondent's facility along with other salespeople and Mr. Felix and Mr. MacGrew. At the meeting, Mr. Aguirre learned the company held the Sears tent sales every 2 weeks. Mr. Aguirre asked if employees were entitled to a break and a meal during the Sears tent sales. Mr. Felix said, "You're always on a break, buddy . . . you just wait for customers all day." Mr. Felix also said that if Mr. Aguirre did not like the way the company operated, he was welcome to leave at any time.

The Respondent held its next Sears tent sale in mid-September. At that sale, Mr. Aguirre discussed the Respondent's employee compensation system with other salespeople. They told him that compensation was straight commission with no income floor, i.e., a guaranteed minimum amount of compensation a salesperson earns within a specified time period. During the course of the sale, Mr. Aguirre discussed with two other salespeople how to alternate restroom breaks. Mr. Aguirre asked Mr. Felix if he could take a break to eat and use the restroom. Mr. Felix refused, saying "If [Mr. Aguirre] didn't like it that [he] could just [leave]." Mr. Felix told Mr. Aguirre and salesmen, Oscar Martinez and Jimmy Pagan, who were also present, that the sales staff was always on a break.

At the following sales staff meeting held at the Respondent's facility, a salesperson other than Mr. Aguirre asked how much employees would be paid. Mr. MacGrew answered that if the sales staff did their jobs right, did the test rides, filled out the proper paperwork, followed the procedures, and did not give the car away for free, they would make money.[6]

At some point prior to receiving his first paycheck, Mr. Aguirre sold a 1999 Suburban that had been on the Respondent's lot for several months. According to Mr. Aguirre, a vehicle of the same description was listed on the Flat List with a commission rate of $1,000 to $2,000. When Mr. Aguirre received his paycheck, he was surprised that the amount was only $150 gross. Mr. Aguirre showed his paycheck to several fellow salespersons who agreed with him that the amount was unfair. When Mr. Aguirre confronted Mr. Felix about his small paycheck, pointing out he had sold the 1999 Suburban, Mr. Felix said the company had given the vehicle away almost for free.

Over the weeks of his employment, Mr. Aguirre talked to other sales employees about his concerns with the way the Respondent paid them, the lack of a restroom facility at the Sears tent sales, and the inability to leave the work area by car to eat.

At one of the Respondent's Wednesday sales meetings, date unspecified, Mr. Plaza raised the following concerns: (1) scratches on the left rear panel of a vehicle for sale and (2) employee negativity. As to the first issue, Mr. Plaza said if the employee responsible for the damage to the vehicle did not come forward, he would deduct the repair cost from sales employees' paychecks. Mr. Aguirre objected, saying, "I believe that is unfair for you to do that to us. We work hard for our money . . . if you're going to deduct any kind of money from anyone's payroll, it would be fair to deduct from everyone who has access to this vehicle." As to the issue of employee negativity, Mr. Plaza said Respondent had a stack of applications from hopeful job seekers whom they could easily hire.[7] Mr. Plaza asked employees to speak about employee morale. Salesman Oscar Martinez told Mr. Plaza the only problem he had was with the breaks and meal periods and that Mr. Felix, in addressing those issues, was short with him and disrespectful. Mr. Plaza answered that the company was trying to work out the meal and break issue and that he would talk to Mr. Felix.

In October at a Sears tent sale, Mr. Aguirre told Mr. Felix, essentially, that he wanted to know which cars would deliver good commissions upon sale because he thought the company was stealing his money. Mr. Felix told Mr. Aguirre that if he didn't trust the company or their method of payment, he was welcome to go elsewhere.[8]

---

buyers on test rides. At some unspecified time, Mr. Felix had told Mr. Aguirre that if he did not offer incentives, he could make good money.

[7] Mr. Plaza denied telling Mr. Aguirre at this meeting that if he did not like company procedures, he didn't have to work there or could leave. Mr. Plaza did not deny referring to multiple employment applicants, and I find that employees could reasonably infer from his statements that they could seek other employment if they were dissatisfied. Counsel for the General Counsel sought permission to amend the complaint to allege Mr. Plaza's statement as a violation of Sec. 8(a)(1), which I denied. While not addressed herein as a violation, the exchange between Mr. Aguirre and Mr. Plaza is relevant to animus.

[8] Mr. Felix denied this statement, saying he told Mr. Aguirre that "nobody should be in a company if they don't believe in the company." However, in his Board affidavit, Mr. Felix recounted, "I told [Mr. Aguirre] that if he did not trust the company, that he should not work for the company," and in redirect examination, did not challenge the underlying fact assumption in Respondent counsel's question,

---

[4] Sometime in 2009 after being contacted by the Industrial Commission of Arizona with regard to minimum wage violations, the Respondent began compensating its salespeople with a minimum wage as a draw against commissions.

[5] Consequent to the Respondent's rental of the Sears parking lot, the Respondent's employees were permitted to use the mall's restrooms.

[6] The Respondent encouraged salespeople to fill out all proper documentation for the sale, including customer references, identification, insurance, etc., to urge the customer to pay the purchase price rather than pressuring the "desk" to lower the price, to avoid offering up to $500 cash-back incentives on select vehicles, and to take potential

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

In late October, Mr. Aguirre contacted an Arizona agency with jurisdiction over wage and hour issues[9] about the Respondent's sales compensation system. Thereafter, Mr. Aguirre told fellow salespersons that the Labor Commission had said the employees should get minimum wages as a draw against commissions. Mr. Aguirre told the others that when he got the full facts from the Labor Commission he would inform Ms. Montenegro of his findings.[10]

On October 28, Mr. Aguirre approached Ms. Montenegro in her office and asked her if the salespeople were entitled to minimum wage as a safety net toward future commissions. Ms. Montenegro said the company did not pay minimum wage and if Mr. Aguirre wanted a minimum wage job, the sales job was not the job for him. Mr. Aguirre told Ms. Montenegro he had spoken to the Arizona Labor Board and that the salespeople were entitled to minimum-wage compensation. He asked Ms. Montenegro if she could find the answer to his minimum pay question, suggesting she ask Mr. Plaza.

Later that afternoon, Mr. Felix called Mr. Aguirre to his office for a meeting with Mr. Plaza (the October 28 meeting). Just prior to the meeting, Mr. Felix told Mr. Plaza that Mr. Aguirre complained about everything all the time, e.g., about not trusting the company's calculation of commissions and not knowing the vehicle cost. Mr. Plaza, Mr. Felix, and Mr. Mac-Grew were present for the Respondent at the meeting. All four participants testified to what occurred there. Because the sequence, as well as the substance, of statements made in the meeting is critical to final determinations herein, a summary of each account follows:

Mr. Aguirre's account: Mr. Aguirre initially testified that Mr. Plaza said, "Nick, you know, you're asking too many questions . . . we're giving you an opportunity to work here and you're just asking all these questions about everything . . . about the price of the vehicles, you're asking too much information.[11] You're asking about the minimum wage. You are not following policy and procedures. . . You're being negative towards the pay . . . you don't meet our criteria. You're fired." Under further examination, Mr. Aguirre expanded the scope of the conversation: Mr. Plaza said the cost of vehicles

was for his eyes and his eyes only and that if Mr. Aguirre did not like it, he was more than welcome to leave or to quit. Mr. Plaza said the company paid the salespeople very well and asked why Mr. Aguirre did not complain when he received a check for seven or eight hundred dollars to which Mr. Aguirre expressed concern about payment accuracy. Mr. Aguirre protested Mr. Plaza's charge that he did not meet the company's criteria, saying he took care of the customers with respect, did what he was told, moved cars back and forth, did everything he could, and did the proper paperwork. Mr. Aguirre told Mr. Plaza he believed Mr. Plaza was upset because he called the Labor Board.

Only after Mr. Plaza told Mr. Aguirre he was fired, did Mr. Aguirre respond intemperately, saying "How can you do this to somebody, especially somebody that works hard that just had a baby[12] . . . this is what I get for trying to succeed." Mr. Aguirre told Mr. Plaza he was an "F'ing mother F'ing," an "F'ing crook, and an a—hole." He asked how Mr. Plaza could fire him just for calling the Labor Board.

Mr. Aguirre asked for his pay since he was being fired. When Mr. Plaza told him he had up to three days to provide the final check, Mr. Aguirre said, "You'll get what's coming to you if I don't get my check."[13]

Mr. Plaza's account: Mr. Plaza met with Mr. Aguirre because he understood from Ms. Montenegro that Mr. Aguirre had raised minimum wage concerns with her and had requested a meeting. Mr. Plaza had no intention of discharging Mr. Aguirre.

At the inception of the meeting, Mr. Plaza asked Mr. Aguirre what was going on, stating that he was concerned because Mr. Aguirre was "talking a lot of negative stuff" that would have a negative impact on the sales force. Mr. Aguirre said he had questions about vehicle costs, sales commissions, and minimum wage. Mr. Plaza told Mr. Aguirre he needed to follow company policies and procedures, referring to the company's pay structure, about which he thought Mr. Aguirre should not be complaining.[14] Mr. Plaza told Mr. Aguirre it was a normal practice in the car business for employees not to know the cost of vehicles. Mr. Plaza twice told Mr. Aguirre that if he did not trust the company, he did not need to work there. Mr. Aguirre became upset, arose from his chair, and said that Mr. Plaza was a f— a—hole, that nobody liked him, that he was f— stupid, that he did not know what he was doing, that he did not know everyone was talking about him, and that he thought he could fire anybody he wanted to. Mr. Plaza believed Mr. Aguirre would have physically attacked him if the others had not been there. Mr. Plaza asked Mr. Aguirre to

"[W]hy did you make the comment to Aguirre that, if he didn't trust the company, that he should not work for the company?" I accept Mr. Aguirre's account of the statement.

[9] The parties did not identify the agency's official title. In its posthearing brief, the General Counsel states the correct title is "Industrial Commission of Arizona." References to the Labor Commission or Arizona Labor Board are to the Arizona agency covering wage and hour issues.

[10] Salesman James Pagan testified, essentially, that Mr. Aguirre told other employees he was looking into the minimum wage question and that he was going to speak to the Arizona Labor Board. Mr. Pagan denied that Mr. Aguirre spoke for him, saying, "If I had a problem with my workplace, I could take care of it myself."

[11] Mr. Plaza did not specifically deny that he accused Mr. Aguirre of asking too many questions, and his testimony that he told Mr. Aguirre he was "talking a lot of negative stuff" that would have a negative impact on the sales force sends an equivalent message, i.e., that Mr. Aguirre was improperly questioning company practices. I credit Mr. Aguirre's testimony in this regard.

[12] Mr. Aguirre's second child was born October 11. His first child had just turned two, and Mr. Aguirre was the sole support of his family.

[13] Mr. Aguirre testified that he only meant he would call the proper authorities or organizations to help him get any money due him, but Mr. Aguirre did not in any way qualify his warning that Mr. Plaza would get what was coming to him, and I conclude his statement was menacing.

[14] According to Mr. Plaza, Mr. Aguirre was at that time making more than minimum wage.

"calm down, settle down, to quit saying what he was saying." When Mr. Aguirre did not comply, and after Mr. Aguirre called him a f— a—hole for the "tenth time," Mr. Plaza told him, "you're done, Nick." Mr. Aguirre asked, "You're going to f— fire me for calling the Labor Department?" Mr. Plaza answered, "No, Nick. I'm firing you because you abused me verbally, almost physically."

On October 28, following Mr. Aguirre's discharge, Mr. Plaza wrote the following memo:

> October 28, 2008
>
> (Tuesday) I had a meeting with my managers, Juan & Gustavo with salesman Nick Aguirre. I had asked to meet with me as soon as I came in and I also had concerns about his attitude and negative influence to the rest of my employees. He was always talking negative about work procedures and everything in general. I also went over that if he could not follow policy and procedures according to our policy manual, then he did not need to work here. I also told him we would not let him know our investment in each of the vehicles and again told him he did not have to work here. At this point he got really upset and every sentence out of his mouth included the "F" word. I asked him to calm down but he was out of control and after several uses of the "F" word I terminated him immediately. We will not tolerate verbal abuse and in conclusion will never rehire or refer Nick to anyone who calls for references.

Mr. Felix's account:[15]  Mr. Plaza told Mr. Aguirre they were meeting because Mr. Felix and Ms. Montenegro had told him Mr. Aguirre wanted to speak to him about concerns Mr. Aguirre had. Mr. Plaza told Mr. Aguirre the Respondent had rules and policies like every other company, and if an employee was not happy with the rules, they did not need to work there. Mr. Aguirre said he had been doing everything he had been asked to do. Mr. Aguirre told Mr. Plaza why he wanted to know the cost of the vehicles, and Mr. Plaza said, "I am just telling you that, if you are not happy here, you don't have to work here." At some point, Mr. Aguirre asked if he were going to be fired, a question he repeated six or seven times during the meeting and to which Mr. Plaza invariably answered, "No."[16]

During the course of the meeting, Mr. Aguirre called Mr. Plaza f— stupid and said that if he got fired, Mr. Plaza was

going to regret it.[17] He said Mr. Plaza was f— stupid because he didn't even know what people were saying about him outside the building. As he was "cussing" Mr. Plaza, Mr. Aguirre stood up, "threw his chair," and faced Mr. Plaza. Believing Mr. Aguirre was going to hit Mr. Plaza, Mr. Felix stood also, as did Mr. MacGrew. Mr. Plaza said, "You know what, that's it, I don't have to get all this from you." Mr. Plaza then told Mr. Aguirre he was done; he was fired. Mr. Felix and Mr. MacGrew "invited" Mr. Aguirre to leave Mr. Felix's office.

Mr. MacGrew's account:[18]  At the beginning of the meeting, Mr. Plaza told Mr. Aguirre that whether or not he liked working at the company, he needed to follow the company's procedures and policies. Mr. Plaza told Mr. Aguirre that if he did not trust the company, he did not have to work there. Immediately Mr. Aguirre began telling Mr. Plaza he was stupid, did not know people were talking about him behind his back, was an a—hole, and f— Mr. Plaza. In the course of the meeting, Mr. Aguirre repeatedly asked if Mr. Plaza was going to fire him. Toward the end of the meeting, Mr. Aguirre stood up, and Mr. Felix and Mr. MacGrew told him that was enough and that it was time to go. Mr. Plaza also stood up and said, "You know, I don't need to hear this; you're done."

Mr. Felix occasionally used obscene language, including the "F" word, when directing employees, but Mr. Aguirre had never heard him do so in Mr. Plaza's presence. In 2008 the Respondent fired salesman, Eddie Yemes, because he was "abusive with foul language" to Mr. Felix while working at a tent sales event when he told Mr. Felix to f— himself.

### V.  DISCUSSION

#### A.  Underlying Legal Principles

Section 7 of the National Labor Relations Act provides that employees have the right to engage in union activities and, in pertinent part, "the right to . . . engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection." The protection afforded by Section 7 extends to employee efforts to improve terms and conditions of employment or otherwise improve their lot as employees. Section 8(a)(1) of the Act provides: "It shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7."

To enjoy Section 7 safeguards, employee activity must be both "concerted" and "protected," which a propounding party may prove by showing the activity (1) involves a work-related complaint or grievance; (2) furthers some group interest; (3) seeks a specific remedy or result; and (4) is not unlawful or otherwise improper. *NLRB v. Robertson Industries*, 560 F.2d 396, 398 (9th Cir. 1976), cited with approval by the Board in *Northeast Beverage Corp.*, 349 NLRB 1166 fn. 9 (2007). To

---

[15]  Mr. Felix described the meeting both on direct and cross-examination. His two accounts vary in certain details and order but are otherwise consistent.

[16]  Counsel for the General Counsel argues that Mr. Felix's testimony regarding the number of times Mr. Aguirre asked if he were going to be fired was so hyperbolic that it destroyed Mr. Felix's credibility. While it seems unlikely Mr. Aguirre made the inquiry as often as Mr. Felix estimated, the apparent exaggeration does not destroy Mr. Felix's credibility, and I credit Mr. Felix's testimony that Mr. Plaza denied any intent to fire Mr. Aguirre.

[17]  As noted earlier, Mr. Aguirre admitted to a similar statement (that Mr. Plaza would "get what's coming to" him) but placed the threat after the discharge and in connection with a question about his final paycheck.

[18]  Mr. MacGrew's account, as set forth herein, is an amalgamation of his direct and cross-examination testimony.

502                     DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

be concerted, employee activity must be engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself. *Meyers Industries*, 268 NLRB 882 (1986). Concerted activity includes individual activity that seeks to initiate or to induce or to prepare for group action, as well as individual employees bringing group complaints to the attention of management. *Meyers Industries*, 281 NLRB 882 (1986). Employees do not have to accept the individual's call for group action before the invitation itself is considered concerted. *Cibao Meat Products,* 338 NLRB 934 (2003); *Whittaker Corp.*, 289 NLRB 933, 934 (1988); *El Gran Combo*, 284 NLRB 1115 (1987). "[C]oncertedness . . . can be established even though the individual [speaking] was not 'specifically authorized'. . . to act as a group spokesperson for group complaints." *Herbert F. Darling, Inc.,* 287 NLRB 1356, 1360 (1988). Concerted activity includes concerns that are a "logical outgrowth" of group concerns. *Salisbury Hotel*, 283 NLRB 685, 687 (1987); *Compuware Corporation,* 320 NLRB 101 (1995). Work-related complaints or grievances include terms and conditions of employment[19] and concerted complaints to governmental agencies.[20]

In cases turning on employer motivation, the Board applies an analytical framework that assigns the General Counsel the initial burden of showing protected concerted activity was a motivating or substantial factor in an adverse employment action. The elements commonly required to support such a showing are protected activity by the employee, employer knowledge of that activity, and animus on the part of the employer. The burden then shifts to the employer to prove, as an affirmative defense, that it would have taken the same action even in the absence of the employee's protected activity. *Wright Line,* 251 NLRB 1083, 1089 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982); *Alton H. Piester, LLC,* 353 NLRB 369 (2008).

Even when an employee is engaged in protected activity, he or she may lose the protection of the Act by egregious behavior, including displaying "an opprobrious or abusive manner." *Verizon Wireless*, 349 NLRB 640, 646 (2007). In assessing employee behavior asserted to be egregious, the Board considers four factors: (1) the place of the discussion; (2) the subject matter of the discussion; (3) the nature of the employee's outburst; and (4) whether the outburst was, in any way, provoked by the employer's unfair labor practices. *Atlantic Steel*, 245 NLRB 814, 816 (1979).[21]

### B.  Mr. Aguirre's Concerted Protected Activities

1. Mr. Aguirre's concerns about breaks and restroom facilities

Mr. Aguirre's first day of employment coincided with a Sears tent sale, where Mr. Aguirre discussed availability of restroom facilities with fellow salespeople. A few days later, during a sales staff meeting with management, Mr. Aguirre

asked about employee entitlement to breaks and meal periods during the Sears tent sales. In this concern, Mr. Aguirre was joined by another salesman who, at a later sales meeting, expressed dissatisfaction with the Respondent's breaks and meals arrangements. Mr. Aguirre continued to raise this and related concerns with other employees in the ensuing weeks: discussing alternating restroom breaks, talking about the lack of a restroom facility at the Sears tent sales, and complaining about the inability to leave the work area by car for meals.

Employee breaks and availability of restroom facilities are employment terms and conditions of general application to employees. Mr. Aguirre raised those issues with management during a sales meeting, as did another employee in a later meeting. From those circumstances, as well as Mr. Aguirre's ongoing related discussions with fellow sales personnel, it is clear that Mr. Aguirre's complaints about breaks and restroom facilities were both protected and concerted. *Hahner, Foreman & Harness, Inc.,* 343 NLRB 1423 (2004) (complaint about paycheck not compensating for lost benefits to management in the presence of coworkers); *Cibao Meat Products,* at 934 ("activity of a single employee in enlisting the support of his fellow employees for their mutual aid and protection is as much 'concerted activity' as is ordinary group activity." Such individual action is concerted as long as it is "engaged in with the object of initiating or inducing . . . group action." Citations omitted.) *NLRB v. Caval Tool Division*, 262 F.3d 184, 190 (2d Cir. 2001) (enforcing Board order finding employee complaint about working conditions made in group meeting was protected concerted conduct on behalf of the group); *Phillips Petroleum Company,* 339 NLRB 916 (2003); *Avery Leasing*, 315 NLRB 576, 580 fn. 5 (1994) (finding concerted activity where an employee, in the presence of other employees, complained to management concerning wages, hours, or other terms and conditions of employment).

Mr. Aguirre's actions with regard to employee breaks and restroom facilities, as described herein, constituted concerted protected activity.

2. Mr. Aguirre's concerns about sales compensation

Early in his employment, Mr. Aguirre took issue with the Respondent's commission-only compensation of sales personnel and its calculation of commissions. Expression of his concern included talking with other salespeople about the Respondent's compensation system, asking Mr. Felix for information as to which vehicles were likely to produce good commissions, showing his unexpectedly low first commission to other employees who agreed the amount was unfair, asking management about the basis of the commission, discussing with fellow salespeople his plan to contact an Arizona state agency about the Respondent's commission-only policy, contacting the agency, thereafter sharing the information learned with fellow employee, telling fellow employees he would inform management, and thereafter sharing his findings with Ms. Montenegro.

Wages are clearly an employment term of prominent interest to employees and employee attention to wages is protected. Although fellow salesman, James Pagan, denied that Mr. Aguirre spoke for him in pursuing his wage inquiries, it is clear Mr. Aguirre attempted to engage the interest of other sales em-

---

[19] *Valley Hospital Medical Center,* 351 NLRB 1250, 1252 (2007).

[20] *Delta Health Center, Inc.*, 310 NLRB 26 (1993).

[21] Evidence of employer knowledge that activity is protected is not a necessary element under *Alliance Steel Products*. The test is whether employer conduct would interfere with, restrain, or coerce employees in the exercise of their Sec. 7 rights. *Alliance Steel Products* at 495.

PLAZA AUTO CENTER, INC.

ployees, including Mr. Pagan, in his wage inquiries by discussing with them perceived wage inequities, by telling them of his state agency information quest, and by alerting them to his intended confrontation with management. It is equally clear that the wage issues Mr. Aguirre addressed affected all sales employees and that the resolutions Mr. Aguirre sought would impact all sales employees. In these circumstances, Mr. Aguirre's involvement with wage issues was concerted. See *Meyers Industries*, 281 NLRB 882 (1986) (individual employees bringing group concerns to the attention of management); *Cibao Meat Products*, supra (concerted action does not depend on employee acceptance of individual's call for group involvement); *Salisbury Hotel*, supra (concertedness includes concerns that are a "logical outgrowth" of group concerns); *Compuware Corp.*, supra (individual employee complaint to State labor board, although unauthorized by group, was a continuation of group efforts); *JMC Transport*, 272 NLRB 545, 546 fn. 2 (1984), enfd. 776 F.2d 612 (6th Cir. 1985) (complaint about discrepancy in individual paycheck was a continuation of employees' protected concerted activity in protesting, a month earlier, the company's change in the way employee wage payments were calculated).

Mr. Aguirre's actions with regard to sales employee compensation, as described herein, constituted concerted protected activity.

### C. Alleged Threats of Reprisal and Invitations to Quit Employment

The Complaint alleges that the Respondent violated Section 8(a)(1) of the Act when the following supervisors on the following dates threatened employees by inviting them to quit their employment:

| Mr. Felix | — | September 3 and October |
| Ms. Montenegro | — | October 28 |
| Mr. Plaza | — | October 28 |

At a late August/early September sales staff meeting, when Mr. Aguirre asked about employee breaks during Sears tent sales, Mr. Felix told him that if he did not like the way the company operated, he was welcome to leave at any time. At a Sears tent sale in mid-September, Mr. Aguirre discussed with other employees how to alternate restroom use. In the presence of two other salesmen, Mr. Aguirre asked Mr. Felix for permission to take a meal break and use the restroom. Telling all three salesmen that the sales staff was always on a break, Mr. Felix refused Mr. Aguirre's request, saying that if Mr. Aguirre did not like it, he could just leave.[22] At another Sears tent sale held sometime in October, when Mr. Aguirre asked Mr. Felix to identify cars whose sale would deliver good commissions, Mr. Felix replied that employees who do not trust in the company should leave its employ.

On October 28, when Mr. Aguirre, after conferring with fellow employees, asked Ms. Montenegro about the sales staff's entitlement to a minimum wage draw against commissions, Ms. Montenegro told him that if he wanted a minimum wage job,

the sales job was not the job for him. Later that same day, during the course of his meeting with Mr. Aguirre, Mr. Plaza told Mr. Aguirre that if he did not like the company's refusal to divulge vehicle costs, he was more than welcome to leave or to quit, and Mr. Plaza twice told Mr. Aguirre that if he did not trust the company, he did not need to work there.

An employer that responds to protected concerted protests of working conditions by telling employees they can leave if they do not like the conditions coerces employees within the meaning of Section 8(a)(1) of the Act. Inviting employees to quit their employment in such circumstances interferes with the free exercise of employees' Section 7 right to protest working conditions. *Alton H. Piester, LLC*, 353 NLRB 369 (2008); *House Calls, Inc.*, 304 NLRB 311, 313 (1991); *Chinese Daily News*, 346 NLRB 906 (2006); *McDaniel Ford, Inc.*, 322 NLRB 956 fn. 1 (1997) ("It is well settled that an employer's invitation to an employee to quit in response to their exercise of protected concerted activity is coercive, because it conveys to employees that . . . engaging in . . . concerted activities and their continued employment are not compatible, and implicitly threatens discharge of the employees involved.")

Mr. Felix, Ms. Montenegro, and Mr. Plaza's suggestions to Mr. Aguirre that he cease working for the Respondent if he did not like its terms and conditions of employment were made in response to his protected concerted activities described above. As such, the suggestions were coercive. Accordingly, the Respondent's conduct in this regard violated Section 8(a)(1) of the Act as alleged in the complaint.

The complaint further alleges the Respondent violated Section 8(a)(1) of the Act when Mr. Plaza threatened employees with unspecified reprisals. The basis for the allegation is Mr. Plaza's statement to Mr. Aguirre in the October 28 meeting that he was "asking too many questions [about company policies]." The General Counsel argues this statement alone impliedly threatened reprisals if Mr. Aguirre persisted in the protected activity of questioning company practices. While Mr. Plaza expressed displeasure with Mr. Aguirre's protected inquiries and thereby evidenced animus toward those activities, it is too great a stretch to categorize the statement as a threat. Accordingly, I will dismiss that allegation of the complaint.

### D. Discharge of Nick Aguirre

The General Counsel argues that the only reason the Respondent discharged Mr. Aguirre was because of the negative influence Mr. Plaza believed Mr. Aguirre's protected activities had on other employees. The Respondent argues that the only reason the Respondent terminated Mr. Aguirre was his physically intimidating and abusive behavior in the October 28 meeting. Determining the Respondent's motivation requires a *Wright Line* analysis. If the Respondent's argument is accepted, determining whether Mr. Aguirre's behavior at the October 28 meeting justified his discharge requires an *Atlantic Steel* analysis.[23]

Many of the facts surrounding Mr. Aguirre's discharge are not disputed: On October 28, Mr. Aguirre told Ms. Montenegro

---

[22] Although the record shows this exchange to have occurred in mid-September, it fits within the time parameters of complaint allegation 4(c) that such a threat was made "in or about October 2008."

[23] See *Alton H. Piester*, supra; *Waste Management of Arizona, Inc.*, 345 NLRB 1339 (2005).

504                                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

he had learned from an Arizona State agency that the Respondent was improperly withholding minimum wage compensation from its commissioned salespeople. Ms. Montenegro thereafter arranged the October 28 meeting. Just prior to the meeting, Mr. Felix told Mr. Plaza that Mr. Aguirre complained about everything all the time, e.g., about not trusting the company's calculation of commissions and not knowing the vehicle cost. At the meeting, Mr. Plaza criticized Mr. Aguirre's negative attitude toward company policies and procedures. Mr. Plaza told Mr. Aguirre that if he did not trust the company, he did not need to work there. During the course of the meeting, Mr. Aguirre became upset and, according to the various accounts, told Mr. Plaza that he was a "F'ing mother F'ing," a "F'ing crook," and an a—hole, that he was stupid, that nobody liked him, and that everyone was talking about him behind his back. At some point in the meeting, Mr. Plaza fired Mr. Aguirre.

There remain two critical factual disputes as to what happened at the October 28 meeting: (1) At what point in the meeting did Mr. Plaza fire Mr. Aguirre? (2) What were the circumstances and manner of Mr. Aguirre's outburst? The General Counsel's position is that Mr. Plaza fired Mr. Aguirre before Mr. Aguirre verbally assailed Mr. Plaza and that, given the Respondent's unlawful conduct, Mr. Aguirre engaged in no unjustifiable behavior. The Respondent's position, on the other hand, is that Mr. Aguirre's threatening and volatile verbal attack both preceded and was the direct cause of Mr. Aguirre's discharge.

I have carefully considered the testimonies of all witnesses to the October 28 meeting. In doing so, I have taken into account the witnesses' manner and demeanor while testifying, as well as the circumstances surrounding the discharge. I give greater weight to the testimonies of Mr. Plaza, Mr. Felix, and Mr. MacGrew. While discrepancies exist in each of their accounts, I found the three management witnesses demonstrated efforts to convey honest, unbiased recollections of the meeting. Mr. Aguirre's testimony was not as believable. Mr. Aguirre initially testified that at the October 28 meeting, Mr. Plaza bluntly itemized his displeasure with Mr. Aguirre's activities and abruptly fired him. Under further questioning, Mr. Aguirre significantly expanded his account of what occurred at the meeting, including Mr. Plaza's statement that if Mr. Aguirre did not like being kept in ignorance of vehicle cost, he was more than welcome to leave or to quit. Not only was Mr. Aguirre's initial testimony not fully congruous with his expanded version of the meeting, Mr. Plaza's implicit invitation to Mr. Aguirre to accept company policy or quit is incompatible with Mr. Aguirre's earlier testimony of abrupt discharge. Accordingly, I do not credit Mr. Aguirre's account of the October 28 meeting where it conflicts with the accounts of Mr. Plaza, Mr. Felix, and Mr. MacGrew.

Mr. Plaza testified he had no intention of firing Mr. Aguirre when he began the October 28 meeting and, until the conclusion of the meeting, told Mr. Aguirre he was not being fired. Consistent with the credibility assessments herein, I accept Mr. Plaza's testimony. Mr. Plaza, Mr. Felix, and Mr. MacGrew, whose testimonies I have credited, were consistent in placing Mr. Aguirre's verbal outburst before Mr. Plaza announced his discharge. Therefore, I find that Mr. Aguirre's denouncement of Mr. Plaza preceded Mr. Aguirre's discharge. I further find that Mr.

Aguirre's behavior in cursing and derogating Mr. Plaza was at least physically aggressive if not menacing.[24]

A finding that Mr. Aguirre verbally attacked Mr. Plaza before rather than after Mr. Plaza fired him on October 28, does not, of course, automatically resolve the issue of why the Respondent fired Mr. Aguirre. The question remains whether the Respondent fired Mr. Aguirre solely because he engaged in concerted protected activities, as counsel for the General Counsel contends, or whether, as the Respondent contends, the Respondent fired Mr. Aguirre because he insulted Mr. Plaza. Since the existence of an arguably valid reason for discharge cannot, in and of itself, expunge an unlawful reason, the Respondent's motivation must be determined by application of a *Wright Line* analysis.

The General Counsel has proven the elements required by *Wright Line*: the General Counsel has shown that Mr. Aguirre engaged in concerted protected activity, that the Respondent's managers knew of the activity, and that the Respondent bore animus toward the activity, as demonstrated by management's repeated suggestions that unhappy employees seek employment elsewhere. The General Counsel having met his initial burden, the burden of proof shifts to the Respondent to prove it would have fired Mr. Aguirre even in the absence of his protected activity.

The Respondent contends that irrespective of Mr. Aguirre's protected activity, Mr. Plaza would have fired him for his profane personal attack at the October 28 meeting. There is no question that Mr. Aguirre's behavior could reasonably be expected to provoke discharge. However, "[a]n employer cannot simply present a legitimate reason for its action but must persuade by a preponderance of the evidence that the same action would have taken place even in the absence of the protected activity." *Yellow Ambulance Service,* 342 NLRB 804, 804 (2004), citations omitted. In 2008, Mr. Plaza directed Mr. Felix to fire salesman Eddie Yemes because he told Mr. Felix to f— himself. Considering that Mr. Aguirre's October 28 contumely was directed at Mr. Plaza himself and was more extensive and opprobrious than Eddie Yemes' outburst, it is reasonable to conclude that the Respondent would have fired Mr. Aguirre for his verbal attack on Mr. Plaza regardless of the Respondent's animosity toward Mr. Aguirre's protected activity. Accordingly, I find the Respondent has met its shifted burden under *Wright Line* and has shown that it fired Mr. Aguirre because he verbally abused Mr. Plaza.

A finding that the Respondent fired Mr. Aguirre because of his October 28 outburst does not lay the discharge issue to rest. The purpose of the October 28 meeting was to address Mr. Aguirre's complaints about the Respondent's sales compensation practices. Mr. Aguirre's participation in the meeting was a furtherance of his concerted, protected wage complaints. At the meeting, Mr. Aguirre engaged in behavior the Respondent contends was opprobrious. "An employer violates the Act by discharging an employee engaged in the protected concerted activ-

---

[24] In finding Mr. Aguirre's behavior to be belligerent, I rely on credited testimony that in the course of his outburst and prior to the discharge, Mr. Aguirre rose from his chair, pushed it aside and said that if he was fired, Mr. Plaza would regret it. As noted earlier, Mr. Aguirre admitted to menacing language—"You'll get what's coming to you"—although in a different context.

ity of voicing a complaint about his employment terms unless, in the course of that protest, the employee engages in opprobrious conduct, costing him the Act's protection." *Alton H. Piester, LLC*, supra at 374. Although I have found that the Respondent fired Mr. Aguirre because of his contumacious behavior in the October 28 meeting, it must yet be determined whether Mr. Aguirre's behavior was so egregious as to lose the Act's protection. See *Verizon Wireless*, 349 NLRB 640, 646 (2007).

In assessing employee behavior asserted to be egregious, the four factors enunciated in *Atlantic Steel*[25] must be considered: (1) the place of the discussion; (2) the subject matter of the discussion; (3) the nature of the employee's outburst; and (4) whether the outburst was, in any way, provoked by the employer's unfair labor practices.

Considering the first factor, Mr. Aguirre's outburst occurred in the presence of management only, and there is no evidence any unit employee overheard the confrontation. The outburst, therefore, had no impact on workplace discipline, nor did Mr. Aguirre's offensive behavior undermine management authority. The place of the discussion, thus isolated from other workers, argues against loss of protection.[26] As to the second and fourth factors, the discussion related wholly to Mr. Aguirre's protected concerted activity. Further, Mr. Aguirre's outburst was contemporaneous with both the Respondent's censure of Mr. Aguirre's protected activity as "a lot of negative stuff" that negatively impacted the sales force and the Respondent's coercive conduct in pointing out that Mr. Aguirre did not have to work for the Respondent if he did not like or trust the company. Both statements are provocative, and the latter, as detailed above, is an unfair labor practice. The subject matter of the discussion, intertwined as it was with the Respondent's intrinsically provocative unfair labor practices, also militates against loss of protection.[27] Accordingly, the first, second, and fourth *Atlantic Steel* factors weigh in favor of protection.

The third factor, the nature of Mr. Aguirre's outburst, is not so easily resolved. Board law establishes that "employees are permitted some leeway for impulsive behavior when engaging in concerted activity, subject to the employer's right to maintain order and respect [citation omitted]." *Tampa Tribune*, 351 NLRB 1324, 1324–1325 (2007), enf. Denied sub nom. *Media General Operations, Inc. v. NLRB*, 560 F. 3d 181 (4th Cir. 2009).[28] The

standard for determining whether specified conduct is removed from the protection of the Act is whether the conduct is "so violent or of such serious character as to render the employee unfit for further service." *St. Margaret Merry Healthcare Centers*, 350 NLRB 203, 204–205 (2007); *Dreis Rump Mfg. v. NLRB*, 544 F.2d 320, 324, (7th Cir. 1976). Insulting profanity alone is not so egregious as to justify loss of the Act's protection.[29] However, repeated use of profanity in a loud ad hominem attack on a supervisor may lose the Act's protection. *Daimler Chrysler Corp.*, 344 NLRB 1324, 1329–1330 (2005).

The question is whether, in the instant circumstances, Mr. Aguirre retained the Act's protection in spite of his outburst or lost the Act's protection because of the outburst. In *Daimler Chrysler Corp.*, supra, the behavior that cost an employee the Act's protection was the making of repeated, extensive, and personally derogatory statements to a supervisor, behavior similar to Mr. Aguirre's. However, *Daimler* differs from the instant situation in that only one *Atlantic Steel* factor—subject matter—favored protection, while here three of the four *Atlantic Steel* factors favor protection with only the nature of Mr. Aguirre's outburst weighing against protection.

Notwithstanding the fact that only one *Atlantic* steel factor disfavors Mr. Aguirre's protection in this case, the impact of that sole factor must not be minimized. It is clear the Board carefully considers the form and scope of offensive language in opprobrious behavior cases.[30] Upon court remand of *Felix Industries*[31], the Board considered the question of whether the nature of an employee's outburst (factor three), by itself, may outweigh the other *Atlantic Steel* factors. The Board stated that "the nature of [an employee's] outburst must be given considerable weight towards losing the Act's protection." *Felix Industries*, 339 NLRB 195, 196 (2003). While the Board in *Felix Industries* decided that the other factors outweighed factor three in that case, the

---

[25] *Atlantic Steel*, supra at 816.

[26] Remarks made in private are less disruptive to workplace discipline than those made in the presence of fellow employees. *Stanford Hotel*, 344 NLRB 558 (2005); *Noble Metal Processing*, 346 NLRB 795, 800 (2006) (place of discussion weighs in favor of protection where outburst occurred away from employees' work area and did not disrupt the work process).

[27] *Care Initiatives*, 321 NLRB at 152 ("[A]n employer may not rely on employee conduct that it has unlawfully provoked as a basis for disciplining an employee [citation omitted]"); *Datwyler Rubber & Plastics*, 350 NLRB 669, 669–670 (2007) (employee did not lose protection of the Act by calling supervisor a devil whom Jesus Christ would punish for requiring a 7-day work week); *Stanford Hotel*, supra (brief profanity protected where it was a response to unlawful threats).

[28] The protections of Sec. 7 would be meaningless were the Board not to take into account the realities of industrial life and the fact that disputes over wages, bonus, and working conditions are among the

disputes most likely to engender ill feelings and strong responses. *Consumers Power Co.*, 282 NLRB 131, 132 (1986).

[29] See *Alcoa Inc.*, 352 NLRB 1222 (2008), (referring to supervisor as "egoistical f—er"); *Tampa Tribune* supra, (calling supervisor a "stupid f—ing moron."); *Union Carbide Corp.*, 331 NLRB 356, 359 (2000) (calling supervisor a "f—ing liar"); *Burle Industries*, 300 NLRB 498, 502, 504 (1990) (calling supervisor a "f—ing a—hole"); *Thor Power Tool Co.*, 148 NLRB 1379, 1380 (1964), enfd. 351 F. 2d 584 (7th Cir. 1965), (referring to supervisor as a "horse's ass"); *Postal Service*, 241 NLRB 1074 (1979) (referring to acting supervisor as an "a—hole"); *NLRB v. Cement Transport Co.*, 490 F.2d 1024, 1030 (6th Cir. 1974) (referring to company president as a "son of a bitch").

[30] See, e.g., *Alcoa, Inc.*, at 1226 (employee/union steward's pejorative description of a supervisor as an "egotistical f—er" was "a single verbal outburst of profane language, in a disciplinary meeting . . . unaccompanied by physical contact or threat of physical harm," which did not destroy the Act's protection); *Beverly Health & Rehabilitation Services*, 346 NLRB 1319, 1323 (2006) (employee conduct "consisted of a brief, verbal outburst of profane language unaccompanied by insubordination, physical contact, or threat of physical harm); *Trus Joist Macmillan* 341 NLRB 369, 371–372 (2004) (employee's repetitious remarks that were personal and highly offensive cost him the protection of the Act); *Datwyler Rubber & Plastics, Inc.*, supra, (employee outburst protected, as it was spontaneous, brief, and unaccompanied by physical contact or threat of physical harm).

[31] *Felix Industries*, 331 NLRB 144, 146 (2000), enf. denied and remanded 251 F.3d 1051 (D.C. Cir. 2001).

506                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Board emphasized that the supervisor involved, who was also the son of the company's president, directed "extremely hostile" remarks to the employee, provoking his response that the supervisor was just a "f—ing kid" to whom the employee did not have to listen. Id. at 195, 196–197.

In applying the balancing test utilized by the Board in these kinds of cases, I have particularly noted the following circumstances: Mr. Aguirre's outburst was qualitatively and quantitatively more opprobrious than that considered in *Felix Industries*. Without extreme provocation from overt hostility or antagonism from Mr. Plaza, Mr. Aguirre repeatedly reviled Mr. Plaza in obscene and personally denigrating terms accompanied by menacing conduct and language.  Considering these circumstances and the record as a whole, I find that Mr. Aguirre's behavior at the October 28 meeting was so egregious as to forfeit the protection of the Act.  Accordingly, I find the Respondent did not violate the Act when it discharged Mr. Aguirre.

VI. CONCLUSIONS OF LAW

1.  The Respondent is an employer engaged in commerce and in a business affecting commerce within the meaning of Section 2(6) and (7) of the Act.

2.  The Respondent violated Section 8(a)(1) of the Act by telling employees they could quit or leave the Respondent's employ if they did not like company policies and/or procedures.

3.  The unfair labor practices set forth above affect commerce within the meaning of Section 8(a)(3) and (1) and Section 2(6) and (7) of the Act.

REMEDY

Having found that Respondent has engaged in certain unfair labor practices, I find it must be ordered to cease and desist and to take certain affirmative action designed to effectuate the policies of the Act.

[Recommended Order omitted from publication.]